No. 22-35474

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

DAVID G. DONOVAN, *et al.*

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, *et al.*

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Washington
No. 4:21-cv-05148-TOR
Hon. Thomas O. Rice

_____

**APPELLANTS' OPENING BRIEF**

_____

Nathan J. Arnold
Arnold & Jacobowitz PLLC
2701 First Avenue, Suite 200
Seattle, WA 98121
(206) 799-4221
Nathan@CAJlawyers.com

Simon P Serrano
Silent Majority Foundation
5238 Outlet Dr
Pasco, WA 99301-8969
(509) 567-7083
pete@silentmajorityfoundation.org

*Attorneys for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

I.     INTRODUCTION ........................................................................ 1

II.    JURISDICTIONAL STATEMENT ............................................ 6

III.   ISSUES PRESENTED................................................................. 6

IV.   STATUTORY AND REGULATORY AUTHORITIY ............................... 7

V.    STATEMENT OF THE CASE .................................................... 7

VI.   SUMMARY OF THE ARGUMENT ..........................................12

VII.  STATEMENT OF FACTS .........................................................13

VIII. STANDARD OF REVIEW .......................................................14

IX.   ARGUMENT...............................................................................16

          A. This Case Remains Justiciable and Ripe. .....................................18

          B. Plaintiffs have Standing to Challenge the Executive Orders…….21

          C. Reversal and Remand are Appropriate…………………………..22

I. The President Exceeded the Scope of Authority.....................22

II. The District Court Erred in Concluding that the Executive Orders Did Not Violate the Federal Property and Administrative Services Act..................................................................................32

      i.      The Eos Violate FPASA' Section 101 and 121..........32

      ii.     The Government Cannot Meet its Burden................35

III. The District Court Erred in Concluding that the Executive Orders Did Not Violate the Administrative Procedure Act....................37

IV. The Executive Orders Violate the Federal Procurement Policy...39

V. The EO's Run Afoul of Federalism.....................................40

VI. The EO's Cannot Pass RFRA Scrutiny.............................41

    A. The Vaccine Mandate Does Not Achieve a Compelling Government Interest as they Failed to Cease Transmission of the Virus..........................................................46

    B. The Government Has Not Employed the Least Restrictive Means to Achieve the Proclaimed Interest in Contracting Efficiency......................................................46

    C. RFRA Has No Exhaustion Requirement.....................56

X.     CONCLUSION ............................................57

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Organization v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) ...................................................................... 25, 28, 32, 33

*Ala. Ass'n of Realtors v. HHS,* 141 S. Ct. 2485, 2489 (2021) ................... 30, 35, 40

*Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.2011) ........ ........................................................................................................ 14, 15

*Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) ...................................... 14

*Ashcroft v. Iqbal, 556 U.S. 552* ........................................................................... 16

*Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012) ............................... 15

*Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) ...................... 34

*Austin, et al. v. U.S. Navy Seals 1-26 et al., 142 S. CT. 1301* (2022) ..................... 5

*Ayestas v. Davis,* 138 S. Ct. 1080, 1093 (2018) ................................................... 33

*Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206, 1212 (9th Cir. 2018) ................. 15, 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ......................................... 16

*Benavidez v. Cty. of San Diego, 993 F.3d 1134 (9th Cir. 2021).* ........................... 15

*Biden v. Missouri, 654-55* (2022) ................................................................... 10, 11

*Bond v. United States,* 572 U.S. 844, 862 (2014) ........................................... 35, 40

*Brnovich v. Biden*, 562 F.Supp.3d 123, 152 (D.Ariz, 2022) .............. 2, 3, 10, 11, 30

*BST Holdings, LLC v. OSHA,* 17 F.4th 604 (4th Cir. 2021) ........................... 5, 9, 26

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 n.3, 726, 728 (2014) ......... ........................................................................................................ 41, 42

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996 ................................................................................................... 32

*Chrysler Corp. v. Brown,* 441 U.S. 281, 306, 99 S. Ct. 1705 (1979). .............. 24, 31

*Col. Fin. Mgmt. Officer v. Austin,* No. 8:22-CV-1275-SDM-TGW, 2022 WL 3643512 *14 (M.D. Fla. Aug. 18, 2022 ................................................... 42

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) ................37, 38

*Dobbs v. Jackson Women's Health Org., No. 19-1392 (2022)2,* ........................... 2

*Edwards v. Marin Park, Inc. 356 F.3d 1058 (9th Cir. 2004)* ..................................16

*Elrod v. Burns.,* 427 U.S. 347, 373 (1976). ......................................................... 9

*Eminence Cap., LLC v. Aspeon Inc., 316 F.3d 1048* (9th Cir. 2003). .....................16

*Employment Division v. Smith*, 494 U.S. 872 (1990)...........................................42

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 160–61 (2000)........34

*Feds for Medical Freedom v. Biden*, 2022 WL 188329 (S.D. Tex. Jan. 21, 2022) ...
..................................................................................................................9, 20

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*654 F.3d 989, 993–94 (9th
Cir.2011)...............................................................................................14

*Florida v. Nelson*, 2021 WL 6108948, at *11–12 (M.D.Fla. Dec. 22, 2021) ..........
..................................................................................................................33

*Franklin v. Massachusetts,* 505 U.S. 788, 800–01; 28-29 (1992) ...................38, 39

*Georgia v. Biden,* No: 21-14269, *27, 11th Circuit (August 26, 2022) ...................
.................................................................................. 11, 22, 23, 24, 29, 31

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–
31 (2006) ...................................................................................42, 43, 55

*Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008) ..........................................15

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,* 471 U.S. 707 (1985),.............40

*Holt v. Hobbs,* 574 U.S. 352 (2015), ......................................................................41

*Kentucky v. Biden*, 23 F.4th 585, 609–10 (6th Cir. 2022). 9, 23, 26, 29, 30, 31, 34, 41

*Louisiana v. Becerra*, 2022 WL 16571 (W.D. La. Jan. 1, 2022)............................10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) ...............................21

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012)................................35

*Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 327 (4th Cir. 2004) ......................33

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661 (2022)...............................9, 11

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018) ......................................................................................40

*Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1068-69 (9th Cir. 2008)...43, 44

*Nayab v. Capital One Bank (U.S.)*, 942 F.3d 480, 495-96 (9th Cir. 2019)..............13

*NFIB v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022).................... 6, 9, 27, 29, 30, 35

*Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838-39 (9th Cir. 2012)...............................................................................22, 55

*Pimentel v. Dreyfus,* 670 F.3d 1096, 1105 (9th Cir. 2012) .....................................15

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) ................14

*Sambrano v. United Airlines, Inc.* (5th Cir. Feb. 17, 2022). ..............................8, 21

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)......................................20

*Texas v. Becerra*, 2021 WL 6198109 (N.D. Tex. Dec. 31, 2021) ...............9, 10, 18,

*U.S. Navy SEALs 1-26 v. Biden*, No. 22-10077 (5th Cir. 2022) ..........................5, 19

*UAW-Labor Emp. and Training Corp. v. Chao*, 325 F.3d 360, 366-67 (D.C. Cir. 2003) ...................................................................................................28

*United States v. Sterling,* 75 M.J. 407, 410 (C.A.A.F. 2016), cert. denied, 137 S. Ct. 2212 (2017)...........................................................................................19

*Vorcheimer v. Phila. Owners Ass'n,* 903 F.3d 100, 105 (3d Cir. 2018) ................33

*Webb v. Trader Joe's Co., 999 F.3d 1196* (9th Cir. 2021) .....................................16

*West Virginia v. EPA,* 142 S. Ct. 2587 (2022)..................................................29, 30

*Zucht v. King*, 260 U.S 174, 176 (1922).................................................................40

**Statutes and Regulations**

21 U.S.C. § 360bbb.................................................................................................49

28 U.S.C. § 1292..................................................................................................... 6

40 U.S.C. § 101 ................................................................... 3, 22, 23, 32, 33

40 U.S.C. § 121 ......................................................................................24, 34

41 U.S.C. § 1707.............................................................................4, 7, 35, 39

42 U.S.C. § 2000bb-1 ....................................................................42, 43

42 U.S.C. § 2000bb-2 ............................................................................19

5 U.S.C. § 551 ................................................................................37, 38

86 Fed. Reg. at 63,423 ....................................................................35, 39

86 Fed. Reg. at 63,424 ..............................................................4, 36, 40

EO 14042, *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors* ................... 4, 11, 17, 19, 25, 26, 27, 28, 33, 36, 37, 39

EO 14043, *Executive Order Requiring Coronavirus Disease 2019 Vaccination for Federal Employees* ...................................................... 17, 19, 26, 33, 37, 39

Federal Property and Administrative Services Act of 1949 (Procurement Act) .......
........................................................................................................3, 6, 23

## Other Authorities

Becerra, Xavier, Secretary of Health and Human Service*s, Determination that a Public Health Emergency Exists. October 13, 2022.* Available at https://aspr.hhs.gov/legal/PHE/Pages/covid19-13Oct2022.aspx..................18

Brownstone Insitute Report October, 2021. Available at https://brownstone.org/articles/16-studies-on-vaccine-efficacy/.................47

Center for Disease Control: Data Tracker (updated September 7, 2022) Available at https://covid.cdc.gov/covid-data-tracker/#variant-proportions.................51

*CDC published report re: Barnstable County, MA, July, 2021. Available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm* ........................47

*COVID-19 Vaccine Effectiveness Against the Omicron (B.1.1.529) Variant*, 386 NEW ENG. J. MED. 1532, 1537 (2022) .....................................................51

DOE Hanford Document: HNF-67450, Rev. 3, September 2022: *Hanford Site COVID-19 Workplace Safety Plan for Federal Employees*, at 2.................19

*Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections*, 387 NEW ENG. J. MED. Available at https://www.nejm.org/doi/pdf/10.1056/NEJMoa2203965 ....................50, 51

*Fauci admits that COVID-19 vaccines do not protect 'overly well' against infection*, FOX NEWS (July 12, 2022), *at* https://www.foxnews.com/media/fauci-admits-covid-19-vaccines-protect-overly-well-infection* ................................................................................52

Jinyan Liu et al., *Vaccines Elicit Highly Conserved Cellular Immunity to SARS-CoV-2 Omicron*, 603 NATURE 493, 495 (2022) ........................................51

Public Health Scotland, COVID-19 & Winter Statistical Report As At 31 January 2022, at 41 ...................................................................................................49

*Renewal of Determination that a Public health Emergency Exists.* Secretary Xavier Becerra October 13, 2022. https://aspr.hhs.gov/legal/PHE/Pages/covid19-13Oct2022.aspx. Last accessed: October 17, 2022. ......................................18

Statens Serum Institut, COVID-19 Rapport on omikronvarianten at 6, table 4 (Dec. 21, 2021), https://www.docdroid.com/C9UY7Ef/dk-serum-institut-rapport-omikronvarianten-21122021-14tk-pdf. ........................................................48

UK Health Security Agency, COVID Vaccine Surveillance Report, Week 7, February 17, 2022. Available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1055620/Vaccine_surveillance_report_-_week7.pdf. ..............................................................................................................................49

Yinon M. Bar-On et al., *Protection by a Fourth Dose of BNT162b2 Against Omicron in Israel*, 386 NEW ENG. J. MED. 1712 (Apr. ...........................51

## I.  INTRODUCTION

Prior to September 2021, the Federal Government has never, under the Procurement Act or otherwise, mandated vaccination for a civilian population. Not for smallpox, deadly for one-third of those infected, and eradicated by that vaccine; not for the lifetime-crippling polio, nearly wiped out through vaccination; and not for influenza, which causes billions of dollars of lost productivity every single year. And through the summer of 2021, President Biden's Administration still recognized that vaccine mandates were "not the role of the federal government."[1]

The Procurement Act itself has never been used to mandate any health-based requirement, much less an irreversible emergency use authorization therapy. The President cannot utilize the Procurement Act to compel "federal contractor employees to refrain from consuming soda or eating fast food" by claiming obesity

---

[1] Press Briefing by Press Secretary Jen Psaki, July 23. 2021. In response to the question of whether "the federal government should step in and issue mandates," Secretary Psaki responded "that's not the role of the federal government."

Available at: https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

Last accessed: October 22, 2022.

1

reduces productivity.[2] The President cannot blacklist employees cited for a speeding or seat belt ticket, because a hypothetical car accident could decrease productivity. In the wake of *Dobbs v. Jackson Women's Health Org.*, the next administration cannot bar federal contractor employees from seeking abortions because recovery time might reduce productivity.[3] And this administration could not, and cannot today, in the name of productivity, while admitting its true purpose lies elsewhere, mandate an irreversible medical procedure.

Prior to this case being dismissed under Fed. R. Civ. P. 12, by the Federal District Court of Eastern Washington, the Federal District Court of Arizona, in a case based upon substantially the same factual setting, and the same legal theories, entered a fully opposite ruling.[4] That court granted an injunction under Fed. R. Civ. Pro. 65, since made permanent, correctly holding: "The Contractor Mandate exceeds the scope of the President's authority under the Procurement Act." *Brnovich v. Biden*, 562 F.Supp.3d 123, 167 (D. Ariz., 2022).

---

[2] *Brnovich v. Biden*, 562 F.Supp.3d 123, 152 (D.Ariz., 2022)

[3] *Dobbs v. Jackson Women's Health Org.,* No. 19-1392 (2022).

[4] The Arizona court also citedfour parallel cases involving states' challenges to the Contractor Mandate, from district courts in Kentucky, Georgia, Missouri and Florida. *Brnovich v. Biden*, 562 F.Supp.3d 123, 137 (D.Ariz., 2022)

As of the date of this Brief, the Contractor Mandate is enjoined in the following states: Arizona, Arkansas, Florida, Iowa, Kentucky, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, South Dakota, Tennessee, and Wyoming

Where the Arizona District Court, upon the same legal theories, and other Circuit Courts, found substantially similar facts satisfied the stringent test for injunction, it was error for the Eastern District of Washington to dismiss this case, particularly without leave to amend, on the much lower standard of Fed. R. Civ. P. 12.

There are several, independent, fatal defects in the Lower Court's ruling:

The President lacks the authority to issue EOs that mandate any vaccination under the Procurement Act. As the Arizona court, other courts, have held, the Federal Property and Administrative Services Act of 1949 (Procurement Act), 40 U.S.C. § 101 et seq. does not go anywhere near that far.

The Government failed to follow the necessary procedural steps to promulgate its unauthorized mandate. As the District Court in Arizona (*Brnovich v. Biden,* 562 F. Supp. 3d 123 (D. Ariz. 2022)) held, the Office of Management Budget's ("OMB") Federal Register Notice adopting the contracting elements of the mandates failed in three respects:

3

A. It did not provide analysis or evidence supporting the determination that the mandates were necessary or proper *Id.* at 134, 151;

B. It was not subject to public comment *Id.* at 134; and

C. It failed to "claim that urgent and compelling circumstances [that] merited forgoing the notice-and-comment procedures set forth in the Office of Federal Procurement Policy Act (the 'Procurement Policy Act'), 41 U.S.C. § 1707(d)."*Id.* at 134.

In the end, the Arizona District Court held that the Contractor Mandate, EO 14042, violated the Procurement Act (*Id.*, at 157), but that the revised OMB determination did not violate the Procurement Policy Act as the accompanying Federal Register Notice (issued nearly one month after the original solicitation) solicited comments (86 Fed. Reg. at 63,424). *Id.* at 159.

In addition, the EOs, on their face, and in application, invade the Police Powers of the several states. The health and safety of her citizens, generally, and specially as it regards compulsory vaccination, has long been the province of the sovereign States. The Procurement Act's own text does not speak at all about the health and safety of those citizens of these States united who performed services fulfilling the contracts procured by the Federal Government. Indeed, that role, if it can intrude upon the States at all, is delegated to OSHA, whose mandate has already

4

been struck by our Supreme Court, despite being much more lenient than the mandate at bar.

Independently, the EO's violate the Religious Freedom Restoration Act ("RFRA"), by failing to achieve an alleged compelling purpose by the "least restrictive means" when burdening employees' Free Exercise rights, by forcing them to choose between their sincere religious beliefs and their livelihoods, their chosen jobs.[5] Most notably, despite the ever changing guidance from the CDC, the Contractor Mandate is even more stringent than the mandate recently struck down by the Supreme Court, which allowed for a masking and testing exception, and fully excluded anyone working outside - a less restrictive means of achieving the

―――――――――――――――

[5] As the Fifth Circuit recently held, "Plaintiffs are 'staring down even more than a choice between their job(s) and their jab(s).' By pitting their consciences against their livelihoods, the vaccine requirements would crush Plaintiffs' free exercise of religion." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022) (stay granted) *Austin, et al. v. U.S. Navy Seals 1-26 et al.,* 142 S.Ct. 1301 (2022) (granting stay in part, denial in part; order of stay granted only insofar as it precludes the Navy from considering respondents' vaccination status in making deployment, assignment, and other operational decisions) quoting *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

expressed government purpose, which could, at least in theory, allow for accommodation of sincere religious belief. *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 671 (2022). The unsustainable OSHA Mandate allowed for specific exemptions, not allowed by the Contractor Mandate, which is an admission that the "least restrictive means" were not employed in the mandates here.

## II.    JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §1331 and 1343 and entered an Order denying Plaintiff's Motion for Declaratory Relief, Temporary Restraining Order, and a Preliminary Injunction on December 17, 2021, and a Dismissal of Plaintiff's Complaint on May 12, 2022. Appellants filed this timely appeal on June 9, 2022. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## III.    ISSUES PRESENTED

1. Did the District Court err in holding that the Executive Orders are authorized by the Federal Property and Administrative Services Act ("FPASA" or "Procurement Act"), 40 U.S.C. §§ 101 and 121? *Yes.*

2.    Do the Executive Orders violate the Administrative Procedure Act by serving as a rule or regulation requiring a notice and comment period and failing to provide such an opportunity? *Yes.*

3.    Do the Executive Orders violate the Federal Procurement Policy, 41 U.S.C. § 1707(a), which mandate the issuance of, and adherence to the Safer Federal

6

Workforce Task Force Guidance upon the Director of the Office of Management Budget's ("OMB") approval of the Guidance without notice and comment without sufficient justifications of "urgent and compelling" circumstances? *Yes.*

4.      Do the EO's run afoul of Federalism? *Yes*.

5.      Do the EO's fail the level of scrutiny demanded by the Religious Freedom Restoration Act ("RFRA")? *Yes*.

## IV.    STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory, constitutional, and regulatory authorities appear in the Addendum to this brief.

## V.    STATEMENT OF THE CASE

This appeal is taken from two orders issued in the District Court in and for the Eastern District of Washington's ("District Court"), case No.: Case No.: 4:21-cv-05148-TOR. First, an Order Denying Plaintiffs' Motion for Declaratory Relief, Temporary Restraining Order, and a Permanent Injunction, issued on December 17, 2021. ER140 – ER159. Second, on May 12, 2022, the District Court granted Appellees' Motion to Dismiss Plaintiffs' claims with prejudice. ER002-ER016. Plaintiffs filed a Notice of Appeal on June 9, 2022.

ER002-ER016. The District Court erred by dismissing claims raised by 307 of the 314 Plaintiffs, concluding that the matter was not ripe as these Plaintiffs had

suffered no harm while conceding that the seven remaining Plaintiffs who had been placed on administrative leave without pay or terminated had stated a claim sufficient for relief. Judge Rice's decision on this issue aligns with current Fifth Circuit case law that concludes that leave without pay is an adverse employment action that injunctive relief can remedy. *Sambrano v United Airlines, Inc.* holding that "that the district court erred as to the plaintiffs who remain on unpaid leave and have brought Title VII actions. Plaintiffs are being subjected to ongoing coercion based on their religious beliefs. That coercion is harmful in and of itself and cannot be remedied after the fact." *Sambrano v. United Airlines, Inc.*, No. 21-11159, at *5-6 (5th Cir. Feb. 17, 2022). ER-008. Among other things, all Plaintiffs except the three who decided not to submit religious exemptions to the COVID-19 vaccine requirements were sufficiently compelled to compromise their religious beliefs based upon the threat of termination posed by the Contractor Mandate, to receive a vaccine they believed abhorrent, a form of damage in and of itself. Their constitutional right to religious freedom was abridged by those very real threats, and they were thus damaged. As the United States Supreme Court has held, and this Court's sister Court in the Fifth Circuit recently affirmed, "the loss of constitutional freedoms 'for even minimal periods of time... unquestionably constitutes irreparable injury.'" *BST Holdings, LLC. V. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) *citing*, *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

8

As to the RFRA claims, Judge Rice erroneously concluded that "Plaintiffs have failed to state a cognizable claim for violations of the RFRA." *Id.* at 13.

These EOs have been widely litigated in multiple Circuits in actions based on the same legal theories. Recently, the Sixth Circuit correctly concluded that the President's (and the U.S. Government's) authority falls far short of the express authorization needed to justify such "a significant encroachment into the lives—and health—of a vast number of employees." *Kentucky v. Biden*, 23 F.4th 585, 609–10 (6th Cir. 2022). See also: *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022). The Sixth Circuit enjoined the EOs, and it has not been alone in grating injunctive relief from these and similar overreaching mandates.[6] Less than a month ago, the Eleventh

---

[6] *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661 (2022) ("*OSHA*") (staying so-called 'OSHA mandate,' which was subsequently withdrawn by agency); *Feds for Medical Freedom v. Biden*, 2022 WL 188329 (S.D. Tex. Jan. 21, 2022) (nation-wide stay of federal employee vaccination mandate), *vacated and remanded* 30 F.4th 503 (5th Cir. Apr. 7, 2022), *reh'g en banc granted and vacated*, 2022 WL 2301458 (5th Cir. June 27, 2022) (reinstating nationwide stay); *Texas v. Becerra*, 2021 WL 6198109 (N.D. Tex. Dec. 31, 2021) & *Louisiana v. Becerra*, 2022 WL 16571 (W.D. La. Jan. 1, 2022) (staying Head Start Mandate in 25 states). The Healthcare Mandate

————————————————

was stayed nationwide in *Louisiana v. Becerra*, 2021 WL 5609846 (W.D. La. Nov. 30, 2021), but that injunction was dissolved and the case remanded by the Supreme Court in *Biden v. Missouri*, 654–55 (2022). The healthcare worker mandate is now back before the district court to consider constitutional challenges not addressed in the Supreme Court's decision. As the Arizona court in *Brnovich v. Biden*, 562 F.Supp.3d 123, 154-55 (D.Ariz., 2022) stated, despite the government's assertions, that case, involving the Contractor Mandate (rather than the Healthcare Mandate) was "clearly distinct from *Biden v. Missouri*, 142 S. Ct. 647, . . .."

Likewise, this case is distinguishable from *Biden v. Missouri* as that case was decided on very narrow facts, such as: (1) the challenged Rule was promulgated by the Secretary of Health, not the US President; (2) the Secretary's decision was based on data "showing that the COVID–19 virus can spread rapidly among healthcare workers and from them to patients, and that such spread is more likely when healthcare workers are unvaccinated;" (3) the Secretary further justified the Rule due to the implications of spreading COVID-19 to the elderly and poor in health (the primary populations served by Medicare and Medicaid); and (4) the Secretary found that "fear of exposure" due to unvaccinated staff could cause individuals to forego non-emergency procedures compounding the impacts to the already short-staffed

Circuit upheld (but limited in geographical scope) an injunction against implementation of EO 14042.[7] It is respectfully submitted that the above entitled Court should follow the path carefully honed by the Arizona District Court, the District Courts of other circuits, and by the Fifth, Sixth and Eleventh Circuits, and by the Supreme Court in *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661 (2022).[8]

---

medical industry. *Id.* For these reasons, and for the reasons discussed in *Brnovich v. Biden at 154-55, Biden v. Missouri* is fully distinguishable from the case at bar.

[7] *Georgia v. Biden*, 46 F.4th 1283, 1285(11th Cir., 2022).

[8] If the legislation creating OSHA, which deals specifically with occupational safety, did not provide sufficient authority for a vaccine mandate, then the Procurement Act which is not at all focused on occupational safety, does not provide any such authority.

11

## VI.   SUMMARY OF THE ARGUMENT

The District Court erred in dismissing the Plaintiff's case under Fed. R. Civ. Pro. 12. The Second Amended Complaint, ER026-ER120, asserts facts as to each individual Plaintiff in detail. A vast number of the religious exemptions were approved, but no accommodations were provided, thus creating an immediate requirement for termination. By way of example only: (1) Plaintiff, Pamela Hartsock, had received a Notice of Right to Sue letter from the EEOC, ¶332, (2) Plaintiff, Thomas Krasner, was granted a religious exemption, but no accommodation and was forced to early retirement, ¶171, and (3) Plaintiff, Gale Lyon, was granted a religious exemption, and a temporary accommodation which required weekly testing, at his personal expense.

Upon similar facts, and pleading the same theories, the plausibility of Plaintiffs' claims was established by their acceptance by, among others, the Arizona District Court, which issued a *permanent* injunction covering that District. Where one Court in this Circuit has found the legal theories posited by Plaintiffs, upon similar facts, not only plausible, but ultimately correct, it was clear error for the Eastern Washington District Court to dismiss this case.[9]

The EOs should have been enjoined, and/or the case should have survived the Motion to Dismiss, or leave to amend should, at minimum, been granted, for several independent reasons. The Procurement Act does not authorize the EOs; the

implementation of the EOs violated the APA and the Federal Procurement Policy [Procurement Policy Act] as the EOs and the associated OMB guidance failed to provide adequate notice and an opportunity for public comment; the EOs violate the FPASA as the EOs exceeded scope of the FPASA by seeking to control individual health decisions; the EOs fun afoul of Federalism by, on its face, attempting to supersede any contrary law within the State's traditional Police Powers; the EOs run afoul of RFRA by either employing means which do not achieve the express compelling government purpose and/or by not employing least restrictive means to do so.

## VII.   STATEMENT OF FACTS

Because this case was dismissed pursuant to Rule 12(b)(6), the facts relevant to the dismissal are those set forth in the operative Complaint. ER026-ER120.  The District Court was obligated to consider those facts as true and correct,[10] and made no findings to the contrary.  Accordingly, the Second Amended Complaint, ER026-ER120, is here incorporated, as though fully set forth, as the Plaintiffs' Statement of Facts.

---

[10] *Nayab v. Capital One Bank (U.S.)*, 942 F.3d 480, 487 (9th Cir. 2019) *citing Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 981 (9th Cir. 2017).

# VIII. STANDARD OF REVIEW

This Appeal is from two Orders from the lower court: a denial of injunctive relief and the dismissal of all claims with prejudice. Regarding the District Court's denial of Appellants' request for Injunctive Relief, "[a] district court's decision regarding preliminary injunctive relief is subject to 'limited review' on appeal." *See Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) *Citing Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 993–94 (9th Cir.2011). The limited discretion allows this Court to set aside the lower court's decision, if the court "'abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Id.* See also: *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) citing *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.2011). Thus, this Court's standard of review for a denial of a Preliminary Injunction is an erroneous legal or on a clearly erroneous finding of fact, which will be reviewed de novo. *Id.*

Prior to dismissal, the District Court abused its discretion in denying the Plaintiffs' request for Preliminary Injunction as it failed to apply the "correct legal rule…to the relief requested" and the District Court's misapplication of the standard "was ... illogical, ... implausible, or ... without support in inferences that may be drawn from the facts in the record.'" *Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012) *citing: Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Plaintiffs-Appellants' burden was to "demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008). "[A] stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies,* 632 F.3d 1127, 1131 (9th Cir. 2011). Plaintiffs-Appellants met that burden and certainly met threshold pleading standards to state a claim for relief under RFRA and that the challenged EOs are not authorized by the Procurement Act, as several other courts have correctly found.

This Court reviews the lower court's decision on a Motion to Dismiss *de novo* and applies the abuse of discretion standard. *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1141–42 (9th Cir. 2021). "A motion under Rule 12(b)(6) should be granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,' construing the complaint in the light most favorable to the plaintiff." *Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206,

1211 (9th Cir. 2018) citing *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1061 (9th Cir. 2004).

Where the lower court dismisses a matter with prejudice and without leave to amend, it must be "'clear on *de novo* review that the complaint could not be saved by amendment.'" *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021) citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam). Thus, dismissal is improper where the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" and where a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007).

## IX. ARGUMENT

The District Court erred in denying Appellants' request for a Preliminary Injunction and in Dismissing the case with Prejudice as Plaintiff-Appellants raised sufficient allegations, supported by fact, to demonstrate that Defendant-Appellees had engaged in the alleged conduct, acting outside the scope of their authority *and* violating Plaintiffs' rights, meeting the grant of injunctive relief. ER241.

On September 9, 2021, the President directed "[e]xecutive departments and agencies" to include a clause in almost all new procurement contracts, contract

extensions, and renewals, requiring the contractor (and subcontractors) to "comply with all guidance … published by the" Safer Federal Workforce Task Force, for "the duration of the contract." EO 14042, §§ 2, 5. In issuing Executive Order 14043, the President declared it "is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law." EO 14043, § 1. The President took the actions claiming authority under the Constitution and the laws of the United States of America, including, specifically, the Procurement Act. *See* EO 14042, Introduction. Not surprisingly, the issuance of the challenged Executive Orders occurred *after* President Biden stated he would take no action and *after* the CDC confirmed that vaccinated persons can contract and transmit COVID-19, and after the CDC recognized the prophylactic value of natural immunity, rendering the Federal Government's refusal to change course independently arbitrary and capricious.[11] These reasons alone suffice to overturn the District Court's decision, but they are not the lone reasons for so doing. The basis for this Court to overturn the lower decision includes:

I. The Procurement Act does not authorize the EOs;

II. The implementation of the EOs violated the APA and the Federal Procurement Policy Act;

---

[11] *See: Supra*, FN 3.

IV. The EOs violate the FPASA;

V. The EOs fun afoul of Federalism; and

VI. Standing in contrast to the more lenient OSHA mandate, already struck

by the Supreme Court, these EOs run afoul of RFRA.

Each reason alone provides the basis for this Court overturning the District Court's denial of Plaintiffs' request for injunctive relief. Each should have survived dismissal or, at minimum, leave to amend should have been granted.

### A.      This Case Remains Justiciable and Ripe.

The challenged EOs remain in effect as does the COVID-19 Public Health Emergency, which was renewed by Secretary of Health and Human Services, Xavier Becerra on October 13, 2022.[12] While the Department of Energy's Hanford Site leadership has placed a pause on the requirement "to provide proof of vaccination status," the guidance provides that it "may be revisited depending on court decisions or future CDC guidance," providing no assurances to the federal employee-plaintiffs

-----

[12] *Renewal of Determination that a Public health Emergency Exists.* Secretary Xavier Becerra October 13, 2022. https://aspr.hhs.gov/legal/PHE/Pages/covid19-13Oct2022.aspx. Last accessed: October 17, 2022.

impacted by EO 14043.[13] Notwithstanding the DOE Hanford Site guidance, the Hanford contractors have not modified the guidance, and all 300 plus contractor-Plaintiffs remain at risk of enforcement of EO 14042, leaving these plaintiffs in the untenable position of requiring them to violate their religious rights in order to retain employment. And several of the Plaintiffs have already been injured by enforcement of the Contractor Mandate, and can be aided by an equitably crafted injunction, which can include mandatory provisions.

As nearly all Plaintiffs sought religious exemptions from the COVID-19 vaccine, RFRA is a critical element to this case. Importantly, the Fifth Circuit recently held that RFRA applies to all branches of the United States government, including "every 'branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States[.]' 42 U.S.C. § 2000bb-2(1).'" *U.S. Navy SEALs 1-26 v. Biden*, 27 F.4th 336, 345-46 (5th Cir. 2022), quoting *United States v. Sterling,* 75 M.J. 407, 410 (C.A.A.F. 2016), cert. denied, 137 S. Ct. 2212 (2017). The Court further held that "'RFRA, in turn, sets the standards binding every department of the United States to recognize ***and accommodate*** sincerely held religious beliefs.'" *Id.* In this case, the failure of the United States Department of

---

[13]  DOE Hanford Document: HNF-67450, Rev. 3, September 2022: *Hanford Site COVID-19 Workplace Safety Plan for Federal Employees*, at 2.

Energy and its contractors "to recognize and accommodate sincerely held religious beliefs" constitute a violation of RFRA by an "agency" (Department of Energy) and an "instrumentality" (contractors) of the United States. Moreover, the continued failure to accommodate religious beliefs leaves each plaintiff at risk of termination or violation of an individual's sincerely held religious belief.

Appellee-Defendants' RFRA violations, as evidenced by the continued risk of termination or religious violation, is the ripeness of this matter. To be ripe, the threat a plaintiff faces must be "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). As Judge Brown in the Southern District of Texas held, "[t]he court does not have to speculate as to what the outcome of the administrative process will be. Many plaintiffs have not only declined to assert any exemption but have also submitted affidavits swearing they will not. The court takes them at their word." *Feds for Medical Freedom v. Biden*, No. 3:21-cv-356 (N.D. Tx. Jan. 21, 2022). Here, the court need not speculate what might happen to Plaintiffs, because many Plaintiffs' religious accommodations were denied, and the few accommodations that were granted were temporary in nature (60 days) and expired in March 2022. *See* ER34, ER37, ER44, ER47, ER53, ER55, ER58, ER61, ER65, ER66, ER67, ER69, ER73, ER74, ER76, ER87-ER88, ER90, ER 92.

. Plaintiffs are forced to continue through the religious accommodation process as some Plaintiffs were placed, on administrative leave without pay over one year ago, and remain in that status. ER42, ER43, ER57. Leave without pay has recently been held to violate individual religious rights. *Sambrano v. United Airlines, Inc.*, No. 21-11159, at *5-6 (5th Cir. Feb. 17, 2022). It should also be noted that even if the President were to rescind the EO's, this appeal remains justiciable. [cite 'flick of a pen' case].

### B. Plaintiffs have Standing to Challenge the Executive Orders.

Focusing solely on the RFRA aspect of this action lends to one logical conclusion: **all** Plaintiffs who have sought and been denied a final religious accommodation from the COVID-19 vaccine, or whose religious exemption has expired, or who have not received a reasonable accommodation, have standing to support their claims in this lawsuit; Plaintiffs also maintain standing through the following ripe causes of action to challenge the EOs under RFRA, the Federal Procurement Act, and the Administrative Procedures Act.

Plaintiffs' standing is demonstrable through their individualized showing of an actual or imminent injury-in-fact that is traceable to Appellee-Defendants' conduct, which this Court can redress through a favorable ruling. *Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206, 1212 (9th Cir. 2018) Citing *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, Plaintiffs "are suffering 'immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case,'" as Plaintiffs' religious rights and employment continue to be pitted against one another. *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012). Moreover, the United States government continues to require the COVID-19 vaccine, which was mandated outside of the President's authority as the EOs are not authorized by the Procurement Act. Each claim grants standing to Plaintiff-Appellants in this matter.

### C. Reversal and Remand are Appropriate.

### I. THE PRESIDENT EXCEEDED THE SCOPE OF AUTHORITY OUTLINED IN THE PROCUREMENT ACT OF 1949.

"[T]he Procurement Act is all about—creating an "economical and efficient system" for federal contracting. 40 U.S.C. § 101. That is worlds away from conferring general authority for every agency to insert a term in every solicitation and every contract establishing health standards for contractors' employees." *Georgia v. Biden*, 46 F.4th 1283, 1296 (11th Cir. 2022). That Court subsequently concluded that "no statutory provision contemplates the power to implement an across-the-board vaccination mandate. It follows that the President likely exceeded his authority under the Procurement Act when directing executive agencies to enforce such a mandate." *Id.* at 21.

Congress enacted the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 101 *et seq.*—known as the Procurement Act—with the aim of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services and performing related functions including contracting." *Id.* § 101. The Act empowers the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle. ***The policies must be consistent with this subtitle***." *Id.* § 121(a).[14]

The text of the Procurement Act is clear: the President can direct internal government policies to provide the "Federal Government" a more efficient "system for" contracting. 40 U.S.C. §§101, 121. It says nothing about authority to impose forced vaccinations (or other medical procedures) on employees of private, contracting entities in an effort to make them supposedly more efficient. For this reason, the Sixth and Eleventh Circuits have held the Contractor Mandate invalid. *Kentucky*, 23 F.4th at 605; *Georgia*, 46 F.4th at 1295. The Eleventh Circuit further held that the "delegation to carry out those provisions does not grant the President free-wheeling authority to issue any order he wishes relating to the federal government's procurement system. What he can lawfully carry out under § 121(a) are the provisions in a specified part of the U.S. Code." *Id.*, at *12. The Court then

---

[14] Emphasis added.

noted that the President's authority is limited by four words: "consistent with this subtitle," calling these four words out as "explicit legislative policies" and "cabining the President's authority." *Id.* at 13. The Eleventh Circuit further held that "[a] presidential directive can stand only if those subordinate officials have the statutory authority that they are told to exercise" and that both the President and the subordinate agencies lacked such authority. *Id.* at 15.

In sum, the Procurement Act gives the President the authority to direct subordinate executive actors as they carry out its specific provisions; directing them to go beyond the statute's boundaries would neither "carry out" the Act nor be 'consistent with' it. 40 U.S.C. § 121(a). A presidential directive can stand only if those subordinate officials have the statutory authority that they are told to exercise. *Georgia v. Biden*, at 15. The Eleventh Circuit, in noting these limitations, relied on "The 'pertinent inquiry'" the Court explained, was whether the agency action was 'reasonably within the contemplation' of any 'statutory grants of authority' relied on by the regulating agency." *Id.* at * 16 citing *Chrysler Corp. v. Brown,* 441 U.S. 281, 306, 99 S. Ct. 1705 (1979). 306 (emphasis omitted).

Nothing in the Act contemplates that every executive agency can base every procurement decision on the health of the contracting workforce. Instead, the statutory scheme establishes a framework through which agencies can articulate

24

specific, output-related standards to ensure that acquisitions have the features they want. *Id.* at * 17.

"In short, the President's authority to issue Executive Order 14042, and executive agencies' authority to implement it, depend on whether Congress delegated the power to require widespread vaccination through the Procurement Act. All signs suggest that Congress has retained this power rather than passing it on. Agencies' bare authority to set contract specifications and terms is not enough to show that when Congress passed the Procurement Act it contemplated the general power to mandate vaccination." *Id.* at * 30.

Since the passage of the Procurement Act in 1949, the President has enjoyed a considerable degree of deference over decisions to improve the "economy and efficiency" of federal contracting. But the contractor mandate moves far beyond previous Procurement Act cases and now ventures into regulating healthcare for approximately one-fifth of the U.S. workforce. The mandates, with their far-reaching implications, lack a sufficient nexus with improvement of economy and efficiency in federal contracting. The district court's denial of the preliminary injunction should be overturned for multiple reasons.

Even when such deference is afforded, even the D.C. Circuit recognizes that the President does not have a "blank check" and can impose procurement policies only if they have a "close nexus" to "likely savings to the Government." *Khan*, 618

25

F.2d at 792-93. But, the EOs have little to do with efficiency, nor was it the real goal of this "work-around" to mandate vaccines for as many Americans as possible. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021). The Administration's "own documents confirm" as much: it is "naked pretext to invade traditional state prerogatives." *Kentucky*, 23 F.4th at 609 & n.15.

The text of the Procurement Act does not support the exercise of authority contained in Executive Order 14042. Second, the contractor mandate is not reasonably related to the Procurement Act's goals of an economic and efficient system for procurement. The connection between the mandate and economy and efficiency is not a sufficient nexus to justify the regulation. Third, the contractor mandate goes beyond even previous extensions of presidential authority under the Procurement Act. Previous cases have read the President's authority broadly, but even those cases could demonstrate a more direct link between the order at issue and efficient operations related to procurement.

The challenged EOs inherently regulate public health that secondarily impact economic conditions; this is clear from a plain reading of the EOs. Section 1 of EO 14043 reads in part:

> It is the policy of my Administration to halt the spread of coronavirus disease 2019 (COVID–19), including the B.1.617.2 (Delta) variant, by relying on the best available data and science-based public health measures. The Delta variant, currently the predominant variant of the virus in the United States, is highly contagious and has led to a rapid rise in cases and hospitalizations…The Centers for Disease Control and

26

> Prevention (CDC) within the Department of Health and Human Services has determined that the best way to slow the spread of COVID–19 and to prevent infection by the Delta variant or other variants is to be vaccinated…
>
> …I have determined that ensuring the health and safety of the Federal workforce and the efficiency of the civil service requires immediate action to protect the Federal workforce and individuals interacting with the Federal workforce. It is essential that Federal employees take all available steps to protect themselves and avoid spreading COVID–19 to their co-workers and members of the public. The CDC has found that the best way to do so is to be vaccinated.

This reads like an OSHA regulation, and the Supreme Court has now told us that OSHA does not have authority to issue such a mandate. *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 671 (2022).

EO 14042, *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors*, fares no better in this regard as it attempts to cloak itself in the Procurement Act by invoking the act.

> This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument as described in section 5(a) of this order. These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government.

While veiling itself as promoting "economy and efficiency in Federal procurement," the EO quickly moves to "ensuring" that Contractors provide "adequate COVID-19 safeguards to their workers." The EO then fully

27

displays its motives: "These safeguards will decrease the spread of COVID-19." Under these circumstances, EO 14042 is clearly not a tool that inherently promotes economic efficiency.

At the lower court Defendants argued that "[c]ourts find a nexus even when '[t]he link may seem attenuated' and even if one can "advance an argument claiming opposite effects or no effects at all.'" ER181. *UAW-Labor Emp. and Training Corp. v. Chao*, 325 F.3d 360, 366-67 (D.C. Cir. 2003) (quoting *Kahn*, 618 F.2d at 789). Defendants then noted that EO 14042 is "concerned with protecting the federal government's financial and operational interests as a contracting party Ensuring that its contractors do not suffer major disruptions from COVID-19 accomplishes just that." *Id.* Defendants then proclaimed that "[t]o anyone who has lived through the COVID-19 pandemic and its resulting economic turmoil, the nexus between reducing the spread of COVID-19 and economic efficiency should be self-evident." *Id.* at 19-20. Finally, Defendants concluded, after noting that six -foot distancing is not always available for workers on the Hanford Site, that a "fully vaccinated workforce will reduce these burdens on Hanford's mission" and summarily concluded that "the Executive Order's explanation is sufficient to show the required nexus between the policy and promoting economy and efficiency." *Id.* at 21.

Appellees' statements demonstrate the Government's position: comply as it's self-evident that COVID-19 is a compelling interest and that the vaccine mandate was narrowly tailored; no more explanation or supporting evidence is provided. These conclusory statements miss the mark of legitimate justification of finding themselves "consistent with" the Procurement Act and leave Appellees' short of legal or logical justification demonstrating the District Court's error in not granting Plaintiff-Appellants' injunction.

And the President cannot expand the breadth of his authority in the face of non-delegation principals, and particularly the Major Questions Doctrine. Defendants "must point to 'clear congressional authorization' for the power [that Defendants] claim[]." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citation omitted).

Such clear authorization is lacking here and the Sixth and Eleventh Circuits have held that the Procurement Act authority question here is a major question. *Kentucky*, 23 F.4th at 606-08; *Georgia*, 46 F.4th at 1295-96.

Likewise, the Supreme Court has already held explicitly that the authority to issue the OSHA workplace mandate was a major question because it "ordered 84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing at their own expense." *NFIB*, 142 S. Ct. at 665. That was so as it was "a significant encroachment into the lives—and health—of a vast number of

29

employees," and thus constituted an "'exercise [of] powers of vast economic and political significance.'" *Id.* (quoting *Alabama Realtors*, 142 S. Ct. at 2489). Defendants cannot credibly distinguish this mandate from the OSHA mandate because it impacts *only* 33 million workers. Notably, the mandate here is more intrusive than the OSHA mandate, which allowed for masking and testing – and the OSHA mandate had some precedent upon which to rely (*see*, *e.g.*, *West Virginia*, 142 S. Ct. at 2608 (quoting *Utility Air*, 573 U.S. at 324)). The Government has no precedent under the Procurement Act to so rely.

These EOs clearly trigger a major question analysis. First, this case involves "a matter of great 'political significance.'" *West Virginia*, 142 S. Ct. at 2620 (Gorsuch, J., concurring) (quoting *NFIB*, 142 S. Ct. at 665). Second, these EOs "seek[] to regulate 'a significant portion of the American economy.'" *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring) (quoting majority opinion, quoting Utility Air, 573 U.S. at 324). Third, it invades traditional state authority, discussed in-depth below. Fourth, the EOs lack any limiting principal. Under the Government's theory it could use the Procurement Act to "mandate that covered employees also wear masks in perpetuity" at "family gatherings, concerts, sporting events, and so on" (*Kentucky*, 23 F.4th at 608) or "refrain from consuming soda or eating fast food." *Brnovich* 562 F.Supp.3d at 152.

In *Chrysler Corp. v. Brown*, the Supreme Court "suggested that the President's authority [under the Procurement Act] should be based on a 'specific reference' within the Act." *Georgia*, 46 F.4th at 1294 (quoting *Chrysler Corp.,* 441 U.S. at 304 n.34). More recently, this Court's sister circuits have held that the best reading of the Procurement Act's plain text is that it grants authority only for the President "to implement systems making the government's entry into contracts less duplicative and inefficient," but does not provide authority to regulate federal contractors to "enhance their personal productivity" (*Kentucky*, 23 F.4th at 605-06) and ""[n]othing in the Act contemplates that every executive agency can base every procurement decision on the health of the contracting workforce… Instead, the statutory scheme establishes a framework through which agencies can articulate specific, output-related standards to ensure that acquisitions have the features they want" (*Georgia*, 46 F.4th at 1295).

The OSH Act speaks explicitly to workers' health and safety, but that more lenient mandate was stricken down by the Supreme Court. By contrast, the text of the Procurement Act makes no mention of worker health and cannot support the more stringent Contractor Mandate.

## II. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE EXECUTIVE ORDERS DID NOT VIOLATE THE FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT ("FPASA").

FAPASA's purpose is to provide the Federal Government with an "economical and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The Executive Orders, however, have actually and materially undermined the efficient and economical delivery of property and services by disrupting the continuity of the federal and federal-contractor workforce, and rendering federally operated nuclear facilities unsafe by leaving these individuals in a position where their jobs may be taken at any moment on a political whim, notwithstanding their religious objection to and employer-granted religious exemption from the COVID-19 vaccine mandate.

### i. The EOs Violate FPASA's Section 101 and 121 as they Lack a Nexus to Government Contracting Efficiency.

While the FPASA "vest[s] broad discretion in the President" it does not provide the President with "a blank check to fill at his will." *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (en banc). "The procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Id*. at 1330-31. The FPASA empowers the President to "prescribe policies and directives that [he] considers necessary to carry out [the FPASA.]" 4 U.S.C. § 121(a). Those policies "*must* be consistent with" the FPASA's

32

purpose, i.e., promoting economy and efficiency in federal contracting. *Id*. § 121(a) (emphasis added). Accordingly, the President must demonstrate a "nexus" between the Executive Orders and the FPASA's purpose of promoting an "economical and efficient system" for federal contracting. 40 U.S.C. § 101; *see Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (explaining that the FPASA is violated when the President does not demonstrate a "nexus" between executive action and the FPASA's policy). The FPASA's text obligates the President to exercise his statutory authority "consistently with [the Act's] structure and purposes," and he failed to do so with EOs 14042 and 14043 *Id*.

Further, the President's power under § 121(a) is limited to what is "necessary" to carry out FPASA. "Necessary" is a "word of limitation" and is often synonymous with "required," "indispensable," and "essential." *Vorcheimer v. Phila. Owners Ass'n,* 903 F.3d 100, 105 (3d Cir. 2018) (quotations omitted); *accord In re Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 327 (4th Cir. 2004). Rather than explaining why a vaccine mandate is required, indispensable, or essential to carrying out FPASA, the government offers only a "threadbare and conclusory rationalization." *Florida v. Nelson*, 2021 WL 6108948, at *11–12 (M.D.Fla. Dec. 22, 2021).

While the term "necessary" is sometimes given a broader reading, *see Ayestas v. Davis,* 138 S. Ct. 1080, 1093 (2018), Congress did not use that word in a broad sense in § 121. In that section, Congress imposed a mandatory duty on the GSA

Administrator to issue regulations that are "necessary" but gave him discretion as to other regulations. 40 U.S.C. § 121(c)(1)–(2) (using "may" in (1) and "shall" in (2)). Congress thus used "necessary" to designate those regulations that GSA must issue. Interpreting "necessary" to mean "simply useful" would read that distinction out of the statute. *See In re MCP No. 165*, 21 F. 4th 357, 392 (6th Cir. 2021) (Larsen, J., dissenting) (quotations omitted). The word "necessary" in § 121(a)—appearing in an identical phrase—should be given the same limited meaning. *See Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.").

Neither § 101 nor § 121 even plausibly support the government's mandate on their plain text. This is especially true as the government "deploy[s] [FPASA] to mandate a medical procedure for one-fifth (or more) of our workforce," a considerable segment of the economy that can be detrimentally placing all of those workers in a position to violate their religious rights in the furtherance of continued employment. *Kentucky, supra*, at 607–08. Congress does not delegate decisions of major economic and social significance "in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 160–61 (2000). And "[i]f administrative agencies seek to regulate the daily lives and liberties of millions of Americans, . . .

they must at least be able to trace that power to a clear grant of authority from Congress." *NFIB*, *supra,* at 668 (Gorsuch, J., concurring).

Moreover, regulation of vaccination is "a matter traditionally committed to the state." *Nelson*, 2021 WL 6108948, at *13. The government cannot overcome the presumption that Congress "preserves the constitutional balance between the National Government and the States," *Bond v. United States,* 572 U.S. 844, 862 (2014), because Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power," *Ala. Ass'n of Realtors v. HHS,* 141 S. Ct. 2485, 2489 (2021). For these reasons, neither § 101 nor § 121 authorize the Executive Order.

> ii. **The Government Cannot Meet its Burden to Demonstrate that it Did Not violate FPASA Section 1707.**

Because § 1707 applies, the government must rely on the "urgent and compelling circumstances" exception in § 1707(d). See 86 Fed. Reg. at 63,423 (making such a finding in the alternative). The government cannot satisfy that exception, which is more demanding than the APA's "good cause" exception, itself an exacting standard. Compare 41 U.S.C. § 1707(d), with 5 U.S.C. § 553(b)(3)(B). *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). The government has not made that showing, as its procurement efficiency rationale is "merely a

hastily manufactured but unproven hypothesis about recent history and a contrived speculation about the future," which does not justify "summary disregard of the requirements of administrative law and rulemaking." *Nelson,* 2021 WL 6108948, at *12. This statement rings especially true with the requirements of EO 14042, which created the Safer Federal Workforce Task Force ("Task Force") and the Task Force's Guidance ("Guidance"), subject to OMB Director approval. EO 14042, which was signed September 9, 2021, required the publication of the Guidance by September 24, 2021. EO 14042, Sec. 2(b). EO 14042 also required that the Federal Acquisition Regulatory Council amend the Federal Acquisition Regulations by October 8, 2021. EO 14042, Sec. 3.

Additionally, the government's own delay in adopting the EO and the regulation betrays any claimed urgency. If OMB had simply complied with § 1707 when it issued its first order on September 28, 2021, it could have completed the 60-day notice and comment period well before its vaccination deadline of January 18, 2022. See 86 Fed. Reg. at 63,424. The government's delay— caused by its own mistakes—cannot itself create the circumstances justifying good cause. *See Nat. Res. Def. Council v. NHTSA,* 894 F.3d 95, 114 (2d Cir. 2018). The Government did not comply with § 1707 and cannot justify a departure from that statute. Thus, the OMB determination, the key predicate for the mandate's operation, is invalid and the

36

Government failed to comply with § 1707 and the District Court erred in concluding that the Government complied with § 1707.

### III. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE EXECUTIVE ORDERS DID NOT VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

The Eleventh Circuit concluded that the challenged EOs exceeded the APA, holding that "[a] presidential directive can stand only if those subordinate officials have the statutory authority that they are told to exercise" as the President and the subordinate agencies lacked authority to issue such a directive. *Id.* at 15. While the President's issuance of an EO is exempt from the APA, there is no basis for extending that Presidential exemption to his delegees as the APA applies to "each authority of the [g]overnment of the United States," 5 U.S.C. § 551 (defining "agency"), and restricts "agency action," *id.* § 706. When agency officials act pursuant to a presidential delegation, as was done here through the Department of Energy's implementation of EOs 14042 and 14043, they are unquestionably taking "agency action."

Moreover, even if the APA were silent on whether agency action is subject to review—and it is not—any such silence would yield the opposite result as applied to an *agency* given the APA's "basic presumption of judicial review for one suffering legal wrong because of agency action." *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted). Just as agencies cannot invoke

Congress's express APA exemption when exercising delegations from Congress, so, too, they cannot invoke the President's implied exemption. *See Franklin v. Massachusetts*, 505 U.S. 788, 828–29 (1992) (Scalia, J., concurring in part and concurring in the judgment) (explaining that "[r]eview of the legality of Presidential action" can be obtained in the same manner as review of "unlawful legislative action," by suing the "agents who carry" it out). Thus, it is proper for this Court to review the President and the Department of Energy's challenged actions in this matter.

The APA applies to "each authority of the [g]overnment of the United States," 5 U.S.C. § 551 (defining "agency"), and restricts "agency action," *Id.* § 706. When agency officials act pursuant to a presidential delegation, they are unquestionably taking "agency action." Moreover, unlike, for example, Congress, *see Id.* § 701(b)(1)(A), the President's APA exemption is found nowhere in the text of the APA, *see Franklin v. Massachusetts,* 505 U.S. 788, 800–01 (1992) ("[T]extual silence is not enough to subject the President to the provisions of the APA."). But even if the APA were silent on whether agency action is subject to review—and it is not—any such silence would yield the opposite result as applied to an agency given the APA's "basic presumption of judicial review for one suffering legal wrong because of agency action." *See DHS v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1905 (2020) (quotations omitted). Just as agencies cannot invoke Congress's express

APA exemption when exercising delegations from Congress, so too they cannot invoke the President's implied exemption. *See Franklin*, 505 U.S. at 828–29 (Scalia, J., concurring in part and concurring in the judgment) (explaining that "[r]eview of the legality of Presidential action" can be obtained in the same manner as review of "unlawful legislative action," by suing the "agents who carry" it out).

### IV. THE EXECUTIVE ORDERS VIOLATE THE FEDERAL PROCUREMENT POLICY, 41 U.S.C. § 1707(A).

The Federal Procurement Policy statute requires "procurement polic[ies], regulation[s], procedure[s], or form[s]" to go through notice and comment, so long as they "relate[] to the expenditure of appropriated funds" and either have "a significant effect beyond the internal operating procedures of" the issuing agency or "a significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a)–(b). ER104-105. The OMB determination implementing EOs 14042 and 14043 was published without those procedures in defiance of this statutory requirement.

Section 1707 applies due to its significant administrative effect on contractors; thus, the government must rely on the "urgent and compelling circumstances" exception in § 1707(d). *See* 86 Fed. Reg. at 63,423 (making such a finding in the alternative). The government cannot satisfy that exception as the government delayed the adoption of the EOs, dampening its proclaimed urgency. If OMB had simply complied with § 1707 when it issued its first order on September 28, 2021, it

could have completed the 60-day notice and comment period well before its vaccination deadline of January 18, 2022. *See* 86 Fed. Reg. at 63,424. The government's delay—especially when caused by the government's own mistakes—cannot itself create the circumstances justifying good cause. *See Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018).

## V. THE EO'S RUN AFOUL OF FEDERALISM

The President's new-found use of the Procurement Act invades traditional concepts of Federalism. There can be no question on this point where the EO expressly claims to "supercede[] any contrary State or local law."

When the President invokes authority that would "significantly alter the balance between federal and state power," Congress must authorize that change with "exceedingly clear language." *Alabama Realtors*, 141 S. Ct. at 2489 (citation omitted). A federal statute to "intrude[] on the police power of the States" only when clearly authorized by Congress. *Bond v. United States*, 572 U.S. 844, 859-60 (2014).

"It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (citation omitted). That includes "compulsory vaccination." *Zucht v. King*, 260 U.S 174, 176 (1922). *Hillsborough Cnty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."); Compulsory vaccination policy is a traditional realm of state

authority, which the Contractor Mandate manifestly intrudes upon: the "contractor mandate seeks to ... transfer[] this traditional prerogative from the states to the federal government." *Kentucky*, 23 F.4th at 609 (emphasis added). While the "States may have no power to dictate what and how much of something the federal government may buy … they certainly have a traditional interest in regulating public health and, specifically, in determining whether to impose compulsory vaccination on the public at large." *Id*. at 610.[15]

Here, the President cannot invade the province of the States and the District Court should not have dismissed Plaintiffs' cause of action based upon this bedrock principal.

## VI. THE EO'S CANNOT PASS RFRA SCRUTINY.

"RFRA did more than merely restore the balancing test used in the *Sherbert* line of cases; it provided even broader protection for religious liberty than was available under those decisions." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 n.3 (2014); *accord Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (RFRA "provide[s] greater protection for religious exercise than is available under the First

---

[15] Of course, the State's too, may only do so without violating their Constitutions and the Federal Constitution, but that is a matter for another day.

Amendment.") RFRA restored this order through "requir[ing] the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' —the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (quoting 42 U.S.C. § 2000bb-1); *Hobby Lobby*, 573 U.S. at 726. "The least-restrictive means standard is exceptionally demanding..." *Hobby Lobby*, 573 U.S. at 728.

Defendants expect to meet this "exceptionally demanding" test by merely "accepting[ing] the merits of [the] exemption" while denying reasonable accommodations in boilerplate denials. ER234-ER237; ER210-ER214; ER203.  ] The law requires more than than lip service; it requires the Government to apply the appropriate legal standard, which did not occur here.

RFRA was enacted with "singularly bi-partisan support" at a time when one party controlled the Presidency and both Houses of Congress for the express purpose of restoring "the protection for Free Exercise suddenly eroded by the Supreme Court." *Col. Fin. Mgmt. Officer v. Austin,* No. 8:22-CV-1275-SDM-TGW, 2022 WL 3643512 *14 (M.D. Fla. Aug. 18, 2022)) ("*CMFO*") *citing Employment Division v. Smith*, 494 U.S. 872 (1990). "By enacting RFRA, Congress exercised this plenary authority to guarantee the "'broad protection for religious liberty.'" *CMFO*, at *15 quoting Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 706 (2014). "To ensure

comprehensive protection of Free Exercise," RFRA allows "[a] person whose religious exercise has been burdened in violation of this section" to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.*, at *14, *see also:* 42 U.S.C. § 2000bb-1(c). As such, "RFRA warrants heightened and focused attention and diligent compliance by the government, including the military, and discerning enforcement by the courts." *Id.*

To prevail on a RFRA claim, Appellants must demonstrate two elements. First, Appellants must demonstrate that the activities burdened by the government action are an "exercise of religion." *Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1068 (9th Cir. 2008). Second, the government action must "substantially burden" Appellants' exercise of religion. *Id.* Once those elements are demonstrated, the burden shifts to the government to prove that the challenged action is in furtherance of a "compelling government interest" and is implemented by "the least restrictive means to achieve its purpose, unless the plaintiff first proves the government action substantially burdens his exercise of religion." *Id.* at 1069. As the United States Supreme Court has held, "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006). That requires courts "to look to the

43

marginal interest" in enforcing the government mandate in similar cases. *Hobby Lobby Stores*, 573 U.S. at 727. Wholly independent of whether or not the President has authority to issue the EO's, they also violate RFRA.

RFRA protects "the individual from a forced choice between a government benefit and the individual's religion." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069 (9th Cir. 2008). In *Navajo Nation*, Appellants challenged the United States Forest Services' application of recycled wastewater to a small portion (one percent of the mountain's entire area) of a sacred mountain to create artificial snow, claiming that the application violated RFRA. *Id.* The Court held that the lack of a "threat of civil or criminal sanctions" or other penalty that prohibited plaintiffs from practicing their religion "in any way" weighed against the finding of a RFRA violation. *Id.* The Court concluded that Defendant had "guaranteed" plaintiffs' access to the remainder of the sacred area (the 99 percent of the mountain) "for religious purposes" and that the government's action did not constitute a "substantial burden on Plaintiffs' religious rights:

> Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*). Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA and does not require the application of the compelling interest test set forth in those two cases. *Id.*, at 1070.

44

Here, unlike *Navajo Nation*, the United States Government, the President of the United States of America, through two Executive Orders, has presented the US government's employees and contractors with a "take it or leave it" approach to the COVID-19 vaccine. These millions of individuals (including the 317 Plaintiffs-Appellants) are presented a Hobson's choice approach: continue with government employment and violate your religious tenants **or** stay true to individual religious principles and lose employment. This paradox violates RFRA.

A. **The Vaccine Mandate Does Not Achieve a Compelling Government Interest as they Failed to Cease Transmission of the Virus.**

It is not in dispute that stemming Covid-19 is a compelling government interest. What is in dispute is whether the vaccines forward that interest. By December of 2021, the CDC's guidance on COVID-19 insolation and quarantine addressed the "general population" and ceased distinguishing between the vaccinated and unvaccinated populations,[16] treating them alike, in part, due to the failure of the vaccine to prevent transmission. Nonetheless, the President of the United States persisted in distinguishing between the vaccinated and unvaccinated populations, including stating, without support, that "For unvaccinated, we are looking at a winter of severe illness and death — if you're unvaccinated — for themselves, their families, and the hospitals they'll soon overwhelm."[17] Five days later, the President stated that "Almost everyone who has died from COVID-19 in the past many months has been unvaccinated. Unvaccinated…. Vaccinated people who get COVID may get ill, but they're protected from severe illness and death. That's why you should still remain vigilant… But uptake slowed this summer as vaccine resistance among some hardened. Look, the unvaccinated are responsible for their own choices… Because Omicron spreads easily, especially among the unvaccinated, it's critically important that we know who's infected."[18]

46

While the President of the United States may freely *opine* on the COVID-19 vaccines, neither he, nor the agencies he directs, has power to direct personal medical decisions of government employees or employees of organizations offering contracted services to the United States government. This is particularly so when the opinion conflicts with the science and the statements of his own government advisors

---

[16] Center for Disease Control: *CDC Updates and Shortens Recommended Isolation and Quarantine Period for General Population.* December 27, 2021. Available at: https://www.cdc.gov/media/releases/2021/s1227-isolation-quarantine-guidance.html. Last accessed: September 9, 2022.

[17] *Remarks by President Biden After Meeting with Members of the COVID-19 Response Team.* December 16, 2021. Available at: https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/12/16/remarks-by-president-biden-after-meeting-with-members-of-the-covid-19-response-team/. Last accessed: September 9, 2022.

[18] *Remarks by President Biden on the Fight Against COVID-19.* December 21, 2021. https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/12/21/remarks-by-president-biden-on-the-fight-against-covid-19/. Last accessed: September 9, 2022.

stating that the required vaccines are not shown to prevent achieve the stated goals of his Executive Orders: ceasing or slowing transmission of the disease (Covid-19) to certain employees.

The failure is incontrovertible. Data was widely available to the public, including to the District Court judge, prior to Plaintiffs' filing of the Complaint.[19]

---

[19] *See, e.g.,* https://brownstone.org/articles/16-studies-on-vaccine-efficacy/, an October 2021 report from the Brownstone Institute itemizing 50 studies and reports from around the world concluding, as the CDC had concluded, that "vaccines are important to reduce severe disease and death but unable to prevent the disease from spreading and eventually infect most of us. As such, COVID vaccines should not be expected to contribute to eliminating the communal spread of the virus or the reaching of herd immunity. This unravels the rationale for vaccine mandates and passports." *See also, https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm,* a landmark July 2021 CDC published report on a large public event in Barnstable County, Massachusetts where 469 COVID-19 cases were identified among Massachusetts residents who traveled to the town during July 3-17, 2021, in which the report concluded that 346, or 74% of the positive COVID-19 cases occurred in fully vaccinated persons, and testing confirmed the Delta variant was found in 90% of the specimens from 133 of the patients.

Shortly after Plaintiffs filed the complaint, official government data from the Province of Ontario (December 25, 2021) showed a higher infection rate among the vaccinated than the unvaccinated population.[20]  The same is true in Denmark, [21]

_____

[20] https://covid-19.ontario.ca/data.

[21] According to Danish government data, 89.7% of the country's Omicron cases are in vaccinated individuals (many with a booster vaccine). Statens Serum Institut, COVID-19 Rapport on omikronvarianten at 6, table 4 (Dec. 21, 2021), https://www.docdroid.com/C9UY7Ef/dk-serum-institut-rapport-omikronvarianten-21122021-14tk-pdf. Because that figure is higher than the percentage of vaccinated individuals in the population as a whole, *see* Johns Hopkins Univ. Coronavirus Resource Center, Denmark, https://coronavirus.jhu.edu/region/denmark (79% of Denmark population vaccinated), this means the rate of Omicron infection among the vaccinated is higher than among the unvaccinated.

Scotland, [22] and the UK.[23] Moreover, those semi-effective vaccines were, and are, only authorized for emergency use ("EUA"), which, under the Food, Drug and Cosmetic Act ("FDCA"), is a temporary authorization that is legally, factually, and scientifically distinct from full Food and Drug Administration approval.[24] These data

_____

[22] Public Health Scotland, COVID-19 & Winter Statistical Report As At 31 January 2022, at 41 (Table 14), https://web.archive.org/web/20220207172220/https://publichealthscotland.scot/media/11597/22-02-02-covid19-winter _publication_report.pdf.

[23] UK Health Security Agency, COVID Vaccine Surveillance Report, Week 7, Feb. 17, 2022 at 44 (Table 13) (showing infection rates for vaccinated adults over *twice as high* as infection rates for unvaccinated adults), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1055620/Vaccine_surveillance_report_-_week7.pdf.

[24] 21 U.S.C. § 360bbb-3(b)(1) authorizes the FDA to grant EUA where "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3). EUA is granted on: (1) scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease; (2)

sets support Plaintiffs' position that the President lacks authority to mandate such vaccines in violation of individual religious rights. The District Court's error in dismissing these claims give rise to this appeal.

As a recent study concluded, the vaccines' ability to stop infection and transmission of the Omicron variant is "negligible." Heba Altarawneh, et al., *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections*, 387 NEW ENG. J. MED. 21 (June 15, 2022), *at* https://www.nejm.org/doi/pdf/10.1056/NEJMoa2203965. ("The effectiveness of vaccination with two doses of BNT162b2 and no previous infection was negligible." And, "No discernable differences in protection against symptomatic BA.1 and BA.2 infection were seen with previous infection, vaccination, and hybrid immunity.")

––––––––––––––––––––

limited/minimal safety requirements, which require that the FDA conclude that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease; and, (3) EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations. 21 U.S.C. §360bbb-3(c)(2)(A), (B).

The Omicron variant now accounts for all COVID-19 infections in the United States. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (updated Sept. 7, 2022). Yet the Omicron variant "dramatically evades neutralizing antibody responses," and so it is able to infect those with prior vaccine-induced immunity.[25] And, Dr. Fauci has grudgingly

_____

[25] Jinyan Liu et al., *Vaccines Elicit Highly Conserved Cellular Immunity to SARS-CoV-2 Omicron*, 603 NATURE 493, 495 (2022). Those facts, coupled with the waning of vaccine-mediated immunity over time, means that any vaccine-mediated immunity a person may have against Omicron largely disappears within six months of vaccination. *See, e.g.,* N. Andrews et al., *COVID-19 Vaccine Effectiveness Against the Omicron (B.1.1.529) Variant*, 386 NEW ENG. J. MED. 1532, 1537 (2022) (Pfizer vaccine's effectiveness against symptomatic Omicron infection went from 65.5 percent in the first month to 8.8 percent after six months. Even boosters, which the Mandate does not require, fail to provide long-term protection against infection and transmission. *See* Yinon M. Bar-On et al., *Protection by a Fourth Dose of BNT162b2 Against Omicron in Israel*, 386 NEW ENG. J. MED. 1712 (Apr. 5, 2022), *at* https://www.nejm.org/doi/full/10.1056/NEJMoa2201570 ("Protection against confirmed infection appeared short-lived" after "a fourth dose of BNT162b2 vaccine").

conceded that, "because of the high degree of transmissibility of this virus," the vaccines "don't protect overly well … against infection."[26] Thus, even if regulating health was appropriate through the EOs was legally proper, the mandated vaccines fail in the claimed scope of "safeguard[ing]" the government's contractor workforce and "ensuring the health and safety of the Federal workforce."

Having demonstrated standing and ripeness and having discussed the ineffectiveness of the COVID-19 vaccine, Plaintiff-Appellants have demonstrated the District Court's errors that warrant this Court's overturning of the lower Court's decision.

Here, all but 3 Plaintiffs have asserted religious rights by seeking a religious exemption and an accommodation from the COVID-19 vaccine, and the government has shown no compelling interest in mandating the vaccine. ER241-ER278 (excepting ER244, ER259, and ER265, the three Plaintiffs that did not file religious exemptions). Plaintiffs have plead facts that demonstrate that the EOs substantially burden each Plaintiff's religious exercise by seeking a religious exemption and

---

[26] *Fauci admits that COVID-19 vaccines do not protect 'overly well' against infection*, FOX NEWS (July 12, 2022), *at* https://www.foxnews.com/media/fauci-admits-covid-19-vaccines-protect-overly-well-infection.

accommodation to the COVID-19 vaccine and asserting that taking/receiving the COVID-19 vaccine violates their religious beliefs. *Id.* see also: ER030-ER084. All Plaintiffs were initially informed by their employer that no accommodation could be made to allow the individual to forego taking the vaccine, and 22 were granted a temporary exemption that has long expired. *Id.* See: *See* ER32, ER37, ER44, ER47, ER53, ER55, ER58, ER61, ER65, ER66, ER67-ER68, ER69, ER73, ER74, ER76, ER87-ER89, ER90, ER92 noting the 22 Plaintiffs who were granted temporary accommodations. Moreover, when religious exemptions submitted, requesting accommodations, employers did not challenge the sincerity of the individual's religious beliefs. *See:* ER224-ER237, ER206-ER217 and ER200-ER205.

### B. The Government Has Not Employed the Least Restrictive Means to Achieve the Proclaimed interest in Contracting Efficiency.

In addition to forwarding a compelling government interest, RFRA demands that the least restrictive means necessary be employed. Under a Fed. R. Civ. Pro. 12 standard, the District Court erred by determining that the Government had carried its burden of showing that, even accepting Plaintiffs' pleadings as true, compulsory vaccination is the least restrictive means of reducing the disruption of the procurement of government contracts. This element was noted in *OSHA*, where the Court concluded that the mandate was both overinclusive (in its application to all industries) as well as underinclusive (by its stringent numeric limitation of 99

employees). *OSHA*, at 611. Finally, the Court noted that the world had suffered the pandemic for nearly two years and that OSHA spent over two months developing the regulations; thus, the Administration's reliance on an "emergency" was "unavailing" to the court as the regulation "grossly exceeds OHSA's statutory authority." *Id.* These under and overinclusive standards were the crux of the Court's decision that OSHA failed to meet this threshold burden of proper tailoring as "this kind of overbreadth plagues the Mandate generally," and the Court's final dagger was the uncertainty that COVID-19 qualifies as an emergency that warranted OSHA emergency actions. *Id.* at 613-14. The challenged EOs fare no better when the burden shifts to Defendants.

Shifting the burden to Defendants to show that the EOs further a compelling governmental interest and is the least restrictive means of furthering that interest. Defendants have not carried that burden; rather, Defendants summarily "accepted" Plaintiffs' requests while refusing to accommodate these requests. Additionally, throughout the pleadings at the lower court, Defendants never satisfied the burden of demonstrating that the vaccine requirement was the least restrictive means, nor did they show a compelling interest in the implementation or enforcement of the EOs.

### C.  RFRA Has No Exhaustion Requirement.

Defendants sought, and wrongly obtained dismissal, on ripeness matters, claiming that Plaintiff-Appellants first need to exhaust administrative (Equal Employment Opportunity Commission and RFRA) remedies prior to seeking an injunction. ER021. As Defendant-Appellees noted, while Plaintiffs' "exemption requests remain pending, any infringement of the plaintiffs' constitutional rights is purely theoretical." ER172. But, as Plaintiffs noted in briefing submitted to the District Court (ER029) the Ninth Circuit and United States Supreme Court have held, RFRA contains no exhaustion remedy:

> We decline, however, to read an exhaustion requirement into RFRA where the statute contains no such condition, *see* 42 U.S.C. §§ 2000bb–2000bb–4, and the Supreme Court has not imposed one. Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). In so doing, it recognized that RFRA 'plainly contemplates that courts would recognize exceptions [to the CSA]— that is how the law works.' *Id.* at 434, 126 S.Ct. 1211. *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012)

Thus, seeking to impose an exhaustion remedy flies in the face of RFRA, itself, and this Court and the United States Supreme Court's jurisprudence.

# X. CONCLUSION

The President's attempt to maximize vaccination, in an end-run of the States' sovereignty, and contrary to RFRA, cannot be done through the Procurement Act. The District Court erred in not granting the Plaintiffs' requested preliminary injunction and erred again in dismissing their case without leave to amend.

**DATED** this 24th day of October 2022.

**ARNOLD & JACOBOWITZ PLLC**

/s/ Nathan J. Arnold

Nathan J. Arnold, WSBA No. 45356
2701 First Ave., Ste. 200
Seattle, WA 98121
(206) 799-4221
Nathan@CAJLawyers.com

**SILENT MAJORITY FOUNDATION**

/s/ Simon P. Serrano
Simon Peter Serrano, WSBA No. 54769
Silent Majority Foundation
5238 Outlet Dr
Pasco, WA 99301
(509)567-7083
pete@silentmajorityfoundation.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **13,523 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

**DATED** this 24th day of October 2022.

**ARNOLD & JACOBOWITZ PLLC**

/s/ Nathan J. Arnold

Nathan J. Arnold, WSBA No. 45356
2701 First Ave., Ste. 200
Seattle, WA 98121
(206) 799-4221
Nathan@CAJLawyers.com

**SILENT MAJORITY FOUNDATION**

/s/ Simon P. Serrano

Simon Peter Serrano, WSBA No. 54769
Silent Majority Foundation
5238 Outlet Dr
Pasco, WA 99301
(509)567-7083
pete@silentmajorityfoundation.org

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

**DATED** this 24th day of October, 2022.


*/s/Korri Oosting*

Korri Oosting