**No. 22-35474**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

——————————

DAVID G. DONOVAN, et al.,

Plaintiffs-Appellants,

v.

JOSEPH R. BIDEN, et al.,

Defendants-Appellees.

——————————

On Appeal from the United States District Court
for the Eastern District of Washington

——————————

**BRIEF FOR APPELLEES**

——————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

VANESSA R. WALDREF
*United States Attorney*

MARK B. STERN
ANNA O. MOHAN
DAVID L. PETERS
*Attorneys, Appellate Staff
Civil Division, Room 7209
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-1673*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF ISSUES ..................................................................1

PERTINENT STATUTES AND REGULATIONS ..................................2

STATEMENT OF THE CASE ............................................................3

    A.    Legal Background ............................................................3

        1.    Federal Contracting And The Procurement Act.............................3

        2.    Federal Employees And The Civil Service Reform Act ................3

    B.    COVID-19 Safety Requirements For Federal Contractors And Employees.....................................................................5

        1.    The COVID-19 Pandemic ................................................5

        2.    The Challenged Federal Actions.........................................7

    C.    Prior Proceedings............................................................9

SUMMARY OF ARGUMENT.............................................................17

STANDARD OF REVIEW .................................................................20

ARGUMENT ..................................................................................21

I.    THE DISTRICT COURT LACKS JURISDICTION OVER THE CLAIMS OF MOST PLAINTIFFS .................................................................21

    A.    The Vast Majority Of Plaintiffs Face No Actual Or Imminent Injury.....................................................................21

    B.    The Federal Employees' Claims Are Precluded By The Civil Service Reform Act............................................................27

II.   PLAINTIFFS' CHALLENGES TO THE CONTRACTOR EXECUTIVE ORDER
      ARE WITHOUT MERIT .................................................................. 32

      A.    Plaintiffs Failed To State A Claim For Violation Of The Religious
            Freedom Restoration Act ............................................................32

      B.    The Contractor Executive Order Is A Proper Exercise Of
            Authority Under The Procurement Act .......................................35

      C.    The Contractor Executive Order Reflects The Required Nexus
            To Economy And Efficiency In Federal Procurement ..............44

      D.    No Other Considerations Cast Doubt On The Validity Of The
            Contractor Executive Order .......................................................48

      E.    The OMB Determination Does Not Suffer From Procedural
            Deficiencies................................................................................54

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING
      TO AFFORD PLAINTIFFS LEAVE TO AMEND ......................................... 58

CONCLUSION ...................................................................................... 59

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*AFL-CIO v. Kahn,*
  618 F.2d 784 (D.C. Cir. 1979) ....................................................... 37, 38, 47, 52

*Alabama Ass'n of Realtors v. Department of Health & Human Servs.,*
  141 S. Ct. 2485 (2021) ...................................................................... 50, 51

*American Fed'n of Gov't Emps. v. Carmen,*
  669 F.2d 815 (D.C. Cir. 1981) ..........................................................47, 52, 53

*Axon Enter., Inc. v. FTC,*
  986 F.3d 1173 (9th Cir. 2021),
  *cert. granted in part*, 142 S. Ct. 895 (2022) ..........................................27, 28, 29

*Baldwin v. Redwood City,*
  540 F.2d 1360 (9th Cir. 1976) ............................................................1

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ........................................................................51

*Boeing Co. v. Movassaghi,*
  768 F.3d 832 (9th Cir. 2014) ..............................................................53

*Bova v. City of Medford,*
  564 F.3d 1093 (9th Cir. 2009) ............................................................22

*Brnovich v. Biden,*
  562 F. Supp. 3d 123 (D. Ariz. 2022) ................................................ 54, 55-56

*Building & Constr. Trades Dep't v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ..............................................................52

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ..........................................................................34

*Chamber of Commerce v. Napolitano,*
  648 F. Supp. 2d 726 (D. Md. 2009) ................................................ 39, 52

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ...................................................................................43

*Chugach Mgmt. Servs. v. Jetnil,*
    863 F.3d 1168 (9th Cir. 2017) ..................................................................40

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .....................................................14, 23-24, 25, 26

*Colwell v. Department of Health & Human Servs.,*
    558 F.3d 1112 (9th Cir. 2009) ..................................................................25

*Contractors Ass'n of E. Pa. v. Secretary of Labor,*
    442 F.2d 159 (3d Cir. 1971) ........................................... 37, 39, 47, 52

*CoreCivic, Inc. v. Candide Grp., LLC,*
    46 F.4th 1136 (9th Cir. 2022) ..................................................................32

*Detroit Int'l Bridge Co. v. Government of Canada,*
    189 F. Supp. 3d 85 (D.D.C. 2016),
    *aff'd,* 875 F.3d 1132 (D.C. Cir. 2017),
    *aff'd,* 883 F.3d 895 (D.C. Cir. 2018) ......................................................55

*D'Lil v. Best W. Encina Lodge & Suites,*
    538 F.3d 1031 (9th Cir. 2008) ..................................................................21

*Elgin v. Department of the Treasury,*
    567 U.S. 1 (2012) ...............................................4, 18, 28, 29, 30, 31

*Farkas v. Texas Instrument, Inc.,*
    375 F.2d 629 (5th Cir. 1967) ..................................................................39

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ......................................................................... 50, 51

*Feds for Med. Freedom v. Biden,*
    25 F.4th 354 (5th Cir. 2022) ..........................................................48, 52

*Feds for Med. Freedom v. Biden,*
    581 F. Supp. 3d 826 (S.D. Tex.)*, vacated and remanded,*
      30 F.4th 503 (5th Cir.)*, and reh'g en banc granted, opinion vacated,*

37 F.4th 1093 (5th Cir. 2022) .................................................................9
30 F.4th 503 (5th Cir. 2022) .................................................................31
37 F.4th 1093 (5th Cir. 2022) ...............................................................31

*Fort Bend County v. Davis,*
139 S. Ct. 1843 (2019) .........................................................................31

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) .............................................................................54

*Gartrell Constr. Inc. v. Aubry,*
940 F.2d 437 (9th Cir. 1991) ...............................................................53

*GEO Grp., Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022) ...............................................................53

*Georgia v. President of the United States,*
46 F.4th 1283 (11th Cir. 2022) ...............................................42, 43, 49-50

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ...................................................................36, 52

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
452 U.S. 264 (1981) .............................................................................26

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) ...............................................................41
571 F. Supp. 3d 715 (E.D. Ky. 2021) ..............................................56, 57

*Kerr v. Jewell,*
836 F.3d 1048 (9th Cir. 2016) ....................................................27, 28, 30

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) .........................................................................37

*Leslie Miller, Inc. v. Arkansas,*
352 U.S. 187 (1956) .............................................................................53

*Louisiana v. Biden,*
-- F.4th --, 2022 WL 17749291 (Dec. 19, 2022 5th Cir.) ........43, 44, 47, 48, 49, 50, 52

*Mack Trucks, Inc. v. EPA,*
    682 F.3d 87 (D.C. Cir. 2012) ...................................................................56

*Mobilize the Message, LLC v. Bonta,*
    50 F.4th 928 (9th Cir. 2022) ...................................................................20

*Montana Envtl. Info. Ctr. v. Stone-Manning,*
    766 F.3d 1184 (9th Cir. 2014) ....................................................... 21-22, 22

*NASA v. Nelson,*
    562 U.S. 134 (2011) ...............................................................................51

*National Fed'n of Indep. Bus. v. Department of Labor, OSHA,*
    142 S. Ct. 661 (2022) ..............................................................................50

*Natural Res. Def. Council, Inc. v. U.S. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009) ........................................................55

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ....................................................33, 34, 35

*Perkins v. Lukens Steel Co.,*
    310 U.S. 113 (1940) ...............................................................................49

*Rydie v. Biden,*
    2022 WL 1153249 (4th Cir. Apr. 19, 2022) ...........................................31

*Salameh v. Tarsadia Hotel,*
    726 F.3d 1124 (9th Cir. 2013) .................................................................20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...............................................................................22

*Texas v. United States,*
    523 U.S. 296 (1998) ..................................................................22, 23, 26

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
    576 U.S. 519 (2015) ...............................................................................40

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ....................................................17, 22, 23

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ...................................................27, 28, 28-29, 30

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...........................................................22, 23

*Trump v. New York*,
  141 S. Ct. 530 (2020) .............................................................17, 26

*UAW-Labor Emp. & Training Corp. v. Chao*,
  325 F.3d 360 (D.C. Cir. 2003) ...............................................11, 38

*United States v. Corinthian Colls.*,
  655 F.3d 984 (9th Cir. 2011) ........................................................58

*United States v. Fausto*,
  484 U.S. 439 (1988) ......................................................................4

*United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*,
  545 F.3d 1134 (9th Cir. 2008) .....................................................20

*United States v. Virginia*,
  139 F.3d 984 (4th Cir. 1998) ........................................................53

*Utility Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) ........................................................49, 50, 51

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ....................................................49, 50, 51

*Willis v. City of Seattle*,
  943 F.3d 882 (9th Cir. 2019) ........................................................33

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..........................................................................32

*Wolfson v. Brammer*,
  616 F.3d 1045 (9th Cir. 2010) .....................................................24

**U.S. Constitution:**

Art. III, § 2, cl. 1 .................................................................21

**Statutes:**

Act of Mar. 3, 1871, ch. 114, § 9, 16 Stat. 495, 514-15 ...................3

Federal Property and Administrative Services Act of 1949,
    40 U.S.C. § 101 *et seq.* ...........................................................3
        40 U.S.C. § 101 .............................3, 19, 36, 40, 43, 44, 45, 48
        40 U.S.C. § 121(a) ...........................3, 19, 36, 40, 43, 46

Pub. L. No. 99-500, 100 Stat. 1783 (1986) ...................................40

Pub. L. No. 99-591, 100 Stat. 3341 (1986) ...................................40

Pub. L. No. 104-208, 110 Stat. 3009 (1996) .................................40

Pub. L. No. 107-217, 116 Stat. 1062 (2002) .................................40

3 U.S.C. § 301 ......................................................................54

5 U.S.C. § 553(a)(2) ..............................................................54

5 U.S.C. § 1212(a)(2) .............................................................30

5 U.S.C. § 1214(a)(1)(A) .........................................................30

5 U.S.C. § 1214(b)(2)(B)-(C) ....................................................30

5 U.S.C. § 2302(a) .................................................................30

5 U.S.C. § 3301(1) ..................................................................4

5 U.S.C. § 3301(2) ..................................................................4

5 U.S.C. § 3302......................................................................4

5 U.S.C. § 7301......................................................................3

5 U.S.C. § 7512 ............................................................................4

5 U.S.C. § 7513(d) ...........................................................4, 30, 31

5 U.S.C. § 7703(a)(1) ...................................................................4

5 U.S.C. § 7703(b) .......................................................................4

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1331 ..........................................................................1

28 U.S.C. § 1343 ..........................................................................1

41 U.S.C. § 133 ..........................................................................55

41 U.S.C. § 1707(a)(1) ...............................................................55

41 U.S.C. § 1707(c) ....................................................................54

41 U.S.C. § 1707(c)(1) ...............................................................54

41 U.S.C. § 1707(d) ....................................................................55

42 U.S.C. § 1395x(e)(9) .............................................................51

42 U.S.C. § 2000bb-1(b) ...........................................................33

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ...........................................................1

**Other Authorities:**

86 Fed. Reg. 50,985 (Sept. 14, 2021) .......................1, 7, 34, 44, 55

86 Fed. Reg. 50,989 (Sept. 14, 2021) ..........................1, 7, 8, 36

86 Fed. Reg. 53,692 (Sept. 28, 2021) ............................................57

86 Fed. Reg. 63,418 (Nov. 16, 2021) ................................ 6, 7, 8, 24, 25, 34, 45, 55, 56, 57

Abay Asfaw, *Cost of Lost Work Hours Associated with the COVID-19 Pandemic—United States, March 2020 Through February 2021*, 65 Am. J. Indus. Med. 20 (2022) ................ 6

CDC:
   *Benefits of Getting a COVID-19 Vaccine*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (last updated Dec. 5, 2022) ......................... 45
   *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Dec. 23, 2022) ......................................................................... 5
   *COVID-19 Vaccine Effectiveness Monthly Update*, https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness (last updated Nov. 10, 2022) .................................. 45
   *Delta Variant: What We Know About the Science* (Aug. 26, 2021), https://perma.cc/4RW6-7SGB ....................................................................... 5
   *Potential Rapid Increase of Omicron Variant Infections in the United States* (Dec. 20, 2021), https://perma.cc/6CWF-QZQW ...................................................... 5

Exec. Order No. 11,246,
   30 Fed. Reg. 12,319 (Sept. 28, 1965) ...................................................................... 3

Exec. Order No. 12,800,
   57 Fed. Reg. 12,985 (Apr. 14, 1992) ....................................................................... 3

Exec. Order No. 13,201,
   66 Fed. Reg. 11,221 (Feb. 22, 2001) ..................................................................... 39

Exec. Order No. 13,465,
   73 Fed. Reg. 33,285 (June 11, 2008) ............................................................... 38, 39

Exec. Order No. 13,706,
   80 Fed. Reg. 54,697 (Sept. 10, 2015) ............................................................. 38, 53

GAO, GAO-20662, *COVID-19 Contracting: Observations on Contractor Paid Leave Reimbursement Guidance and Use* (Sept. 2020), https://perma.cc/TPF7-9VN4 ............ 6

Jessica Mathews, *The Major Companies Requiring Workers to Get COVID Vaccines*, Fortune (Aug. 23, 2021), https://perma.cc/2WQZ-SUCA ......................................... 6

Safer Fed. Workforce Task Force, *Vaccinations*,
   https://perma.cc/JFN4-Y7LU ................................................................... 8, 9, 23

U.S. Dep't of Health & Human Servs., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R ...................................................5

Eduardo Levy Yeyati & Federico Filippini, *Social and Economic Impact of COVID-19* (Brookings Inst., Brookings Global Working Paper #158, June 2021), https://perma.cc/4J2W-N83V ........................................................................................ 5-6

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1343.  2-ER-29.  On December 17, 2021, the district court denied plaintiffs' motion for preliminary injunctive relief.  2-ER-140-59.  On May 12, 2022, the district court dismissed plaintiffs' Second Amended Complaint and entered final judgment.  *See* 1-ER-15.  On June 9, 2022, plaintiffs filed a timely notice of appeal of the final judgment.  3-ER-306; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has appellate jurisdiction over the district court's interlocutory order and final judgment under 28 U.S.C. § 1291.  *See Baldwin v. Redwood City*, 540 F.2d 1360, 1364 (9th Cir. 1976) ("The interlocutory order merges in the final judgment and may be challenged in an appeal from that judgment.").

## STATEMENT OF ISSUES

Amidst an unprecedented pandemic, the President issued two executive orders aimed at ameliorating the impact of COVID-19 on federal contractors and the federal workforce.  Executive Order 14,042 directs federal agencies to include in certain contracts a clause requiring contractor employees to follow COVID-19 safety protocols, including a vaccination requirement.  86 Fed. Reg. 50,985 (Sept. 14, 2021) (Contractor EO).  Executive Order 14,043 directs federal agencies to require certain federal employees be vaccinated against COVID-19 unless a legally required exception applies.  86 Fed. Reg. 50,989 (Sept. 14, 2021) (Employee EO).

Plaintiffs—eight federal employees and 306 current or former employees of federal contractors—challenged the executive orders. After plaintiffs repeatedly failed to cure "procedural and jurisdictional flaws" in their pleadings, the district court dismissed plaintiffs' Second Amended Complaint. 1-ER-3. The court concluded that all the federal employees and the vast majority of contractor employees "fail[ed] to establish they meet the standing requirements to maintain this action." 1-ER-7. As to the remaining contractor employees, the district court concluded that their various procedural and substantive challenges to the Contractor EO "fail[ed] to state claims upon which relief may be granted." 1-ER-11.

The questions on appeal are:

1. Whether the district court correctly concluded that the federal employees and the vast majority of contractor plaintiffs failed to establish subject-matter jurisdiction to maintain this suit.

2. Whether the district court correctly concluded that the remaining contractor plaintiffs failed to state claims upon which relief may be granted.

3. Whether the district court abused its discretion in denying plaintiffs leave to amend their complaint.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Federal Contracting And The Procurement Act

Congress enacted the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 101 *et seq.*—known as the Procurement Act—with the aim of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." *Id.* § 101. The Act empowers the President to "prescribe policies and directives that the President considers necessary to carry out" that objective. *Id.* § 121(a). Presidents have long used this power to issue a wide variety of executive orders relating to federal procurement and contracting. *See, e.g.*, Exec. Order No. 11,246, 30 Fed. Reg. 12,319, 12,319 (Sept. 28, 1965) (forbidding civilian contractors from discriminating on the basis of race, creed, color, or national origin); Exec. Order No. 12,800, 57 Fed. Reg. 12,985, 12,985 (Apr. 14, 1992) (requiring contractors to inform their employees that they have a right not to pay union dues).

#### 2. Federal Employees And The Civil Service Reform Act

Consistent with the President's role as head of the Executive Branch, Congress has long recognized the President's authority to "prescribe regulations for the conduct of employees in the executive branch." 5 U.S.C. § 7301; *see* Act of Mar. 3, 1871, ch. 114, § 9, 16 Stat. 495, 514-15. The President is authorized to "prescribe such

3

regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service" and to "ascertain the fitness of applicants as to age, health, character, knowledge, and ability." 5 U.S.C. § 3301(1), (2). And the President has broad delegated authority to "prescribe rules governing the competitive service." *Id.* § 3302.

The Civil Service Reform Act (CSRA), enacted in 1978, created a framework of administrative and judicial review for federal employees to challenge adverse personnel actions. The CSRA replaced an "outdated patchwork of statutes and rules built up over almost a century" with a "comprehensive and integrated review scheme." *United States v. Fausto*, 484 U.S. 439, 444, 454 (1988) (quotation marks omitted). As relevant here, the CSRA governs review of "major adverse" employment actions, including removal. *Id.* at 447; *see* 5 U.S.C. § 7512. Once an action is "taken," the employee has a right of "appeal to the" Merit Systems Protection Board (MSPB), *id.* § 7513(d), which can "order relief to prevailing employees, including reinstatement, backpay, and attorney's fees," *Elgin v. Department of the Treasury*, 567 U.S. 1, 6 (2012). The Federal Circuit can review MSPB decisions. 5 U.S.C. § 7703(a)(1), (b).

4

### B. COVID-19 Safety Requirements For Federal Contractors And Employees

#### 1. The COVID-19 Pandemic

Since January 2020, the United States has been in a state of public health emergency because of COVID-19. U.S. Dep't of Health & Human Servs., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R. During that period, there have been more than 100 million confirmed cases of COVID-19 in America and more than one million Americans have died from the disease. Ctrs. for Disease Control & Prevention (CDC), *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Dec. 23, 2022). Beginning in July 2021, cases, deaths, and hospitalizations due to COVID-19 once more began to rise dramatically following the emergence of a "more infectious" strain of the virus known as the Delta variant. CDC, *Delta Variant: What We Know About the Science* (Aug. 26, 2021), https://perma.cc/4RW6-7SGB. In December 2021, another strain, the Omicron variant, began to cause "a rapid increase in infections" due to its "increased transmissibility and … ability … to evade immunity conferred by past infection or vaccination." CDC, *Potential Rapid Increase of Omicron Variant Infections in the United States* (Dec. 20, 2021), https://perma.cc/6CWF-QZQW.

COVID-19 has also led to massive economic disruptions in the public and private sectors. The global economy contracted by 3.5 percent in 2020. Eduardo

Levy Yeyati & Federico Filippini, *Social and Economic Impact of COVID-19*, at 1 (Brookings Inst., Brookings Global Working Paper #158, June 2021), https://perma.cc/4J2W-N83V.  One study estimates that between March 2020 and February 2021 the pandemic cost $138 billion in lost work hours among U.S. full-time private-sector employees.  Abay Asfaw, *Cost of Lost Work Hours Associated with the COVID-19 Pandemic—United States, March 2020 Through February 2021*, 65 Am. J. Indus. Med. 20 (2022).  In the public sector, the Government Accountability Office (GAO) reports that in the first six months of the pandemic a single federal agency, the Department of Energy, spent more than $550 million reimbursing contractors for COVID-19-related paid leave.  GAO, GAO-20662, *COVID-19 Contracting: Observations on Contractor Paid Leave Reimbursement Guidance and Use* 11 (Sept. 2020), https://perma.cc/TPF7-9VN4.

Once vaccines against COVID-19 became widely available in the United States, many private companies chose to mitigate the costs of the pandemic by imposing vaccination requirements on their workers and, in some cases, on visitors to their premises.  86 Fed. Reg. 63,418, 63,422 & n.13 (Nov. 16, 2021) (citing Jessica Mathews, *The Major Companies Requiring Workers to Get COVID Vaccines*, Fortune (Aug. 23, 2021), https://perma.cc/2WQZ-SUCA).  Many companies have reported high rates of compliance with these requirements.  *See id.* at 63,422 (citing examples).

### 2. The Challenged Federal Actions

On September 9, 2021, President Biden issued two executive orders to address COVID-19's impact on federal contractors and employees. *See* 86 Fed. Reg. 50,985; 86 Fed. Reg. 50,989.

a. The Contractor EO instructs departments and agencies, "to the extent permitted by law," to incorporate a COVID-19 safety clause into certain future contracts and solicitations. 86 Fed. Reg. at 50,985. That clause requires that contractors and subcontractors comply with guidance developed by a federal task force, upon a determination by the Office of Management and Budget (OMB) Director that adherence to the guidance "by contractors or subcontractors[] will promote economy and efficiency in Federal contracting." *Id.* The Contractor EO by its terms does not apply to existing contracts absent the contractor's consent, and it has no application to contractors' workplaces that are unconnected to work on a federal contract. *See id.*

On November 10, 2021, the Acting OMB Director determined that the task force's guidance would promote economy and efficiency in federal contracting. 86 Fed. Reg. at 63,418 (OMB Determination). The Acting OMB Director explained that, "[j]ust as … private businesses have concluded that vaccination, masking, and physical distancing requirements will make their operations more efficient and competitive in the market, … the Guidance will realize economy and efficiency in Federal contracting." *Id.* at 63,421. The OMB Determination accordingly required "covered

7

contractor employees" to be fully vaccinated against COVID-19 unless they are legally entitled to an accommodation. *Id.* at 63,420. As to the accommodation requirement, the OMB Determination explained that a contractor employer "may be required to provide an accommodation to covered contractor employees who communicate to the … contractor that they are not vaccinated against COVID-19 because of a … sincerely held religious belief, practice, or observance." *Id.* The OMB Determination left to the contractor employer the discretion to "review and consider what, if any, accommodation [they] must offer." *Id.*

b.    The Employee EO instructs federal agencies to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of [their] Federal employees." 86 Fed. Reg. at 50,990. It provides that employees may obtain "exceptions" to the vaccination requirement "as required by law." *Id.*

Accordingly, guidance issued by the task force explained that federal employees may obtain exceptions to the vaccination requirement based on a sincerely held religious belief, practice, or observance. Safer Fed. Workforce Task Force, *Vaccinations*, https://perma.cc/JFN4-Y7LU (*Employee Guidance*). The employee guidance also instructed that employees who request an exception should not be disciplined while the request is pending and that employees whose requests are denied should have two weeks to begin vaccination before an agency initiates any disciplinary proceedings. *Id.* If employees refuse vaccination after having been denied an exception (or not having requested one), or refuse to disclose their vaccination status,

the guidance recommends a period of education and counseling, potentially followed by a letter of reprimand and suspension. *Id.* If noncompliance continues, agencies may impose additional discipline up to and including potential removal. *Id.*[1]

### C. Prior Proceedings

**1.** Plaintiffs are 314 individuals who work or worked at the Hanford nuclear site in Richland, Washington. 1-ER-6. Eight of the plaintiffs are federal employees who work for the U.S. Department of Energy (DOE). 2-ER-31 ¶ 20; 2-ER-42 ¶ 66; 2-ER-46 ¶ 81; 2-ER-51 ¶ 103; 2-ER-56 ¶ 127; 2-ER-67 ¶ 181; 2-ER-88 ¶ 306; 2-ER-93 ¶ 325. The remaining 306 plaintiffs work or worked for federal contractors performing work at the Hanford site. *See* 2-ER-31-93 (identifying contractor employees); *see also* 2-ER-240-41 (identifying contactor employers). Plaintiffs are subject to the vaccination requirements either as federal employees, 2-ER-144, or as federal contractor employees, 2-ER-145.

**2.** Plaintiffs filed this suit in November 2021, seeking injunctive and declaratory relief based on various substantive and procedural challenges to the executive orders and the OMB Determination. 2-ER-281-304.

---

[1] The federal government is currently enjoined from enforcing the Employee EO nationwide, which includes processing exemption requests. *See Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826 (S.D. Tex.), *vacated and remanded*, 30 F.4th 503 (5th Cir.), *and reh'g en banc granted, opinion vacated*, 37 F.4th 1093 (5th Cir. 2022) (per curiam).

The original complaint included limited allegations with regards to some, but not all, plaintiffs concerning their compliance with the vaccination requirements and whether they had sought exemptions. *See, e.g.*, 2-ER-251 (alleging as to plaintiff Chris George only that he "is a security police officer with [federal contractor] HMIS"). At the time, some plaintiffs had "completed the [exemption request] process, some [we]re still going through the process, and others h[ad] not applied at all." 2-ER-145. Plaintiffs initially named as defendants the President; Brian Vance, a DOE official at the Hanford site; and individual executives of the contractor employers. 2-ER-240-41.

Plaintiffs moved for preliminary injunctive relief. *See* 2-ER-141. After holding a hearing on the motion, the district court determined that "[p]laintiffs' attempts at injunctive relief fall woefully short" and denied the request. 2-ER-143. The court concluded that plaintiffs were unlikely to prevail on the merits of their claims for several reasons. 2-ER-149-57.

As an initial matter, the court concluded that plaintiffs lacked a cause of action to seek injunctive relief against the President and that the individual private sector executives were not proper defendants. 2-ER-143.

The court next concluded that plaintiffs' claims were unripe because plaintiffs "failed to articulate any facts" showing that they faced "an imminent threat of harm or adverse enforcement action." 2-ER-151. The court noted that, at the time, the compliance deadline was still some months away, and that plaintiffs "failed to

10

articulate a clear plan to violate the vaccination requirement[s]." 2-ER-151. In addition, plaintiffs identified no "specific warning or threat" that their employers would "initiate enforcement proceedings" if they did. 2-ER-151. To the contrary, declarations from DOE and federal contractors made clear that plaintiffs did "not face imminent adverse employment action." 2-ER-151-52.

The court also rejected plaintiffs' claim that the President exceeded his Procurement Act authority in promulgating the Contractor EO. The court explained that under the statute, "executive order[s] must have a 'sufficiently close nexus to the values of providing the government an economical and efficient system for procurement and supply.'" 2-ER-154 (quoting *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003)). The court concluded that the Contractor EO "easily satisfies the nexus requirement" because "it promotes federal government economy and efficiency by ensuring federal contractors implement adequate COVID-19 safeguards to protect their workers, … thereby decreasing worker absences, reducing labor costs, and improving work efficiency at federal contractor worksites." 2-ER-155.

The court similarly rejected plaintiffs' various constitutional claims. The court concluded that plaintiffs failed to carry their burden of "demonstrat[ing that] there are serious questions going to the merits" of their structural claims premised on federalism and the Tenth Amendment. 2-ER-154. And the court concluded that plaintiffs' Free Exercise claims failed because plaintiffs did "not allege[] sufficient

facts demonstrating their sincerely held religious views have been affected by the" vaccination requirement.  2-ER-157.

Finally, the district court held that plaintiffs failed to establish the remaining requirements for preliminary injunctive relief.  The court explained that plaintiffs' cursory allegations regarding "loss of employment" were insufficient to establish irreparable harm.  2-ER-158.  And the court concluded that the balance of harms and public interested weighed against plaintiffs' request.  2-ER-158-59.

**3.**      Plaintiffs did not appeal the district court's interlocutory order.  Instead, plaintiffs filed a First Amended Complaint and, after the government filed a motion to dismiss, a Second Amended Complaint, the operative complaint here.  *See* 2-ER-26-120.  The Second Amended Complaint seeks injunctive and declaratory relief to address plaintiffs' purported "imminent and wrongful termination[s]" for failure to comply with the vaccination requirements.  2-ER-28.  Plaintiffs allege that the executive orders violate the Free Exercise Clause and the Religious Freedom Restoration Act (RFRA), 2-ER-97-98; that the President exceeded his Procurement Act authority in issuing the Contractor EO, 2-ER-101-03; that the orders and the OMB Determination violate the procedural requirements of the Office of Federal Procurement Policy Act (Procurement Policy Act), 2-ER-104-05, and the

Administrative Procedure Act (APA), 2-ER-112-17; and that the orders violate various other constitutional provisions, 2-ER-98-100; 2-ER-106-12; 2-ER-117-18.[2]

The Second Amended Complaint includes additional allegations regarding plaintiffs' compliance with the vaccination requirements. It alleges that three plaintiffs have complied fully with the vaccination requirements, *see* 2-ER-44 ¶ 70; 2-ER-51 ¶ 104; 2-ER-66 ¶ 172, and that three more have neither complied nor yet sought exemptions, *see* 2-ER-37 ¶ 46; 2-ER-66 ¶ 173; 2-ER-74 ¶ 223. It alleges that nearly all other plaintiffs—including all eight federal employees—have requested exemptions, *see, e.g.*, 2-ER-31-33 ¶¶ 18-28, although a handful have provided incomplete information regarding their employment, vaccination, or exemption statuses, *see, e.g.*, 2-ER-32-33 ¶ 27 (no employment information); 2-ER-33 ¶ 32 (no vaccination or exemption information). Of the plaintiffs that requested exemptions, more than 50 have been granted accommodations. *See, e.g.*, 2-ER-31-32 ¶¶ 21-23; 2-ER-63-64 ¶¶ 160-161; 2-ER-81-82 ¶¶ 268-269. Only seven plaintiffs—all contractor employees—have had their requests denied and claim that they face or faced disciplinary measures for their noncompliance with the vaccination requirement. *See* 2-ER-40 ¶ 53; 2-ER-42 ¶ 65; 2-ER-43 ¶ 67; 2-ER-46 ¶ 78; 2-ER-57 ¶ 130; 2-ER-65-66 ¶ 171; 2-ER-78-79 ¶ 251. The remaining plaintiffs, including all the federal

---

[2] Plaintiffs also voluntarily dismissed their claims against the private sector executives, 1-ER-3, and added Jennifer Granholm, in her official capacity as U.S. Secretary of Energy, as a defendant, 2-ER-29.

employees, have not had their requests conclusively resolved. *See, e.g.*, 2-ER-33 ¶¶ 28-30; 2-ER-40 ¶¶ 56-58; 2-ER-46 ¶¶ 79, 81-82 (alleging plaintiffs submitted exemptions but were "originally not provided an accommodation").[3]

The district court granted the government's renewed motion to dismiss, concluding that the Second Amended Complaint "continues to suffer from the same procedural and jurisdictional flaws as prior pleadings." 1-ER-3.

As a threshold matter, the court concluded that the vast majority of plaintiffs—307 of 314—failed to establish subject-matter jurisdiction to pursue their claims. The court concluded that those plaintiffs who are in compliance with the vaccination requirements, have received accommodations, or have exemption requests pending failed to establish that they face the threat of immediate adverse employment actions. 1-ER-8. The court also concluded that those plaintiffs who have not provided information regarding their employment, vaccination, or exemption statuses failed to establish subject-matter jurisdiction because "it is impossible to know whether they could face an adverse employment action," 1-ER-8, or "whose actions [they] are challenging," 1-ER-7. And the court concluded that the handful of plaintiffs who have not yet sought exemptions cannot "'manufacture'" subject-matter jurisdiction "by failing to pursue [available] exemptions." 1-ER-7 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)). The court thus concluded that the only plaintiffs

---

[3] The federal government stopped processing all federal employees' exemption requests in light of the nationwide injunction. *See supra* p. 9 n.1.

14

who alleged injuries sufficiently "actual [and] imminent" to establish jurisdiction were the seven contractor employees whose exemption requests were conclusively denied and who face or faced adverse employment actions. 1-ER-6; 1-ER-9.

On the merits, the court held that those seven plaintiffs failed to state claims under the Free Exercise Clause and RFRA. The court again rejected plaintiffs' Free Exercise claims because plaintiffs nowhere explained how "their sincerely held religious beliefs have been adversely affected by the" vaccination requirement. 1-ER-13. The court concluded that plaintiffs' RFRA claims failed for much the same reason, as plaintiffs' allegations did not "identify the religious activities they were engaged in, or how those activities were substantially burdened." 1-ER-13.

The court also reiterated its conclusion that the Contractor EO "satisfies the requirements of the Procurement Act." 1-ER-9. The court explained that plaintiffs had "failed to advance any new factual allegations or arguments to support their claim beyond their reliance on nonbinding authority" from district courts and other courts of appeals. 1-ER-9.

The court further concluded that plaintiffs' challenges under the Procurement Policy Act and APA "fail[ed] as a matter of law." 1-ER-11. The court explained that plaintiffs failed to show that the statutes' requirements applied to the issuance of the executive orders and OMB Determination. 1-ER-9 (Procurement Policy Act); 1-ER-11 (APA).

15

The court similarly rejected plaintiffs' structural constitutional challenges. Those claims were not viable, the district court stated, because plaintiffs' "broad recitations of various constitutional principles muddled with repetitive allegations" made their claims "incomprehensible." 1-ER-10 (quotation marks omitted).

Finally, although plaintiffs did not request leave to amend, the district court concluded that granting them leave to do so would be futile. The court explained that plaintiffs had "amended their Complaint twice" and that their "continued failures to address the shortcomings in their various pleadings demonstrates a third opportunity to amend would be futile." 1-ER-14-15. The court therefore denied plaintiffs' leave to amend, dismissed plaintiffs' claims against the federal defendants, and entered final judgment in the government's favor. 1-ER-15; 3-ER-391.

**4.** Plaintiffs timely appealed. 3-ER-306. They then moved to consolidate their appeal with *Brnovich v. Biden*, No. 22-15518 (9th Cir.), another case involving challenges to the Contractor EO. *See* DE11.[4] The government opposed plaintiffs' request on the ground that the interests of judicial economy counseled against consolidation, but urged this Court to hold plaintiffs' appeal in abeyance pending the outcome in *Brnovich*. DE13 at 3-4. The Court rejected plaintiffs' consolidation motion and denied without prejudice the government's request to stay the proceedings. DE17.

---

[4] Numbered docket entries in this appeal, No. 22-35474, are abbreviated "DE#."

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that the vast majority of plaintiffs failed to establish subject-matter jurisdiction over their claims.

Most plaintiffs have not alleged that they face a sufficiently concrete and imminent injury to establish subject-matter jurisdiction. The Constitution "mandates that prior to [a court's] exercise of jurisdiction there exist a constitutional case or controversy" and that "the issues presented are definite and concrete, not hypothetical or abstract." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (quotation marks omitted). Plaintiffs premise their claims on the threat of "imminent and wrongful termination" for failure to comply with the vaccination requirements. 2-ER-28. But only seven plaintiffs, all of them contractor employees who have had their exemption requests conclusively denied, adequately alleged that they face an imminent threat of disciplinary action. The remaining plaintiffs—including all eight federal employees and 299 of the contractor plaintiffs— face no concrete and impending injury because they either are in compliance with the vaccination requirements, have been granted an exemption, have exemption requests pending, may still request exemptions, or have not established their employment or compliance statuses. All these plaintiffs' claims are "riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam).

The district court also lacks jurisdiction over the federal employees' claims on the independent ground that they are precluded by the CSRA, which provides the "exclusive" means for federal employees to challenge adverse employment actions. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5 (2012). The CSRA requires that employees first seek administrative review of disciplinary actions from the MSPB, even with respect to constitutional claims; then, if necessary, they may seek judicial review in the Federal Circuit. *See id.* at 5-6. The federal employees' claims—which amount to preemptive challenges to hypothetical, future personnel actions—are barred by the CSRA's comprehensive statutory scheme.

**II.** The district court correctly dismissed on the merits the only claims over which it had jurisdiction—the challenges by seven contractor plaintiffs to the Contractor EO.

The Contractor EO is facially consistent with RFRA because it authorizes contractor employers to grant accommodations to individuals who are unvaccinated because of their religious beliefs. And plaintiffs cannot state a RFRA claim based on the denial of their accommodation requests because they have neither identified their religious beliefs nor alleged how the order's requirements substantially burden their religious exercise.

The Contractor EO falls well within the President's authority under the Procurement Act. The Procurement Act authorizes the President to "prescribe policies and directives" that he considers "necessary" to ensure "an economical and

18

efficient system" for procurement and contracting. 40 U.S.C. §§ 101, 121(a). For decades, all three branches of government have agreed that the Procurement Act authorizes the President to pursue policies that in his judgment will improve the economy and efficiency of the overall federal procurement system by enhancing the economy and efficiency of the services that the federal government procures. The Contractor EO is consistent with that tradition. As the President determined, requiring covered contractor employees to comply with COVID-19 safety protocols, including vaccination, reduces absenteeism among the federal contractor workforce resulting from a virulent and deadly disease.

Plaintiffs mistakenly argue that the Contractor EO regulates public health, not procurement, and if sustained, would permit the President to enact far-fetched orders governing soda consumption and abortions. But any Procurement Act executive order must bear a close nexus to the statute's goals, and the President, as a market participant and the most accountable elected official, has strong incentives to refrain from imposing conditions that contractors and the public would view as unacceptable. The President does not undermine the effectiveness of those limits when he imposes conditions on federal contractors that are aimed at addressing the distinct and real threats posed by a pandemic to government operations and that are analogous to conditions imposed by private and public entities.

No other considerations cast doubt on the validity of the Contractor EO. Contrary to plaintiffs' suggestion, major-question principles are inapplicable where, as

19

here, the President is acting in his proprietary authority to set conditions for those that elect do to business with the federal government. And because federal contracting is a matter reserved to the federal government, not the states, the Executive Order does not raise federalism concerns. The Contractor EO's implementing documents are also procedurally valid.

**III.** The district court did not abuse its discretion in denying plaintiffs leave to amend their complaint. As the court explained, plaintiffs repeatedly failed to correct the "egregious deficiencies" in their pleadings, despite ample opportunity to do so. 2-ER-144. The district court thus correctly concluded that any further opportunity to amend would be futile.

## STANDARD OF REVIEW

This Court reviews the district court's dismissal of the Second Amended Complaint for failure to state a claim de novo and the denial of leave to amend for an abuse of discretion. *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1129, 1133 (9th Cir. 2013). The Court reviews the district court's order denying a preliminary injunction, which on appeal merges with the final judgment, *see United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*, 545 F.3d 1134, 1141 (9th Cir. 2008), for abuse of discretion, but questions of law are reviewed de novo, *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 934 (9th Cir. 2022).

# ARGUMENT

## I. THE DISTRICT COURT LACKS JURISDICTION OVER THE CLAIMS OF MOST PLAINTIFFS

The district court correctly held that the vast majority of plaintiffs failed to establish subject-matter jurisdiction to pursue their claims. Most plaintiffs—including all eight federal employees and 299 out of the 306 contractor plaintiffs—failed to allege that they face a concrete and imminent injury. The district court also lacked jurisdiction over the federal employees' claims for the independent reason that they are precluded by the CSRA. The only plaintiffs that established subject-matter jurisdiction are the seven contractor plaintiffs that have had their exemption requests conclusively denied. The district court thus properly dismissed all other plaintiffs' claims for lack of subject-matter jurisdiction.

### A. The Vast Majority Of Plaintiffs Face No Actual Or Imminent Injury

**1.** Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "A party invoking federal jurisdiction has the burden of establishing that it has satisfied the 'case-or-controversy' requirement of Article III." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008).

Two closely related doctrines—standing and ripeness—enforce that case-or-controversy limitation by "restrict[ing] the types of disputes that federal courts will entertain." *Montana Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir.

2014). To establish the irreducible constitutional minimum of standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Similarly, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted); *see also Montana Envtl. Info.*, 766 F.3d at 1188 ("A dispute is ripe in the constitutional sense if it present[s] concrete legal issues, presented in actual cases, not abstractions." (alteration in original) (quotation marks omitted)).

In practice, "the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). "That is so because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009). Thus, the "Article III standing and ripeness issues" often "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (quotation marks omitted). "Whether … viewed as [a question] of standing or ripeness, the Constitution mandates that prior" to the court's exercise of jurisdiction

22

"the issues presented are definite and concrete, not hypothetical or abstract." *Thomas*, 220 F.3d at 1139 (quotation marks omitted).

    **2.**    The federal employees failed to satisfy Article III's case-or-controversy requirement. All eight requested that DOE exempt them from the vaccination requirement, and none claim that their requests have been conclusively resolved. *See* 2-ER-31 ¶ 20; 2-ER-42 ¶ 66; 2-ER-46 ¶ 81; 2-ER-51 ¶ 103; 2-ER-56 ¶ 127; 2-ER-67 ¶ 181; 2-ER-88 ¶ 306; 2-ER-93 ¶ 325. While their exemption requests remain pending, they are not required to be vaccinated and are not subject to discipline. *See Employee Guidance*; 2-ER-30 ¶ 16 (alleging DOE "would commence enforcing its COVID-19 vaccination policy … for unvaccinated Federal employees *who haven't applied for an exemption*" (emphasis added) (quotation marks omitted)). If their requests are ultimately granted, they will not have to be vaccinated and will face no discipline for that decision. Even if their exemption requests are denied, what discipline would ultimately be imposed is as yet undetermined because the relevant guidance recommends a progressive discipline procedure with multiple intervening steps before potential removal from federal service. *See Employee Guidance*. The federal employees thus face no "actual or imminent" threat of discipline or requirement to be vaccinated. *TransUnion LLC*, 141 S. Ct. at 2203. Their claims "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (quotation marks omitted); *see also Clapper v. Amnesty Int'l, USA*,

23

568 U.S. 398, 416 (2013) (explaining that "fears of hypothetical future harm that is not certainly impending" do not satisfy Article III).

**3.** Most of the contractor plaintiffs' claims are similarly unfit for adjudication. Their claims rest on the general assertion that they face the threat of "imminent and wrongful termination," 2-ER-28, but apart from a handful of instances discussed more fully below, the Second Amended Complaint lacks any plausible allegations to support that claim. Plaintiffs nowhere specify what steps their employers have taken to implement the vaccination requirement or what disciplinary action, if any, they will face for failing to comply with the requirement. Nor have plaintiffs identified any "specific warning or threat" by the contractor employers "to initiate [termination] proceedings" for non-compliance. *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). To the contrary, several of the contractors "affirmatively stated" that their employees "do not face imminent adverse employment action," and others "have not indicated they plan to initiate adverse employment action." 2-ER-151-52. The contractor plaintiffs thus have failed to show that they are "subject to a *genuine* threat of *imminent*" harm sufficient to establish subject-matter jurisdiction. *Wolfson*, 616 F.3d at 1058 (quotation marks omitted).

Nearly all the contractor plaintiffs also submitted exemption requests to their employers. The OMB Determination obligates the contractor employers to "review and consider" the requests to determine whether exemptions are required under federal law. 86 Fed. Reg. at 63,420. The contractors here granted exemptions to

24

more than 50 contractor plaintiffs.  As the district court correctly concluded, those plaintiffs "cannot allege any actual or imminent harm" because "they are in compliance with the vaccine requirement[] and do not face any potential adverse employment actions." 1-ER-7-8.  Plaintiffs suggest that the accommodations were granted only for limited periods of time, *see* Opening Br. 20, but they make no showing that the accommodations have since been revoked or that those plaintiffs who received accommodations must now be vaccinated or else face discipline, *cf. Colwell v. Department of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009) ("The burden of establishing ripeness and standing rests on the party asserting the claim.").[5]

The many contractor plaintiffs with pending exemption requests similarly face no immediate threat of injury.  They nowhere allege that while their requests are pending, they are required to become vaccinated or will be subject to discipline.  Like the federal employees, these contractor plaintiffs need not become vaccinated if their requests are granted.  It is also unclear what, if any, disciplinary action they will face if their requests are ultimately denied, as that decision is left to the contractor employers.  *See* 86 Fed. Reg. at 63,420.  These contractor plaintiffs' claims are thus

---

[5] One contractor plaintiff had an accommodation revoked when he voluntarily moved out of state.  2-ER-34-35 ¶ 37.  That plaintiff's self-inflicted harm cannot be fairly traced to the Contractor EO.  *See Clapper*, 568 U.S. at 416 (holding plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

"riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). And plaintiffs' passing suggestion (at 20) that speculation is unwarranted because some contractor employers have denied a handful of exemption requests cannot be squared with the fact that many more plaintiffs' requests have been granted.

Many of the remaining contractor plaintiffs' claims suffer similar jurisdictional defects. Three face no threat of disciplinary action because they have complied with the vaccination requirement. 1-ER-7-8. Although they raise objections to possible future vaccination requirements, *see* 2-ER-44 ¶ 70; 2-ER-51 ¶ 104; 2-ER-66 ¶ 172, such speculative "fears of hypothetical future harm that is not certainly impending" cannot satisfy the concrete case-or-controversy requirement, *Clapper*, 568 U.S. at 416. Three more have not yet requested exemptions. 2-ER-37 ¶ 46; 2-ER-66 ¶ 173; 2-ER-74 ¶ 223. Their claims are unfit for judicial resolution because they can still seek exemptions, meaning their asserted injuries "may not occur as anticipated, or indeed may not occur at all," *Texas*, 523 U.S. at 300 (quotation marks omitted); *see Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297 (1981) (suggesting that claims are "not ripe for judicial resolution" where "[t]here is no indication in the record that [plaintiffs] have availed themselves of the opportunities provided by [a statutory scheme] to obtain administrative relief by requesting either a variance … or a waiver"). And a handful of contractor plaintiffs have provided insufficient information to determine their employment, vaccination, or exemption statuses, *see*

26

*supra* p. 13. As the district court explained, these plaintiffs failed to carry their burden of showing a concrete case or controversy exists because "it is impossible to know whether they could face an adverse employment action," 1-ER-8, or "whose actions [they] are challenging," 1-ER-7.

Only seven contractor plaintiffs alleged that they suffered a concrete and imminent threat of injury sufficient to establish subject-matter jurisdiction. All seven have had their exemption requests conclusively denied and claim that they imminently face, or have already faced, disciplinary action for their noncompliance with the vaccination requirement. *See* 2-ER-40 ¶ 53; 2-ER-42 ¶ 65; 2-ER-43 ¶ 67; 2-ER-46 ¶ 78; 2-ER-57 ¶ 130; 2-ER-65-66 ¶ 171; 2-ER-78-79 ¶ 251.

### B. The Federal Employees' Claims Are Precluded By The Civil Service Reform Act

The district court also lacked jurisdiction over the federal employees' claims because they are precluded by the CSRA. Although district courts typically "have general federal question jurisdiction under 28 U.S.C. § 1331," that grant of jurisdiction "is not absolute." *Kerr v. Jewell*, 836 F.3d 1048, 1058 (9th Cir. 2016). Congress may "impliedly preclude[] district court jurisdiction" by "enact[ing] a statutory scheme of administrative review." *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1178 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 895 (2022). In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court established the framework for determining whether Congress "intended to preclude initial judicial review" in federal district court by

27

channeling claims through a scheme of administrative review. *Id.* at 207. Courts must ask whether Congress's "intent is fairly discernible in the statutory scheme," *id.* (quotation marks omitted), and whether the "claims are of the type Congress intended to be reviewed within [the] statutory structure," *id.* at 212; *see, e.g.*, *Axon Enter.*, 986 F.3d at 1180-85 (applying framework).

The Supreme Court's decision in *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012), squarely resolves the first prong of the *Thunder Basin* inquiry here—that is, whether it is "fairly discernible" that Congress meant for the CSRA "to preclude initial judicial review" in district court, *Thunder Basin*, 510 U.S. at 207 (quotation marks omitted). In *Elgin*, the Court explained that "employees to whom the CSRA grants administrative and judicial review" may not sue except under the CSRA. 567 U.S. at 11 (emphasis omitted). And, as to "employees to whom the CSRA denies statutory review," the Court explained that "the CSRA's elaborate framework demonstrates Congress' intent to entirely foreclose judicial review." *Id.* (cleaned up). In other words, the Court recognized that Congress meant to make the CSRA scheme "exclusive." *Id.* at 13; *Kerr*, 836 F.3d at 1058 ("[W]e have long held that the remedies set forth in the CSRA are exclusive.").

The second prong of the *Thunder Basin* inquiry is also satisfied here because plaintiffs' claims—at bottom, challenges to the discipline they potentially will face if they refuse to comply with the Employee EO's vaccination requirement—are "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder*

28

*Basin*, 510 U.S. at 212. In making that determination, courts consider whether plaintiffs "can obtain meaningful judicial review" of their claims through the statutory scheme, whether the claims are "'wholly collateral' to the statutory scheme," and whether the claims are "outside the … expertise" of the agency charged with initially reviewing them under the statutory scheme. *Axon Enter.*, 986 F.3d at 1181 (citing *Elgin*, 567 U.S. at 15). *Elgin*—which concerned constitutional challenges brought by federal employees to a requirement that they register for the draft, *see* 567 U.S. at 12— confirms that all three factors point toward preclusion here. Here, as in *Elgin*, requiring adherence to the CSRA framework would not foreclose meaningful judicial review because the employees, after completing the administrative process, could appeal an adverse MSPB decision to the Federal Circuit. *See id.* at 17. Here, as in *Elgin*, the Federal Circuit is "fully competent to adjudicate" challenges to the statutory requirement, including constitutional ones. *Id.* Here, as in *Elgin*, the employees' claims are not "wholly collateral to the CSRA scheme" because they are "the vehicle by which" plaintiffs seek to overcome "adverse employment action." *Id.* at 22. And here, as in *Elgin*, plaintiffs' claims are within the MSPB's expertise, including because the MSPB's resolution of "preliminary questions unique to the employment context" could "obviate the need to address the constitutional challenge." *Id.* at 22-23.

That DOE has yet to discipline the federal employees only underscores the impropriety of their attempt to circumvent the CSRA framework. The CSRA provides a mechanism for review of adverse employment actions once they have been

"taken," 5 U.S.C. § 7513(d), but it does not provide a mechanism for employees to bring *preemptive* challenges to *potential* discipline.[6]  The absence of a mechanism in the CSRA to bring such challenges means judicial review of them is "entirely foreclose[d]." *Elgin*, 567 U.S. at 11.  In *Thunder Basin*, for instance, the Court held that a mine operator could not bring a pre-enforcement challenge to the Mine Act—even where the Act was "facially silent with respect to pre-enforcement claims"—because "[t]he Act's comprehensive review process" allowed the operator to raise any challenge in the context of an enforcement proceeding, 510 U.S. at 208-09, and it would be inconsistent with the "statutory structure" to allow circumvention of that process, *id.* at 213.  The Court applied that same principle in *Elgin*, explaining not only that "employees to whom the CSRA grants administrative and judicial review" must proceed within the CSRA framework, but also that judicial review is "entirely foreclose[d]" where "the CSRA denies statutory review."  567 U.S. at 11 (emphasis omitted); *Kerr*, 836 F.3d at 1058 ("[T]he comprehensive nature of the procedures and remedies provided by the CSRA indicates a clear congressional intent to permit federal court review as provided in the CSRA or not at all." (quotation marks omitted)).

---

[6] There is a narrow exception not implicated here:  Congress has authorized the Office of Special Counsel to investigate whether a challenged "personnel action"— a phrase defined broadly, *see* 5 U.S.C. § 2302(a)—constitutes a "prohibited personnel practice," *id.* §§ 1212(a)(2), 1214(a)(1)(A), and to petition the Board for corrective action, *id.* § 1214(b)(2)(B)-(C).

Permitting plaintiffs to file preemptive attacks on potential adverse employment actions would make a hash of the CSRA's carefully crafted remedial scheme, including the distinction Congress specifically drew between the administrative process available to employees against whom an adverse action has merely been proposed and the judicial review available when the action has been "taken," 5 U.S.C. § 7513(d). It also "would reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Elgin*, 567 U.S. at 14. District courts would be left to deal with preemptive challenges, while challenges to actual employment actions would continue to arise under the CSRA's scheme. Such bifurcated review would squarely contravene "[t]he CSRA's objective of creating an integrated scheme of review." *Id.* Consistent with those principles, the only two appellate courts to have addressed the issue have held that the CSRA precludes district court review of preemptive challenges brought by federal employees to the Employee EO, *see Rydie v. Biden*, 2022 WL 1153249, at *4-8 (4th Cir. Apr. 19, 2022); *Feds for Med. Freedom v. Biden*, 30 F.4th 503, 511 (5th Cir. 2022), though the Fifth Circuit vacated the panel decision upon granting rehearing en banc, which remains pending, *see* 37 F.4th 1093 (5th Cir. 2022) (per curiam).[7]

---

[7] The government noted this limitation on the district court's subject-matter jurisdiction below, albeit late in the proceedings. *See* 2-ER-20. Anyway, challenges to subject-matter jurisdiction may be raised at any point in the litigation. *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019).

## II. PLAINTIFFS' CHALLENGES TO THE CONTRACTOR EXECUTIVE ORDER ARE WITHOUT MERIT

The district court correctly dismissed the claims over which it had jurisdiction—the challenges to the Contractor EO asserted by the seven contractor plaintiffs who presented a concrete case or controversy—as without merit. On appeal, plaintiffs frame their arguments as challenges to both the Contractor and Employee EOs. But the district court held that it lacked jurisdiction to address any of the federal employees' claims and so did not address the merits of the Employee EO. Even if this Court disagrees and concludes that it has jurisdiction over those claims, it should decline to address those arguments in the first instance. *See CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1145-46 (9th Cir. 2022). As to the Contractor EO, this Court should affirm the district court's dismissal of the seven plaintiffs' challenges.[8]

### A. Plaintiffs Failed To State A Claim For Violation Of The Religious Freedom Restoration Act

The district court correctly dismissed plaintiffs' RFRA claims.[9] Plaintiffs advance two theories as to how the federal defendants purportedly violated RFRA.

---

[8] Because plaintiffs cannot succeed on the merits of their challenges, the district court also correctly denied their request for preliminary injunctive relief. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs appeal of that decision independently fails because plaintiffs do not contend that the district court abused its discretion in weighing the equities, which, the court concluded, "tip[] heavily in Defendants' favor." 2-ER-159.

[9] Plaintiffs do not contest the district court's dismissal of their First Amendment claims.

First, plaintiffs suggest that the Contractor EO violates RFRA on its face because it "coerces" all covered contractor employees, including plaintiffs, "into either violating their sincerely held religious beliefs or losing their livelihoods." 2-ER-98; *see* Opening Br. 5-6, 45. Second, they argue that their individual RFRA rights were violated when their employers denied their exemption requests. *See* 2-ER-97-98; Opening Br. 19-20. Neither of those theories is sufficient to state a claim under RFRA.

1. Plaintiffs' first theory fails as a matter of law. To bring a facial challenge, plaintiffs must show that the government's action is unlawful "in all of its applications." *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019). Plaintiffs cannot show that the Contractor EO violates RFRA as to every contractor employee. RFRA claims require an individualized inquiry into whether a given policy substantially burdens a plaintiff's sincere religious beliefs; if a plaintiff cannot meet that substantial burden requirement, he cannot state a RFRA claim. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc). Even if an individual can show that a government policy substantially burdens his religious exercise, moreover, there is no RFRA violation if the government can show that applying the policy to that individual furthers a "compelling governmental interest" and is implemented by "the least restrictive means." *Id.* (quoting 42 U.S.C. § 2000bb-1(b)). Because the Contractor EO may lawfully apply to contractors who cannot meet RFRA's substantial burden requirement or to whom the government has a compelling interest in applying the policy, plaintiffs cannot show that the Contractor EO is

33

unlawful in all applications. The Contractor EO and its implementing guidance also recognize that contractor employers may "provide an accommodation to" the vaccination requirement "because of a[n employee's] sincerely held religious belief, practice, or observance." 86 Fed. Reg. at 63,420; *see* 86 Fed. Reg. at 50,985 (requirements apply "to the extent permitted by law"). Thus, far from "forcing" covered contractor employees "to choose between their sincere religious beliefs and their livelihoods," *contra* Opening Br. 5, the Contractor EO offers a mechanism for obtaining an "effective[] exempt[ion]" from the generally applicable vaccination requirement on religious grounds, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 698 (2014).

      **2.** Plaintiffs' challenges to the denial of their individual exemption requests also fail. As the district court recognized, "[t]o assert a claim for violation of the RFRA, Plaintiffs must establish a prima facie case by presenting evidence that the activities they claim are burdened by Defendants' action are an exercise of religion, and that Defendants' action substantially burdened their exercise of religion." 1-ER-13 (citing *Navajo Nation*, 535 F.3d at 1068). Plaintiffs, however, never identified "the religious activities they were engaged in, or how those activities were substantially burdened by" the Contractor EO. 1-ER-13. Instead, they alleged only that "they applied for a religious exemption but were denied." 1-ER-14. Such allegations, the district court correctly concluded, "are akin to unadorned, the-defendant-unlawfully-

34

harmed-me accusation[s]," which are insufficient to survive a motion to dismiss. 1-ER-14 (alteration in original) (quotation marks omitted).

Plaintiffs do not dispute this analysis. Instead, they argue that the government lacks a compelling interest in requiring vaccination and that vaccination is not the least restrictive means of reducing disruption to government contracts. *See* Opening Br. 46-55. Even if that were true, *but see infra* pp. 44-48, "the government is not required to prove a compelling interest for its action or that its action involves the least restrictive means to achieve its purpose, unless the plaintiff first proves the government action substantially burdens his exercise of religion," *Navajo Nation*, 535 F.3d at 1069. Because plaintiffs have failed to satisfy that initial burden here, the district court correctly dismissed their RFRA claims.[10]

## B. The Contractor Executive Order Is A Proper Exercise Of Authority Under The Procurement Act

The district court was similarly correct to conclude that the Contractor EO is a valid exercise of the President's authority under the Procurement Act. *See* 1-ER-9; 2-ER-154-56.[11]

---

[10] As explained (*supra* p. 32) this Court should not address the merits of plaintiffs' RFRA challenge to the Employee EO. In any event, that challenge also fails. The Employee EO, like the Contractor EO, establishes a religious exemption, and none of the federal employees identifies how the EO substantially burdens their exercise of religion or alleges that DOE has denied their exemption requests. *See supra* p. 33-34.

[11] Contrary to plaintiffs' suggestion (at 6), the district court did not conclude that the Employee EO is authorized under the Procurement Act. And the

*Continued on next page.*

1.     The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle."  40 U.S.C. § 121(a).  Section 101 of that subtitle, in turn, informs which policies "carry out" the statute, stating that the Procurement Act's "purpose … is to provide the Federal Government with an economical and efficient system for," among other things, "[p]rocuring … property and nonpersonal services, and performing related functions including contracting."  *Id.* § 101.  That statement of purpose "is an appropriate guide to the meaning of the statute's operative provisions," including § 121.  *Gundy v. United States*, 139 S. Ct. 2116, 2127 (2019) (plurality op.) (cleaned up).  Together then, these provisions make clear that the Procurement Act empowers the President to "prescribe policies and directives that the President considers necessary" to "provide the Federal Government with an economical and efficient system for … [p]rocuring … property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. §§ 101, 121(a).  That express grant of statutory authority permits the President to issue, among others, orders that ensure that executive agencies contract with contractors who will perform economically and efficiently.

2.     That textual interpretation of the Procurement Act is consistent with the interpretation of the statute advanced by Presidents and upheld by courts of appeals over many decades, without any concerns from Congress.  Such an "early,

---

government has never argued that the Procurement Act is the source of authority for the Employee EO.  *See* 86 Fed. Reg. at 50,989.

longstanding, and consistent interpretation" of a statute is "powerful evidence of [the statute's] original public meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) (emphasis omitted).

a. Presidents regularly have used their Procurement Act authority to issue orders that ensure the government contracts with economical and efficient contractors. In the first decades after the Procurement Act's enactment, "the most prominent use of the President's authority under the [statute]" was "a series of anti-discrimination requirements for Government contractors." *AFL-CIO v. Kahn*, 618 F.2d 784, 790 (D.C. Cir. 1979) (en banc). Presidents Dwight D. Eisenhower, John F. Kennedy, and Lyndon B. Johnson each issued orders forbidding contractors from discriminating on the basis of race, creed, color, or national origin, *id.* at 790-91, 791 n.33 (citing orders)—all in an effort to prevent the federal government's suppliers from "increasing its costs and delaying its programs by excluding from the labor pool available minority workmen," *Contractors Ass'n of E. Pa. v. Secretary of Labor*, 442 F.2d 159, 170 (3d Cir. 1971).

More recently, Presidents have continued to exercise their Procurement Act authority to impose contract requirements that they determined enhanced the economy and efficiency of federal contractor operations. President George W. Bush, for example, issued an order requiring federal contractors to use the E-Verify system to verify the lawful immigration status of employees, reasoning that "[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely

37

to face immigration enforcement actions" and thus are "generally more efficient and dependable procurement sources." Exec. Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 11, 2008). And President Barack Obama issued an order requiring federal contractors to provide their employees with paid sick leave based on his determination that doing so would "improve the health and performance of employees of Federal contractors and bring benefits packages at Federal contractors in line with model employers, ensuring that they remain competitive employers in the search for dedicated and talented employees." Exec. Order No. 13,706, 80 Fed. Reg. 54,697, 54,697 (Sept. 10, 2015).

b.     For decades, the courts of appeals have endorsed this view of the Procurement Act as affording the President both "necessary flexibility and 'broad-ranging authority'" in setting procurement policies. *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (quoting *Kahn*, 618 F.2d at 789). Courts have accordingly recognized that an order issued by the President is a proper exercise of his Procurement Act authority if there exists a "sufficiently close nexus" between the order and the statutory goals of economy and efficiency, *Kahn*, 618 F.2d at 792, and the order is otherwise consistent with the law.

That standard is a "lenient" one, *Chao*, 325 F.3d at 367, and courts have respected the President's judgment that policies will enhance economy and efficiency in federal procurement, including by ensuring the government contracts with efficient and productive federal contractors. In *Chao*, for example, the D.C. Circuit upheld an

38

order requiring government contractors to post notices of certain labor rights based on President Bush's judgment that "[w]hen workers are better informed of their rights, … their productivity is enhanced" and that "[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts." *Id.* at 366 (quoting Exec. Order No. 13,201, 66 Fed. Reg. 11,221, 11,221 (Feb. 22, 2001)).  Similarly, in *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), a district court upheld President Bush's order requiring federal contractors to use the E-Verify system based on his judgment that contractors with "rigorous employment eligibility confirmation policies" would be "more efficient and dependable procurement sources." *Id.* at 738 (quoting 73 Fed. Reg. at 33,285).  And courts have upheld antidiscrimination orders, observing that they are not "so unrelated to the establishment of 'an economical and efficient system for … the procurement and supply' of property and services that [they] should be treated as issued without statutory authority." *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (ellipsis in original) (citation omitted); *see Contractors Ass'n*, 442 F.2d at 170-71 (agreeing that antidiscrimination orders were "authorized by the broad grant of procurement authority" because "the federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of its projects" (emphasis added)).

c. Congress has repeatedly revised the Procurement Act against the background of this longstanding consensus among the courts of appeals, and it has never modified or restricted the President's power. *See, e.g.*, Pub. L. No. 99-500, 100 Stat. 1783, 1783-345 (1986); Pub. L. No. 99-591, 100 Stat. 3341, 3341-345 (1986); Pub. L. No. 104-208, 110 Stat. 3009, 3009-337 (1996). Indeed, Congress recodified—without substantive change—both the Procurement Act's statement of purpose and the operative provision authorizing the President to set procurement policies to achieve the statute's goals. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law[] … ."). As this Court has emphasized, "Congress is presumed to be aware of a[] … judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Chugach Mgmt. Servs. v. Jetnil*, 863 F.3d 1168, 1174 (9th Cir. 2017) (quotation marks omitted); *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015) ("If a word or phrase has been … given a uniform interpretation by inferior courts …, a later version of that act perpetuating the wording is presumed to carry forward that interpretation." (ellipses in original) (quotation marks omitted)).

**3.** Plaintiffs urge this Court to abandon this decades-old understanding of the Procurement Act based on recent opinions in two other challenges to the Contractor EO. *See* Opening Br. 9-10, 22-25, 29-31. Those opinions do not reflect

binding merits holdings in their respective circuits and reflect a fundamental misunderstanding of the statute.

In the first decision, a motions panel of the Sixth Circuit denied a stay pending the appeal of an injunction against the Contractor EO. *See Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022). The motions panel's interlocutory order declared that the statute does not permit the President to set standards governing the performance of contractual agreements, concluding instead that the President's authority is limited to policies that "mak[e] the government's entry into contracts less duplicative and inefficient." *Id.* at 605 (emphasis omitted).

Nothing in the Procurement Act's text supports that restrictive reading. The motions panel derived the limitation from the statute's reference to the "system" for procurement, which the panel defined as a "formal scheme or method of governing organization." *Kentucky*, 23 F.4th at 604 (quotation marks omitted). Even accepting the stay panel's novel theory that the word "system" restricts the permissible types of presidential action, and even accepting the panel's definition of that word, executive orders that establish requirements to be implemented in federal contracts fall within its scope. Just like the CEO of a private business, the President can establish an efficient "scheme or method" for "contracting" for services only if he takes into account factors affecting the performance of those service contracts, including the availability and productivity of service providers. A "system" for procurement thus includes appropriate measures to minimize the risks to the government that

41

performance of contracts will be delayed or unforeseen costs incurred. And one primary way to ensure that a "system" of procurement and contracting is "economical and efficient" is to ensure that the system purchases services that are performed in a cost-efficient and timely manner.

Plaintiffs also overread *Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022). In the fractured *Georgia* decision only one judge of a three-judge panel was willing to say that the Contractor EO was unlawful (and another unequivocally said the opposite). The majority of the panel agreed only that the "plaintiffs have a reasonable chance to succeed on the merits in the case underlying this interlocutory appeal." *Georgia*, 46 F.4th at 1308 (Edmondson, J., concurring with Judge Grant in the result). The lead opinion's merits analysis, upon which plaintiffs rely (at 23-25), is thus not binding even in the Eleventh Circuit.

That opinion's analysis is also deeply flawed to the extent it suggests that the Procurement Act authorizes only policies that help agencies carry out the specific authority they are granted under the statute. As the partial dissent in that case explains, the Procurement Act's statement of purpose "is part of the subtitle that § 121 gives the President the authority to carry out." *Georgia*, 46 F.4th at 1311 (Anderson, J., concurring in part & dissenting in part). The statutory language thus "clearly authorizes the President to prescribe such policies and directives that carry out the purpose of the statute to ensure an 'economical and efficient system for' procurement," which is precisely "what the President did here." *Id.* at 1309 (quoting

40 U.S.C. § 101). And contrary to the lead opinion's suggestion, the Supreme Court in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) "expressly disavow[ed]" any requirement that "delegated authority must always be tied to a specific statutory provision." *Georgia*, 46 F.4th at 1310 (Anderson, J., concurring in part & dissenting in part). *Contra* Opening Br. 31. Indeed, in refusing "to decide whether" the executive order at issue in that case "[wa]s authorized by" the Procurement Act, *Chrysler*, 441 U.S. at 304, the Court emphasized that a "grant of legislative authority" need not be "specific before [policies] promulgated pursuant to it can be binding," *id.* at 308.

More recently, a divided panel of the Fifth Circuit upheld a preliminary injunction enjoining enforcement of the Contract EO, but notably declined to adopt the narrow constructions urged by the Sixth Circuit in *Kentucky* and the lead opinion in *Georgia*. *See Louisiana v. Biden*, -- F.4th --, 2022 WL 17749291, *6-*8 (Dec. 19, 2022 5th Cir.). The court recognized that the Procurement Act's "statutory text, … in fact, places discernment explicitly in the President's hands" regarding the orders the President may prescribe to carry out the Act. *Id.* at *7 (citing 40 U.S.C. § 121(a)). The court also rejected the notion that the "dicta from" *Chrysler* constituted "a narrowing instruction for interpretation of the Procurement Act," explaining that "this interpretation is not supported by the rest of the footnote in question, let alone the rest of the opinion." *Id.* at *6 n.24.

The court nonetheless concluded that the Contractor EO's scope exceeded the President's statutory authority based on "[t]he so-called 'Major Question Doctrine,'"

43

which in this case warranted "extra-statutory limitations on the President's authority under the Procurement Act." *Louisiana*, 2022 WL 17749291, at *7-*8. For the reasons discussed below, *infra* pp. 48-52, the court's application of major-question principles was mistaken. In any event, the decision provides no support to the reading of the statute offered by plaintiffs here. *See Louisiana*, 2022 WL 17749291, at *15 (Graves, J., dissenting) (explaining that the majority "recognizes that analyzing the text of the statute could lend the President the power to issue the [Contractor EO]").

### C. The Contractor Executive Order Reflects The Required Nexus To Economy And Efficiency In Federal Procurement

**1.** As the district court concluded, 2-ER-155, the Contractor EO "easily satisfies the … requirement" that the order bear a nexus to the statutory objective of "an economical and efficient system" for contracting and procurement, 40 U.S.C. § 101. The Contractor EO directs departments and agencies to include in certain new or renewed contracts and solicitations a clause requiring contractors to provide adequate COVID-19 safeguards to their workers. Those safeguards, the Contractor EO explains, "will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." 86 Fed. Reg. at 50,985. Those efforts, in turn, help to avoid schedule delays and reduced performance quality in critical federal contracts. The safeguards also minimize the leave and health care costs that, in some contracts, might be passed along to the federal government. By ensuring that the federal

government is entering into contracts that will be performed efficiently—where the services are delivered on time and at cost—the Contractor EO contributes directly to establishing "an economical and efficient system," 40 U.S.C. § 101, for "[p]rocuring … property and nonpersonal services" and "performing related functions including contracting," *id.* § 101(1).[12]

**2.** Plaintiffs acknowledge that courts, in conducting the nexus inquiry, have recognized that the President is entitled to a "considerable degree of deference over decisions to improve the 'economy and efficiency' of federal contracting." Opening Br. 25; *see* Opening Br. 32 (acknowledging that the Procurement Act vests "broad discretion in the President" (quotation marks omitted)). Plaintiffs nevertheless contend that the Contractor EO lacks the requisite nexus because it is not "required" or "indispensable," it purportedly "regulate[s] public health," and it has "far-reaching implications." Opening Br. 25-28, 33-34. That reasoning suffers from several flaws.

---

[12] The Acting OMB Director expanded on this rationale, explaining that vaccination would decrease absenteeism by reducing transmission of the virus and limiting serious illness in those who catch it. *See* 86 Fed. Reg. at 63,422. Although the latest CDC Guidance suggests that aspects of the former justification related to the reduction of transmission may carry reduced force with respect to vaccines and COVID variants for which data on transmission and infection was available as of September 2022, the latter justification remains highly relevant. *See* CDC, *Benefits of Getting a COVID-19 Vaccine*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (last updated Dec. 5, 2022); CDC, *COVID-19 Vaccine Effectiveness Monthly Update*, https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness (last updated Nov. 10, 2022). *Contra* Opening Br. 46-53.

*First*, the President need not demonstrate that an order is "required" or "indispensable" to establish the requisite nexus to economy and efficiency in federal procurement. *Contra* Opening Br. 33-34. The statute empowers the President to enact policies that he "*considers* necessary" to carry out the statute's goals. 40 U.S.C. § 121(a) (emphasis added). And the courts that upheld previous orders never concluded that it was "essential" to require contractors to abide by antidiscrimination requirements, to use the E-Verify system, or to post notices of labor rights in their offices. *See supra* pp. 38-39.

*Second*, in suggesting that the Contractor EO is impermissible because it affects public health, plaintiffs misperceive the nature of both the order and the President's authority under the Procurement Act.

The Contractor EO is directed at federal procurement. It sets the terms under which executive departments and agencies should acquire services by setting criteria for the contractors eligible to bid on certain federal contracts. Those criteria, in turn, promote the safety and efficiency of the workplaces where the services being procured by the federal government will be performed. The Contractor EO operates solely by altering the government's negotiating position to include these requirements in voluntary commercial agreements.

That the Contractor EO also protects the health and safety of citizens does not make its economy-and-efficiency rationale pretextual. *Contra* Opening Br. 26. Orders under the Procurement Act and related statutes have often had effects in addition to

the promotion of economy and efficiency. For example, in *American Federation of Government Employees v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (R.B. Ginsburg, J.), the D.C. Circuit observed that the order sustained in *Kahn*—which had the principal purpose of lowering the government's procurement costs by requiring adherence to price and wage guidelines—had the "additional goal of slowing inflation in the economy as a whole." *Id.* at 821 (citing *Kahn*, 618 F.2d at 792-93). Much the same was true of the antidiscrimination requirements, addressed in cases like *Contractors Ass'n*, which had the "additional goal of promoting enhanced employment opportunities for minorities." *Id.* (citing *Contractors Ass'n*, 442 F.2d at 171). As these courts have emphasized, the President's determination of how best to achieve economy and efficiency in federal operations does not "become[] illegitimate," simply because it "serves other, not impermissible, ends" *Carmen*, 669 F.2d at 821. That is particularly true where, as here, the other end—*i.e.*, the protection of contractor employees from serious illness—directly affects the economy and efficiency of the federal procurement system.

*Third*, plaintiffs are wrong to predict that sustaining the Contractor EO—a measure that addresses acute threats posed by an unprecedented pandemic—will permit the President to issue any order that improves the general health or productivity of contractor employees. *Contra* Opening Br. 1-2, 30; *cf. Louisiana*, 2022 WL 17749291, at *10-*11 (raising similarly misguided concerns).

47

The government has always acknowledged that presidential authority under the Procurement Act is constrained by the statute's text, which requires that any executive order bear a close nexus to the statutory goals of establishing "an economical and efficient system" for federal procurement and contracting. 40 U.S.C. § 101. The President's status as "the most singularly accountable elected official in the country," *Feds for Med. Freedom v. Biden*, 25 F.4th 354, 357 (5th Cir. 2022) (Higginson, J., dissenting), also serves as a check on extreme actions that would offend the popular will. And, like any market participant, the President, as CEO of the Executive Branch, has a strong interest in doing business with qualified contractors. The President thus has additional incentives not to impose conditions that do not promote efficiency and that contractors might view as unacceptable. *See Louisiana*, 2022 WL 17749291, at *16 (Graves, J., dissenting) ("If the company does not want to abide by the clauses of the government contract, the government is not forcing companies to contract with it."). These limits have proven effective: In the Procurement Act's seven decades of existence, no President has issued the far-fetched orders plaintiffs posit. *Cf. Louisiana*, 2022 WL 17749291, at *10 (theorizing similarly outlandish orders).

### D. No Other Considerations Cast Doubt On The Validity Of The Contractor Executive Order

No other considerations support invalidating the Contractor EO.

1.    Plaintiffs argue that major-question principles required Congress to speak more clearly if it intended to authorize the Contractor EO.  Opening Br. 29-31, 34-35.  The court of appeals in *Louisiana* similarly held the Contractor EO invalid based on the "extra-statutory limitations" imposed by the "so-called 'Major Question Doctrine.'" 2022 WL 17749291, at *7-*8.  Those principles, however, are implicated only when an agency action threatens a "transformative expansion in … regulatory authority," *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  No such expansion occurred here.

The Contractor EO does not exercise "regulatory authority" at all.  Instead, it is an exercise of the federal government's proprietary authority, as the purchaser of services from federal contractors, and one that applies only to those workplaces where work on federal contracts is taking place.  As the Supreme Court recognized 80 years ago, "[l]ike private individuals and businesses, the Government enjoys the unrestricted power … to determine those with whom it will deal[] and to fix the terms and conditions upon which it will make needed purchases."  *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).  The Contractor EO thus does not regulate employers generally (or even federal contractors generally because it does not reach workplaces that are unrelated to federal contracting work), *cf. Louisiana*, 2022 WL 17749291 at *9; instead, it reflects a management decision to insist on, from companies that elect to do business with the federal government, contract terms that reflect the same type of requirements that private sector employers impose on their employees.  *See Georgia*, 46

49

F.4th at 1311 (Anderson, J., concurring in part & dissenting in part) (observing that "[t]he President in this case is acting in the role of a proprietor—not in the role of a regulator" and that "the proprietary role of the government here is significant"); *Louisiana*, 2022 WL 17749291, at *15 (Graves, J., dissenting) (same).

The contract conditions addressed by the Contractor EO thus stand on a very different footing from the COVID-19 vaccination-or-testing standard promulgated by the Occupational Safety and Health Administration (OSHA), upon which plaintiffs focus (at 29-30). *See National Fed'n of Indep. Bus. v. Department of Labor, OSHA*, 142 S. Ct. 661, 663 (2022) (per curiam) (concluding that the plaintiffs were likely to succeed on the merits of their challenge to OSHA's standard). The standard there, like the rules in the other cases plaintiffs cite, directly regulated employers pursuant to authority granted by Congress under the Commerce Clause. *See id.* at 662-63; *see also West Virginia*, 142 S. Ct. at 2612 (evaluating rule that regulated greenhouse gas emissions from power plants); *Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 141 S. Ct. 2485, 2486 (2021) (per curiam) (evaluating eviction moratorium imposed on "all residential properties nationwide"); *Utility Air*, 573 U.S. at 324 (evaluating whether agency had authority to regulate greenhouse gas emissions from new motor vehicles); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000) (evaluating whether agency had authority to regulate cigarettes and smokeless tobacco).

50

In contrast, the Procurement Act is an exercise of Congress's powers under distinct constitutional provisions, including the Spending Clause, and the Contractor EO invokes only the President's power to impose conditions in workplaces involved in performing federal contracts. When the government acts "in its capacity 'as proprietor'" and "manager of its 'internal operation,'" it "has a much freer hand" than when it "exercise[s] its sovereign power 'to regulate.'" *NASA v. Nelson*, 562 U.S. 134, 148 (2011). That is why when the government—for the first time in history—exercised its spending power to impose a vaccination requirement on recipients of Medicare and Medicaid, the Supreme Court declined to require an authorization more specific than definitional provisions which authorized the Secretary to impose conditions he "finds necessary in the interest of … health and safety." *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (per curiam) (quoting 42 U.S.C. § 1395x(e)(9)).

The cases cited by plaintiffs, moreover, reflect concerns about diminished accountability and thus suggest a need for special clarity only when there is some doubt as to whether Congress "assign[ed]" a significant decision "to an agency." *Utility Air*, 573 U.S. at 324 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 160), *quoted in Alabama Ass'n of Realtors*, 141 S. Ct. at 2489; *see West Virginia*, 142 S. Ct. at 2609 (considering whether "Congress would have been likely to delegate such power to the agency at issue" (cleaned up)). Those considerations are also inapplicable here. The Procurement Act clearly assigns the President the authority to determine what policies are necessary to carry out the statute's economy and efficiency goals. And

51

there is no risk of diminished accountability, as the President is "the most singularly accountable elected official in the country," *Feds for Med. Freedom*, 25 F.4th at 357 (Higginson, J., dissenting), and has inherent power to direct operations of the Executive Branch, *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002).

That inherent authority forms the backdrop against which Congress legislated in delegating authority to the President. When the President is acting in an area "where he enjoys his own inherent Article II powers," Congress can "assign the President broad authority" without raising constitutional concerns. *Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting). Thus, courts for decades have upheld Procurement Act orders involving issues of great economic and political significance—like inflation, discrimination, energy, and immigration—without demanding special clarity from Congress. *See Contractors Ass'n*, 442 F.2d at 170-71 (1960s discrimination); *Kahn*, 618 F.2d at 790-91, 790 n.32 (1970s inflation); *Carmen*, 669 F.2d at 817-23 (1979 oil crisis); *Chamber of Commerce*, 648 F. Supp. 2d at 738 (2000s immigration policy).[13]

**2.** The Contractor EO also does not intrude on an area that is traditionally reserved to the States. *Contra* Opening Br. 4-5, 35, 40-41. Federal contracts are not an area traditionally reserved to the States. Courts, including this one, have repeatedly

---

[13] Accordingly, the Fifth Circuit erred in concluding that there is no basis for applying major-question principles differently in the context of presidential exercises of authority. *Louisiana*, 2022 WL 17749291 at *9-*10 & n.40.

held that "federal contractors cannot be required to satisfy state "'qualifications in addition to those that the [Federal] Government has pronounced sufficient.'"" *United States v. Virginia*, 139 F.3d 984, 990 (4th Cir. 1998) (alteration in original) (quoting *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (per curiam)); *see also GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc) (invalidating state law that "purport[ed] to override the federal government's decisions about who will carry out federal functions"); *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 441 (9th Cir. 1991) (invalidating state licensing requirements imposed on federal contractors).

The President's exercise of Procurement Act authority does not invade state sovereignty simply because "in addition to promoting economy and efficiency," it may also protect the health and safety of some Arizona citizens. *Carmen*, 669 F.2d at 821. Courts have routinely upheld under the Procurement Act executive orders that advance non-economic policy interests—preventing workplace discrimination, deterring illegal immigration, and so on—as well as promote economy and efficiency in federal procurement. *See supra* pp. 38-39. And Presidents have previously exercised Procurement Act authority in ways that affect areas traditionally regulated by States, like public health. *See, e.g.*, 80 Fed. Reg. at 54,697. Effects on public health and safety do not render impermissible an otherwise valid exercise of federal contracting authority. *Cf. Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (invalidating state hazardous waste law aimed at protecting "public health and safety" because it

"regulate[d] not only the federal contractor but the effective terms of federal contract itself").

### E. The OMB Determination Does Not Suffer From Procedural Deficiencies

The district court also correctly dismissed plaintiffs' procedural challenges to the OMB Determination. The APA's notice-and-comment requirements do not apply to "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). The OMB Determination plainly fails within that exemption, and plaintiffs do not contend otherwise. Instead, plaintiffs argue that the OMB Determination violated the Procurement Policy Act's procedural requirements. But the OMB Determination is not subject to those requirements either, and the Acting OMB Director voluntarily complied with them in any event.[14]

**1.** The Procurement Policy Act's requirements apply only to specifically enumerated "executive agenc[ies]." 41 U.S.C. § 1707(c); *see Brnovich v. Biden*, 562 F. Supp. 3d 123, 158 (D. Ariz. 2022). The Acting OMB Director, however, was not acting as an "executive agency" when she issued the OMB Determination. Instead, she was exercising authority delegated to her by the President under 3 U.S.C. § 301.

---

[14] Plaintiffs' procedural claims fail to the extent they are challenges to the Contractor EO because plaintiffs cannot assert claims against the President under the APA. *See* Opening Br. 37; 1-ER-10-11 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992)). The President similarly is not subject to the Procurement Policy Act, which applies only to "executive agenc[ies]." 41 U.S.C. § 1707(c)(1); *see infra* p. 55.

*See* 86 Fed. Reg. at 50,985-86. When an agency exercises presidentially delegated authority, it "stands in the President's shoes," acting not as the agency, but as the President. *Natural Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 & n.5, 111 (D.D.C. 2009); *see also Detroit Int'l Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (collecting cases "conclud[ing] that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential'"), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). Because the President is not listed among the executive agencies subject to § 1707's requirements, *see* 41 U.S.C. § 133, the Acting OMB Director also was not subject to those requirements when she exercised the delegated authority to issue the OMB Determination.

In any event, this Court need not determine the applicability of the Procurement Policy Act because the Acting OMB Director voluntarily complied with § 1707. The statute provides that "a procurement policy, regulation, procedure, or form" ordinarily "may not take effect until 60 days after it is published for public comment in the Federal Register." 41 U.S.C. § 1707(a)(1). Those requirements "may be waived," however, "if urgent and compelling circumstances make compliance … impracticable." *Id.* § 1707(d). The Acting OMB Director correctly invoked that exception here, explaining that waiving § 1707's notice requirements was critical for several reasons. 86 Fed. Reg. at 63,423-24; *see Brnovich*, 562 F. Supp. 3d at

55

158 (concluding that Acting OMB Director "properly invoked the § 1707(d) waiver provision"); *Kentucky v. Biden*, 571 F. Supp. 3d 715, 732 (E.D. Ky. 2021) (similar).[15]

The Acting OMB Director explained that the "broader economy-and-efficiency purpose" of the OMB Determination "would be severely undermined by the minimum delay" required under § 1707's notice-and-comment provisions. 86 Fed. Reg. at 63,424. An important purpose of the guidance was to "align[] the vaccination deadline for Federal contractors with the vaccination deadline for private companies under" other federal standards. *Id.* The Acting OMB Director described how certain employers could have workers or workplaces subject to different vaccination requirements. *See id.* For those employers, having the same deadline across all requirements would "promote consistency and administrability" of the requirements and "eliminate potential confusion and frustration that disparate deadlines could produce." *Id.*

That OMB could have completed a 60-day comment period before the January 18 vaccination deadline does not undermine the Acting OMB Director's determination. *Contra* Opening Br. 36-37. The Acting OMB Director explained that if the OMB Determination underwent the requisite comment period, it could not

---

[15] There is no basis for concluding, as plaintiffs suggest (at 35), that the "urgent and compelling circumstances" standard is "more demanding than the APA's 'good cause' exception." The authority plaintiffs invoke for that proposition does not cite § 1707, let alone opine on its standard. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

have become effective until January 9, 2022, at the earliest—five days *after* the deadline for covered contractor employees to receive their final COVID-19 vaccination dose (January 4, 2022) and a little more than one week before contractors were expected to have a fully vaccinated work force (January 18, 2022). *See* 86 Fed. Reg. at 63,424. In other words, "absent an immediately effective determination of [the] deadline," contractors would not have known whether, at the conclusion of the 60-day comment period, they would be facing an imminent vaccination deadline or, as a result of the comment process, a delayed deadline. *Id.* Given the many weeks required to meet a vaccination deadline, contractors would have struggled to determine how to remain compliant. *Id.*; *see Kentucky*, 571 F. Supp. 3d at 732 (explaining that the compliance date was set "to benefit federal contractors and ensure that they would have sufficient time to comply with the mandate").

Nor does the President's purported delay in issuing the Contractor EO and accompanying guidance suggest that circumstances were not "urgent" or "compelling." *Contra* Opening Br. 39-40. The President issued the order in September 2021, shortly after vaccines became both widely available among adults and particularly necessary given the emergence of the Delta variant and the return to work of many federal contractor employees. *See* 86 Fed. Reg. at 63,423. OMB made an initial economy-and-efficiency determination later that same month as soon as the relevant task force issued initial guidance. *See* 86 Fed. Reg. 53,692 (Sept. 28, 2021). When the task force updated its guidance a few weeks later, OMB issued a revised

determination that comprehensively examined the emerging data on the effectiveness of vaccines, assessed the experience of private employers in imposing vaccination requirements, and concluded that a vaccination requirement would promote economy-and-efficiency in federal contracting.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO AFFORD PLAINTIFFS LEAVE TO AMEND

The district court acted well within its discretion in denying plaintiffs leave to amend their complaint. *See* 1-ER-14-15. In assessing whether to grant leave to amend, courts consider whether "the plaintiff has previously amended the complaint," whether the plaintiff acted in "bad faith," and whether amendment would be "futile." *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011).

Those factors support the district court's decision to deny plaintiffs' leave to amend. As the district court recognized, plaintiffs here already had amended their complaint twice. *See* 1-ER-14. In preparing their amended complaints, plaintiffs had the benefit of the district court's ruling on their request for a temporary restraining order as well as the federal government's two motions to dismiss. Plaintiffs nonetheless failed to "adequately address[] all of the factual and procedural deficiencies" in their amended complaint and never identified any additional facts they could allege to cure those deficiencies. 1-ER-14-15. Accordingly, the district court reasonably concluded that "[p]laintiffs' continued failures to address the shortcomings

58

in their various pleadings demonstrate[d] a third opportunity to amend would be futile." 1-ER-15.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*

VANESSA R. WALDREF
  *United States Attorney*

MARK B. STERN
ANNA O. MOHAN
 *s/ David L. Peters*

DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-1673*

December 2022

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellees state that they know of two related cases challenging Executive Order 14,402 pending in this Court: *Brnovich v. Biden*, No. 22-15518, and *Cano v. Biden*, No. 22-56094.

*s/ David L. Peters*

David L. Peters

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,934 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ David L. Peters*

David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.


*s/ David L. Peters*
David L. Peters

**ADDENDUM**

## TABLE OF CONTENTS

40 U.S.C. § 101...................................................................................................Add.1

40 U.S.C. § 121...................................................................................................Add.1

## 40 U.S.C. § 101

### § 101. Purpose

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

## 40 U.S.C. § 121

### § 121. Administrative

(a) Policies prescribed by the President.--The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

(b) Accounting principles and standards.--

(1) Prescription.--The Comptroller General, after considering the needs and requirements of executive agencies, shall prescribe principles and standards of accounting for property.

(2) Property accounting systems.--The Comptroller General shall cooperate with the Administrator of General Services and with executive agencies in the development of property accounting systems and approve the systems when they are adequate and in conformity with prescribed principles and standards.

(3) Compliance review.--From time to time the Comptroller General shall examine the property accounting systems established by executive agencies to determine the extent of compliance with prescribed principles and standards and approved systems. The Comptroller General shall report to Congress any failure to comply with the principles and standards or to adequately account for property.

(c) Regulations by Administrator.--

(1) General authority.--The Administrator may prescribe regulations to carry out this subtitle.

(2) Required regulations and orders.--The Administrator shall prescribe regulations that the Administrator considers necessary to carry out the Administrator's functions under this subtitle and the head of each executive agency shall issue orders and directives that the agency head considers necessary to carry out the regulations.

(d) Delegation of authority by Administrator.--

(1) In general.--Except as provided in paragraph (2), the Administrator may delegate authority conferred on the Administrator by this subtitle to an official in the General Services Administration or to the head of another federal agency. The Administrator may authorize successive redelegation of authority conferred by this subtitle.

(2) Exceptions.--The Administrator may not delegate--

(A) the authority to prescribe regulations on matters of policy applying to executive agencies;

(B) the authority to transfer functions and related allocated amounts from one component of the Administration to another under paragraphs (1)(C) and (2)(A) of subsection (e); or

(C) other authority for which delegation is prohibited by this subtitle.

(3) Retention and use of rental payments.--A department or agency to which the Administrator has delegated authority to operate, maintain or repair a building or facility under this subsection shall retain the portion of the rental payment that the Administrator determines is available to operate, maintain or repair the building or facility. The department or agency shall directly expend the retained amounts to operate, maintain, or repair the building or facility. Any amounts retained under this paragraph shall remain available until expended for these purposes.

(e) Assignment of functions by Administrator.--

(1) In general.--The Administrator may provide for the performance of a function assigned under this subtitle by any of the following methods:

(A) The Administrator may direct the Administration to perform the function.

(B) The Administrator may designate or establish a component of the Administration and direct the component to perform the function.

(C) The Administrator may transfer the function from one component of the Administration to another.

(D) The Administrator may direct an executive agency to perform the function for itself, with the consent of the agency or by direction of the President.

(E) The Administrator may direct one executive agency to perform the function for another executive agency, with the consent of the agencies concerned or by direction of the President.

(F) The Administrator may provide for performance of a function by a combination of the methods described in this paragraph.

(2) Transfer of resources.--

(A) Within Administration.--If the Administrator transfers a function from one component of the Administration to another, the Administrator may also provide for the transfer of appropriate allocated amounts from the component that previously carried out the function to the component being directed to carry out the function. A transfer under this subparagraph must be reported to the Director of the Office of Management and Budget.

(B) Between agencies.--If the Administrator transfers a function from one executive agency to another (including a transfer to or from the Administration), the Administrator may also provide for the transfer of appropriate personnel, records, property, and allocated amounts from the executive agency that previously carried out the function to the executive agency being directed to carry out the function. A transfer under this subparagraph is subject to approval by the Director.

(f) Advisory committees.--The Administrator may establish advisory committees to provide advice on any function of the Administrator under this subtitle. Members of the advisory committees shall serve without compensation but are entitled to transportation and not more than $25 a day instead of expenses under section 5703 of title 5.

(g) Consultation with federal agencies.--The Administrator shall advise and consult with interested federal agencies and seek their advice and assistance to accomplish the purposes of this subtitle.

(h) Administering oaths.--In carrying out investigative duties, an officer or employee of the Administration, if authorized by the Administrator, may administer an oath to an individual.