

Arnold & Jacobowitz PLLC

8201 164th Ave. NE, Suite 200
Redmond, WA 98052
113 Woodin Avenue, Suite 200
Chelan, WA 98816 (non-service address)

April 13, 2023

**Via CM/ECF Electronic Filing System**

Molly C. Dwyer, Clerk of the Court
Ninth Circuit Court of Appeals

Re:     *David Donovan, et al., v. Brian Vance, et al.*, Case No. 22-35474
        Appellants' Rule 28(j) citation of supplemental authority: *Feds for Medical Freedom, et al., v. Joseph R. Biden, et al.*, No. 22-40043 (5th Cir., March 23, 2023), slip opinion attached

Dear Clerk:

Pursuant to Fed. R. App. P. 28(j), Plaintiff-Appellants hereby submit the Fifth Circuit's *en banc* decision in *Feds for Medical Freedom, et al. v. Biden, et al.*, 22-40043, issued on March 23, 2023. The Fifth Circuit's *en banc* panel held that a federal employees need not exhaust the Civil Service Reform Act ("CSRA") to challenge Executive Order 14043, "because the vaccine mandate itself is not a personnel action…" *Id.* at 28.

In the present matter, Appellees alleged that the district court lacked jurisdiction over the federal employees Plaintiff-Appellants as their claims "are precluded by the CSRA" and because "CSRA requires that employees first seek administrative review of disciplinary actions from the MSPB, even with respect to constitutional claims." Appellee's Answer Brief, at 18, 27.

The Fifth Circuit's decision shows the inaccuracy of Appellees' CSRA exhaustion claim, as follows: "plaintiffs are not challenging CSRA-covered personnel actions. Plaintiffs are challenging (under the Constitution, the APA, and the DJA) the President's executive orders requiring federal employees to make irreversible medical decisions to take COVID-19 vaccines. 'Even construing the CSRA's language broadly, we fail to see how an employer's' medical mandate could constitute a covered personnel action." *Id.* at 12-13 (original citations omitted).

The Court also held that "[n]o part of [] [CSRA] includes reviewing an executive order for compliance with the APA or ordering injunctive relief that affects thousands or millions of employees. No part of its byzantine procedures is suited for (or even appears to allow) an emergency preliminary injunction. And the Government does not cite a single case, nor have we found one, where OSC agreed in its unreviewable discretion to petition the MSPB for relief that remotely resembles what plaintiffs request here." *Id.* at 23.

April 13, 2023
Page 2


Where the Fifth Circuit, *en banc*, held that CSRA does not bar challenging an Executive Order, and the Eleventh Circuit in *Georgia v. Biden*, 21-14269 and the District of Arizona in *Brnovich v. Biden*, 2:21-cv-01568-MTL (recently stayed by this court, Case No. 22-15518), have enjoined Executive Order 14043, Appellants' case should not have been dismissed without leave to amend.

Respectfully submitted,

*s/ Nathan J. Arnold*
*s/Simon Peter Serrano*
*Counsel for Appellants*


Attachment

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2023

Lyle W. Cayce
Clerk

No. 22-40043

---

FEDS FOR MEDICAL FREEDOM; LOCAL 918, AMERICAN
FEDERATION OF GOVERNMENT EMPLOYEES; HIGHLAND
ENGINEERING, INCORPORATED; RAYMOND A. BEEBE, JR.; JOHN
ARMBRUST; ET AL.,

*Plaintiffs—Appellees*,

*versus*

JOSEPH R. BIDEN, JR., *in his official capacity as President of the United
States*; THE UNITED STATES OF AMERICA; PETE BUTTIGIEG, *in
his official capacity as Secretary of Transportation*; DEPARTMENT OF
TRANSPORTATION; JANET YELLEN, *in her official capacity as Secretary
of Treasury*; ET AL.,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:21-CV-356

---

Before RICHMAN, *Chief Judge*, and JONES, SMITH, BARKSDALE,
STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES,
HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM,
and WILSON, *Circuit Judges*.

No. 22-40043

Andrew S. Oldham, *Circuit Judge*, joined by Jones, Smith, Barksdale, Elrod, Willett, Ho, Duncan, Engelhardt, and Wilson, *Circuit Judges*:[*]

The primary question presented is whether we have jurisdiction over pre-enforcement challenges to President Biden's vaccine mandate for federal employees. We do. On the merits, we affirm the district court's order.

I.

On September 9, 2021, President Biden issued Executive Order 14043, which generally required all federal employees to be vaccinated. Employees who didn't comply would face termination. He also issued Executive Order 14042, imposing the same requirements and punishments for federal contractors.

Feds for Medical Freedom is a non-profit organization with over 6,000 members employed by numerous federal agencies and contractors. Feds for Medical Freedom, along with a chapter of the American Federation of Government Employees and more than 50 individual plaintiffs, sued for declaratory and injunctive relief against the enforcement of both mandates.

Plaintiffs raised several constitutional and statutory claims. First, they asserted constitutional objections. They argued that the President did not have inherent Article II authority to issue either mandate. And any purported congressional delegation of such power violated either the major questions doctrine or the non-delegation doctrine. Second, they claimed both mandates were arbitrary, capricious, and otherwise not in accordance with law under the Administrative Procedure Act ("APA"). And the contractor mandate

---

[*] Judge Willett joins all except Part VI. Judge Douglas was not a member of the court when this case was submitted to the court en banc and did not participate in this decision.

violated the APA because it was not in accordance with law. Finally, they sought relief under the Declaratory Judgment Act ("DJA").

The day after filing their complaint, plaintiffs sought preliminary injunctions against both mandates. The district court declined to enjoin the contractor mandate because it was already the subject of a nationwide injunction. But it enjoined the employee mandate on January 21, 2022. The Government timely appealed that injunction.

On an expedited appeal, a divided panel of our court vacated the injunction. *See Feds for Medical Freedom v. Biden*, 30 F.4th 503 (5th Cir. 2022). The panel majority held "that the [Civil Service Reform Act of 1978 ("CSRA")] precluded the district court's jurisdiction. Accordingly, the plaintiffs' claim for preliminary injunctive relief fails because they have not shown a substantial likelihood of success on the merits. We do not reach the parties' arguments regarding the other requirements for a preliminary injunction." *Id.* at 511. Judge Barksdale dissented. We granted rehearing en banc, vacating the panel opinion. *See Feds for Medical Freedom v. Biden*, 37 F.4th 1093 (5th Cir. 2022).

## II.

"Jurisdiction is always first." *Carswell v. Camp*, 54 F.4th 307, 310 (5th Cir. 2022) (quotation omitted). Congress gave federal district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. It's undisputed that plaintiffs' claims arise under federal law, both constitutional and statutory. It's also undisputed that the CSRA nowhere *expressly* repeals district courts' § 1331 jurisdiction over plaintiffs' claims. The Government's contention, however, is that the CSRA *implicitly* repeals § 1331 jurisdiction over plaintiffs' claims.

No. 22-40043

Implicit jurisdiction-stripping turns on whether it's "fairly discernible" from the statutory scheme that Congress silently took away the jurisdiction that § 1331 explicitly conferred. "To determine whether it is 'fairly discernible' that Congress precluded district court jurisdiction over petitioners' claims, we examine the CSRA's text, structure, and purpose." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (citations omitted). We (A) begin with the CSRA's text and structure. Then we (B) discuss the statute's purpose. Then we (C) hold that the CSRA does not apply to the plaintiffs' claims and hence does not implicitly displace § 1331 jurisdiction.

A.

We begin with the CSRA's text and structure. The CSRA's "statutory framework provides graduated procedural protections depending on an [employment] action's severity." *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012). Two parts of that graduated procedural framework are central to this case.

The first is codified at Chapter 23. *See* 5 U.S.C. §§ 2301 *et seq.* Chapter 23 is the bottom of the CSRA's pyramid. It governs the least severe employment actions the Government can take and provides concomitantly fewer procedural protections and remedies for federal employees aggrieved by those employment actions.

Specifically, Chapter 23 prohibits federal employers from using a "prohibited personnel practice," *id.* § 2302(a)(1), (b), to take a certain "personnel action," *id.* § 2302(a)(2)(A). Chapter 23's "prohibited personnel practice[s]" include various forms of discrimination (race, age, sex, &c.), nepotism, and retaliation for whistleblowing. *See id.* § 2302(b)(1) (discrimination), (b)(7) (nepotism), (b)(8) (whistleblowing). The triggering "personnel action[s]" are limited to the following twelve things:

(i) an appointment;

(ii) a promotion;

(iii) an action under chapter 75 of this title or other disciplinary or corrective action;

(iv) a detail, transfer, or reassignment;

(v) a reinstatement;

(vi) a restoration;

(vii) a reemployment;

(viii) a performance evaluation under chapter 43 of this title or under title 38;

(ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;

(x) a decision to order psychiatric testing or examination;

(xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and

(xii) any other significant change in duties, responsibilities, or working conditions;

*Id.* § 2302(a)(2)(A). Chapter 23's personnel actions obviously do not include severe measures such as demotions or terminations.[1]

---

[1] Section 2302(a)(2)(A)(iii) ("romanette iii") cross-references "an action under chapter 75 of this title." Chapter 75 does not use the phrase "personnel action" but instead uses the phrase "an action." 5 U.S.C. §§ 7502, 7512 (subchapter titles); *see also id.* § 7513(a), (b), (d), (e) (referring to "an action" taken against a federal employee). By virtue of romanette iii's cross-reference, "personnel action" includes both a Chapter 23 personnel action and a Chapter 75 action. Throughout this opinion, we use "Chapter 23

Given that Chapter 23 applies only to relatively mild personnel actions, Chapter 23's review mechanisms are also relatively modest. When a federal employee suffers a Chapter 23 "personnel action" based on a "prohibited personnel practice," the employee can file an allegation with the Office of Special Counsel ("OSC"). *Id.* §§ 1214(a), 2302. The OSC, in turn, can terminate the matter or refer it to the Merit Systems Protection Board ("MSPB"). *Id.* § 1214(a)(2) (termination), (b) (referral). The employee can then seek judicial review of the MSPB's final order in the United States Court of Appeals for the Federal Circuit. *Id.* §§ 1214(c), 7703(b)(1)(A). Judicial review for Chapter 23 personnel actions is extremely limited, however. As then-Judge Scalia explained: "judicial scrutiny [is] limited, at most, to insuring compliance with the statutory requirement that the OSC perform an adequate inquiry." *Carducci v. Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983) (quotation omitted).

The second part of the CSRA's graduated procedural framework is codified at Chapter 75. *See* 5 U.S.C. §§ 7501 *et seq.* Chapter 75 forms the top of the CSRA's pyramid and governs the most-severe employment actions—such as suspensions, reductions in pay, and terminations. *Id.* §§ 7502, 7512(1)–(5). When the Government proposes a suspension of fourteen days or less, the covered employee is entitled to notice, the opportunity to respond, the right to an attorney, and the right to a written decision. *Id.* § 7503(b)(1)–(4). When the Government proposes any other Chapter 75 action, the covered employee receives these same protections, *id.* § 7513(b),

---

personnel actions" to refer to the non-Chapter-75, less-severe employment actions listed in § 2302. We use "Chapter 75 personnel actions" or "Chapter 75 actions" to refer to the more-severe employment actions such as demotion and termination listed in § 7512. And unless context dictates otherwise, we use "personnel actions" or "CSRA-covered personnel actions" to include any employment actions covered by the CSRA.

and can also appeal to the MSPB, *id.* § 7513(d), and to the Federal Circuit, *id.* § 7703(b)(1)(A).

Where a covered employee challenges a covered personnel action, the CRSA's review mechanisms are "exclusive." *Elgin*, 567 U.S. at 13–14. Take for example *McAullife v. Rice*, 966 F.2d 979 (5th Cir. 1992). There, a CSRA-covered employee challenged the Chapter-75-covered termination of her employment—but she tried to do it in the Western District of Texas under the APA, rather than in the MSPB and Federal Circuit under the CSRA. *See id*. at 979. We rejected the attempt because the CSRA provides the exclusive jurisdictional (and remedial) font for covered federal employees *when they are challenging CSRA-covered personnel actions*. *See ibid*.

The italicized clause is very important for two reasons. First, the Supreme Court has been clear that the CSRA eliminates § 1331 jurisdiction only for personnel actions covered by the CSRA. For example, in *United States v. Fausto*, 484 U.S. 439 (1988), the Court said the CSRA "displays a clear congressional intent to deny the excluded employees the protections of Chapter 75—including judicial review—*for personnel action covered by that chapter.*" *Id*. at 447 (emphasis added). Likewise in *Elgin*, the Court repeatedly limited its holding to the CSRA's jurisdictional effects on "a *covered* employee challeng[ing] a *covered* action," 567 U.S. at 13; "a *covered* employee's appeal of a *covered* action," *ibid.*; and "a *covered* employee [attempting to] challenge a *covered* employment action first in a district court," *id.* at 14 (all emphases added); *see also id.* at 10, 20–21 (reiterating the limitation). The Court has never suggested—much less held—that the CSRA implicitly strips § 1331 jurisdiction over federal employees' claims *outside* the CSRA's covered personnel actions. *See Bosco v. United States*, 931 F.2d 879, 883 (Fed. Cir. 1991) ("The Supreme Court did not rule that the CSRA provided the only means of judicial review of *any* actions affecting federal employees, but rather that it was the only means of review as to the

types of adverse personnel action specifically *covered* by the CSRA . . . ." (emphases in original)).

Second, the Court has expressly said the opposite—that the CSRA does nothing to affect jurisdiction *outside* of its covered personnel actions:

> Not all personnel actions are covered by this [CSRA] system. For example, there are no provisions for appeal of either suspensions for 14 days or less or adverse actions against probationary employees. In addition, certain actions by supervisors against federal employees, such as wiretapping, warrantless searches, or uncompensated takings, would not be defined as 'personnel actions' within the statutory scheme.

*Bush v. Lucas*, 462 U.S. 367, 385 n.28 (1983) (citations omitted). In accordance with this express command, federal courts across the country have time and again held that the CSRA does not strip § 1331 jurisdiction when federal employees challenge something *other than* a CSRA-covered personnel action. For example, installing a hidden camera in the women's changing area of a VA medical center is not a CSRA-covered personnel action and hence can be challenged outside the CSRA. *See Gustafson v. Adkins*, 803 F.3d 883, 888 (7th Cir. 2015) ("Under the plain language of the statute, the term 'personnel action' does not encompass Adkins's conduct . . . [of] installing the hidden camera . . . ."). Same with assaulting a federal employee. *See Orsay v. DOJ*, 289 F.3d 1125, 1131 (9th Cir. 2002), *abrogated on other grounds by Millbrook v. United States*, 569 U.S. 50 (2013) ("Claxton's alleged aiming of a loaded weapon at Appellants does not fit any of the CSRA's definitions of 'personnel action.' Consequently, the CSRA does not bar Appellants' [Federal Tort Claims Act] claims . . . ."); *Brock v. United States*, 64 F.3d 1421, 1425 (9th Cir. 1995) (sexual assault). Same with libeling a federal employee. *See Gutierrez v. Flores*, 543 F.3d 248, 253–54 (5th Cir. 2008) (holding the CSRA does not apply or strip jurisdiction because "this

case does not involve . . . any adverse employment action"). And same with illegally searching a federal employee's home. *See Collins v. Bender*, 195 F.3d 1076, 1080 (9th Cir. 1999) ("[W]e do not believe that Congress intended to deputize government supervisors as chieftains of security forces that police the private lives of their employees subject only to some administrative oversight, and we do not believe that Congress meant to shoehorn into the CSRA every odd occurrence where a supervisor forms and leads such a renegade posse.").

Consider for example the Third Circuit's recent decision in *Manivannan v. DOE*, 42 F.4th 163 (3d Cir. 2022). In that case, DOE attempted to fire a CSRA-covered scientist and then allowed him to resign. Manivannan sued DOE. Some of his claims challenged CSRA-covered personnel actions and hence could be brought under only the CSRA (and not under § 1331). *Id.* at 173 (holding employee could challenge DOE's internal investigation only under the CSRA because that investigation constituted a CSRA-covered "significant change in working conditions"). But some of his claims were not covered by the CSRA and hence could be brought in the district court under § 1331. For example, DOE's "decision to disclose an employee's records to state prosecutors is not an adverse action" under Chapter 75 or a "personnel action" under Chapter 23. *Ibid.* Same with DOE's conversion of Manivannan's personal property:

> Even construing the CSRA's language broadly, we fail to see how an employer's alleged conversion of a former employee's personal property, unrelated to the latter's federal employment, constitutes a 'disciplinary or corrective action,' 5 U.S.C. § 2302(a)(2)(A)(iii), a 'significant change in duties, responsibilities, or working conditions,' *id.* § 2302(a)(2)(A)(xii), or any other employment action set out in the statute.

*Id.* at 174.

No. 22-40043

In short, the text and structure of the CSRA creates a decades-old, well-established, bright-line rule: Federal employees must bring challenges to CSRA-covered personnel actions through the CSRA, but they remain free to bring other, non-CSRA challenges under the district courts' general § 1331 jurisdiction.

## B.

The CSRA's purpose reinforces this conclusion. The CSRA was enacted "to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century.'" *Fausto*, 484 U.S. at 444 (quoting S. REP. NO. 95-969, at 3 (1978)). The old system created different grievance rights for federal employees in different agencies; it entailed labyrinthine and uncertain administrative review mechanisms that disincentivized managers from taking disciplinary action even when clearly warranted. *See id.* at 444–45 (citing S. REP. NO. 95-969, at 9 (1978)). The CSRA "replaced the patchwork system with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445 (citing S. REP. NO. 95-969, at 4 (1978)).

Thus, the CSRA's purpose is to streamline and integrate the review system for federal employees' challenges to *personnel actions*. It does nothing to promote that purpose to interpret the CSRA as stripping § 1331 jurisdiction over disputes *beyond* CSRA-covered personnel actions. If anything, it would disserve the CSRA's purposes to rewrite it, as the Government requests, to strip jurisdiction over every claim any federal employee could ever bring. That's because the MSPB has expertise in the byzantine procedures for taking and challenging CSRA-covered personnel

actions, but it knows nothing about peephole cameras and wiretaps and searches. It would substantially burden the MSPB to task it with such non-CSRA matters. And more to the point, if Congress wanted to make the CSRA process applicable to every claim an employee could ever bring against a federal employer, it could've said so. That would've made the CSRA less complicated by obviating all the personnel-action limitations in Chapter 23 and Chapter 75—a road Congress plainly did not take. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1357 (2018) ("We need not and will not invent an atextual explanation for Congress's drafting choices when the statute's own terms supply an answer." (quotation omitted)).

The Government offers two responses. First, the Government claims that allowing plaintiffs to bring suits in district court would undermine the CSRA's purpose of creating "an integrated scheme of review." Gov't En Banc Br. 22. The theory appears to be that federal employees can't otherwise sue in district court, so it would undermine the integration of the MSPB and the Federal Circuit to allow this case to get past the CSRA's roadblocks. This contention is quite odd. As the Government well knows, one of the most common suits brought by federal employees is the so-called "mixed case." It's so-called because the employee mixes CSRA-covered claims (for example, for CSRA-governed Chapter 75 violations) with non-CSRA claims (for example, for sex discrimination under Title VII). *See Kloeckner*, 568 U.S. at 44–48 (describing mixed cases). Both Congress and the Supreme Court say that federal employees are free to bring their mixed cases in district court without ever dealing with the MSPB or the Federal Circuit in any way. *See* 5 U.S.C. § 7703(b)(2); *Kloeckner*, 568 U.S. at 50 (holding "mixed cases shall be filed in district court"); *see also Punch v. Bridenstine*, 945 F.3d 322, 324–25 (5th Cir. 2019) (holding "the employee [bringing a mixed case] need not start with the MSPB—or take any of the roads running from it"—and instead can

file in district court). Thus, it's simply not true that federal employees face an "integrated" grievance system that never includes district court.

Second, the Government claims that it would create a "gaping loophole" if employees could see a CSRA-covered personnel action coming down the pike and then race to district court to invoke § 1331 jurisdiction before it otherwise disappears. Gov't En Banc Br. 22. Of course it's our job to interpret the words Congress actually wrote, not to entertain such policy arguments for writing the CSRA differently. *See, e.g.*, *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006). And in any event, the Government's policy concerns misunderstand the nature of plaintiffs' claims. In a case like this one, where plaintiffs are *not* challenging a CSRA-covered personnel action, § 1331 jurisdiction would not disappear *even if* the Government took CSRA-covered personnel actions against them. That's why, for example, Manivannan could litigate his non-CSRA claims *even after* incurring a CSRA-covered personnel action. *See Manivannan*, 42 F.4th at 174. So there's no race to the courthouse because the plaintiff can stay in district court *before or after* the CSRA-covered personnel action so long as he's not challenging that CSRA-covered personnel action.

## C.

The text, structure, and purpose of the CSRA all show that it provides the exclusive review procedures and employment remedies for CSRA-covered personnel actions. The dispositive question therefore is whether plaintiffs are challenging CSRA-covered personnel actions. If they are, they must channel their claims through the CSRA; if they are not, their claims are cognizable in the district court.

We hold plaintiffs are not challenging CSRA-covered personnel actions. Plaintiffs are challenging (under the Constitution, the APA, and the DJA) the President's executive orders requiring federal employees to make

irreversible medical decisions to take COVID-19 vaccines. "Even construing the CSRA's language broadly, we fail to see how an employer's" medical mandate could constitute a covered personnel action. *Ibid.*

We (1) begin with Chapter 23. Then we (2) discuss Chapter 75.

### 1.

First, the Government fails to prove plaintiffs are challenging a "personnel action" under Chapter 23. Neither § 2302(a)(2)(A)(xii) ("romanette xii") nor § 2302(a)(2)(A)(iii) ("romanette iii") applies to plaintiffs' claims.

### *Romanette xii*

Romanette xii is a residual clause that appears at the end of a twelve-item list. After defining Chapter 23's "personnel action[s]" to include things such as appointments, promotions, and reassignments, Congress concluded the list by covering "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). Such residual clauses trigger "the maxim *ejusdem generis*, the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (quotation omitted). All eleven of the personnel actions that precede romanette xii are typical, everyday employment decisions to, say, promote or reassign a single employee; none is an irrevocable decision that extends beyond the term of employment. *See Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 367 (D.D.C. 2020) ("[C]ourts have determined that the term 'working conditions' generally refers to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources."). Accordingly, we must interpret romanette xii to refer to these discrete

employment decisions—not government-wide mandates that commandeer the personal medical decisions of every federal employee. And we must interpret romanette xii to only include conditions that last for the duration of the employee's job tenure—not mandated vaccinations that have consequences long after the employee leaves the federal workforce.

Moreover, it strains romanette xii's text far beyond its breaking point to say it includes permanent medical decisions made outside the workplace. "[D]uties, responsibilities, or working conditions" plainly refer to duties, responsibilities, or working conditions of the employee's workplace. 5 U.S.C. § 2302(a)(2)(A)(xii). It doesn't apply to personal medical choices. That result follows *a fortiori* from *Gustafson* because if "working conditions" does not include peephole cameras *in workplace changing rooms*, it certainly does not include private, irreversible medical decisions made in consultation with private medical professionals outside the federal workplace. *See* 803 F.3d at 888.

This interpretation of romanette xii is further reinforced by the Supreme Court's decision in *NFIB v. OSHA*, 142 S. Ct. 661 (2022) (per curiam). There, the Court considered whether OSHA's COVID-19 vaccine mandate could constitute an "occupational safety and health standard[]." *Id.* at 665 (quoting 29 U.S.C. § 655(b)). The Court held no—both because "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance," and because workplace-safety standards refer to "hazards that employees face at work" and not "day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases." *Ibid.* (quotation omitted). Likewise here, Congress would need to speak much more clearly than it did in romanette xii if it wanted to strip § 1331 jurisdiction over challenges to a mandate that extends to every single federal employee's irreversible medical decisions. *Cf. Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 954–56 (Fed. Cir. 2020) (holding

Congress's enumeration of eleven specific personnel actions in the first eleven clauses of § 2302(a)(2)(A) precludes interpreting the residual clause in romanette xii to include a modest retaliatory investigation of a single employee).

### Romanette iii

Nor does romanette iii help the Government. It defines Chapter 23's "personnel action[s]" to include "disciplinary or corrective action" against federal employees. 5 U.S.C. § 2302(a)(2)(A)(iii). But plaintiffs have not received any "disciplinary or corrective action," and hence their claims do not challenge such actions. Some plaintiffs received "letters of counseling" and "letters of reprimand" for their failures to comply with the executive order. ROA.1195–1202, 1204, 1206, 1212, 1216, 1229, 1232, 1242, 1244, 1486, 1493, 1745. But it's well settled that such letters are not "disciplinary or corrective action[s]" under the CSRA. *See, e.g.*, *Sistek*, 955 F.3d at 955–57 (letter of reprimand was not a "personnel action" under the CSRA); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (Roberts, J.) (letter of censure was not a "personnel action" under the CSRA).[2] Absent any evidence of such action, the Government has no basis to suggest plaintiffs' claims are governed by romanette iii.

And the Government all but concedes the point. In its panel-stage brief, the Government obliquely suggests an employee could seek review under the CSRA when he receives a letter of reprimand, but it never explains

---

[2] The circuits likewise have held that letters of reprimand and other written warnings are not "materially adverse actions" in the analogous Title VII context. *See Durant v. D.C. Gov't*, 875 F.3d 685, 698 (D.C. Cir. 2017); *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (Kavanaugh, J.); *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1137 (10th Cir. 2005); *Whitaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005); *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001).

No. 22-40043

how or why such review comports with a wall of contrary precedent from around the country. Moreover, the Government concedes that receipt of a letter is merely "an early stage of [a] *still-hypothetical* progressive disciplinary process." Blue Br. 24 (emphasis added). That concession all but proves that counseling and reprimand letters do not trigger the CSRA's review provisions. And it's telling that the Government abandons the point altogether in its later-filed briefs.[3]

2.

Second, the Government fails to prove that Chapter 75 implicitly strips the court of jurisdiction. As JUDGE BARKSDALE noted in his panel dissent, the Government has never argued that plaintiffs have suffered any of the Chapter 75 personnel actions. *See Feds for Medical Freedom*, 30 F.4th at 513 (Barksdale, J., dissenting). And as JUDGE BARKSDALE correctly concluded, "[t]he EO's *enactment* . . . does not constitute an adverse action subject to CSRA. The case at hand is instead a pre-enforcement challenge to a government-wide policy, imposed by the President, that would affect the 2.1 million federal civilian workers, including the 6,000 members of Feds for Medical Freedom." *Ibid.*

In its en banc briefs, the Government does not contest JUDGE BARKSDALE's premise; it effectively concedes that plaintiffs have not yet incurred reviewable Chapter 75 employment actions. Rather, the Government (incorrectly) contests JUDGE BARKSDALE's conclusion; it contends plaintiffs *might one day* incur Chapter 75 actions, and that alone should implicitly strip the jurisdiction explicitly conferred by § 1331 *today*.

---

[3] Even if Chapter 23 did govern plaintiffs' claims, it's entirely speculative to think plaintiffs could ever get them before a federal court. *See infra* Part IV (discussing the OSC process).

We disagree. "It is quite clear, that the jurisdiction of the Court depends upon the state of things at the time of the action brought, and that after vesting, it cannot be ousted by subsequent events." *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824); *see also Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction."). And it's equally clear that we do not make jurisdictional determinations based on hypothetical future facts. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–11 (2013) (rejecting attempt to make jurisdictional determinations based on "[a]llegations of *possible* future injury" and "mere speculation" about what the Government will do (quotation omitted)). Just as plaintiffs cannot invoke a district court's jurisdiction based on speculation about what the Government will do in the future, the Government cannot deny a district court's jurisdiction based on speculation about what its employment supervisors will do in the future.[4]

---

[4] The contrary rule would have untenable consequences. Consider, for example, the amount-in-controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332. "Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289–90 (1938). "[O]nce the district court's jurisdiction is established, subsequent events that reduce the amount in controversy to less than $75,000 generally do not divest the court of diversity jurisdiction." *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000) (citations omitted). "Importantly, the jurisdictional facts must be judged as of the time the complaint is filed; subsequent events cannot serve to deprive the court of jurisdiction once it has attached." *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253–54 (5th Cir. 1998) (citations omitted). Yet on the Government's theory here, a defendant could defeat diversity jurisdiction by saying: "We recognize plaintiffs properly pleaded an amount in controversy of $75,001, but we'll produce documents in discovery to show the real amount in controversy is around $25,000." Such future-hypothetical-fact arguments have never been allowed to defeat (or create) subject matter jurisdiction.

No. 22-40043

Plaintiffs' complaint does not challenge any personnel action reviewable under the CSRA. Nor does it challenge any personnel action they could hypothetically incur in the future. Rather, plaintiffs claim that the President's vaccine mandate violates the U.S. Constitution and the APA. *See Manivannan*, 42 F.4th at 172 ("[W]hen assessing whether the CSRA bars federal jurisdiction over an otherwise reviewable claim, courts should look to the *specific underlying conduct being challenged* to determine whether that conduct is an employment action covered by the statute." (emphasis added)).[5] The Government does not dispute that plaintiffs' claims are ripe and otherwise cognizable under § 1331. And we can find nothing in the CSRA's text, structure, or purpose that implicitly displaces that jurisdiction for a claim outside the CSRA's coverage. We therefore hold that the district court properly exercised its jurisdiction over plaintiffs' claims.

III.

Our reading of the CSRA's text, structure, and purpose is confirmed by precedent. A long line of cases establishes that federal employees can bring facial, pre-enforcement actions against federal policies outside of the CSRA.

For example, in *NFFE v. Weinberger*, 818 F.2d 935 (D.C. Cir. 1987), civilian federal employees sued to enjoin a directive establishing a "Drug Abuse Testing Program." *Id.* at 937. The government argued that the CSRA precluded pre-enforcement review in federal court. Rejecting this argument, the court noted that its decisions "have made it absolutely clear that civilian

---

[5] Judge Higginson points out that some members of Feds for Medical Freedom may have incurred adverse personnel actions. *See post*, at 66–67 & n.8 (Higginson, J., dissenting). That would matter only if such actions could displace § 1331 jurisdiction that otherwise attaches to claims that do not implicate the CSRA. *See supra*, at 12 (rejecting this contention); *accord Manivannan*, 42 F.4th at 174.

federal employees may seek to enjoin government actions that violate their constitutional rights." *Id.* at 940 (citation omitted).

*NTEU v. Devine*, 733 F.2d 114 (D.C. Cir. 1984), similarly rejected the government's argument that the CSRA precludes jurisdiction over pre-enforcement challenges. The court held:

> This claim is meritless. It is one thing to say that when a statute provides a detailed scheme of administrative protection for defined employment rights, less significant employment rights of the same sort are implicitly excluded and cannot form the basis for relief directly through the courts. It is quite different to suggest, as appellant does, that a detailed scheme of administrative adjudication impliedly precludes preenforcement judicial review of rules.

*Id.* at 117 n.8 (citations omitted).

The Supreme Court has also, on multiple occasions, entertained pre-enforcement challenges to laws or directives affecting federal employees without a word about CSRA preclusion. *See, e.g.*, *NTEU v. Von Raab*, 489 U.S. 656 (1989) (pre-enforcement challenge to drug-testing program for federal employees); *United States v. NTEU*, 513 U.S. 454 (1995) (pre-enforcement challenge to a law prohibiting federal employees from accepting honoraria).

We have done the same. For example, in *AFGE v. FLRA*, 794 F.2d 1013 (5th Cir. 1986), we cited *Devine* for the proposition that a union of federal employees would be able to bring a pre-enforcement challenge to OPM regulations in district court. *See id.* at 1015–16. Similarly, in *NTEU v. Bush*, 891 F.2d 99 (5th Cir. 1989), we addressed the merits of a pre-enforcement suit challenging an executive order mandating drug testing for federal employees. *See id.* at 100. We didn't mention CSRA preclusion, even though the claims in the suit centered on the CSRA. *See ibid.*

No. 22-40043

The Government has two responses. First, it points out that these cases predate *Elgin*, which according to the Government, abrogated them. But as we recently held in *Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021) (en banc), *cert. granted*, 142 S. Ct. 2707 (2022), *Elgin* did not "break new ground" regarding implicit preclusion. *Id.* at 206. Nor did *Elgin* address pre-enforcement challenges at all. And the Government's position entails that *Elgin* held *sub silentio* that the Court lacked jurisdiction in all its past cases entertaining pre-enforcement challenges to federal employment policies— including *Von Raab* and *United States v. NTEU*. So *Elgin* can't support the weight the Government puts on it.

The Government's other response is to claim that most of these decisions involve "drive-by jurisdictional rulings" on the scope of CSRA preclusion. Gray Br. 6 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)). That's certainly not true of *Weinberger* and *Devine*. In those cases, the D.C. Circuit carefully considered and emphatically rejected the Government's theory of CSRA preclusion as "discredited" and "meritless." *Weinberger*, 818 F.2d at 939–42; *Devine*, 733 F.2d at 117 n.8. So it's no surprise that litigants and courts gave it less-thorough consideration in later cases.

IV.

Because the CSRA's text, structure, and purpose foreclose the Government's implicit-jurisdiction-stripping theory, we need not proceed to an analysis of the factors listed in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). *See Elgin*, 567 U.S. at 10; *Cochran*, 20 F.4th at 204. But even if we reach them, those factors only confirm that the CSRA left intact the district court's jurisdiction over this suit.

The first *Thunder Basin* factor is whether "a finding of preclusion could foreclose all meaningful judicial review." 510 U.S. at 212–13. The

Government contends that plaintiffs have two avenues for meaningful judicial review: Chapter 23 and the All Writs Act, 28 U.S.C. § 1651.

Chapter 23 provides no guarantee of judicial review—much less a meaningful one. With exceptions not relevant here,[6] claims covered by Chapter 23 are vindicable only by OSC. And here's how the OSC process works: The employee first files a complaint with the OSC. *See* 5 U.S.C. § 1214(a)(1)(A). If the OSC finds "reasonable grounds" of a "prohibited personnel practice," the OSC must report it to the employing agency, MSPB, and OPM. *Id.* § 1214(b)(2)(B). If the agency doesn't fix the problem, the OSC "*may* petition" to the MSPB. *Id.* § 1214(b)(2)(C) (emphasis added). And only a final order from the MSPB is reviewable before the Federal Circuit. *See id.* § 1214(c). This process gives the OSC total and unfettered discretion to decide whether to bring the claims before the MSPB. *See Krafsur v. Davenport*, 736 F.3d 1032, 1034 (6th Cir. 2013) ("[I]f the Special Counsel . . . declines to refer the case to the Board, the employee is out of luck. A court may not review the Special Counsel's decisions unless the Counsel has declined to investigate a complaint at all." (quotation omitted)). Its decisions not to pursue claims are unreviewable. *Cf. Heckler v. Chaney*, 470 U.S. 821, 837 (1985) (prosecutorial discretion not reviewable).

This is not particularly surprising, given that Chapter 23 is the bottom of the CSRA's pyramid and warrants the fewest procedural protections for federal employees. *See Carducci*, 714 F.2d at 175. But the narrowness of Chapter 23's review provisions—and the fact that any review at all turns on

---

[6] For example, Congress created an "individual right of action" in certain reprisal cases under § 2302(b)(8) and § 2302(b)(9)(A)(i), (B), (C), and (D) that allows some employees to sue without OSC's involvement. *See* 5 U.S.C. §§ 1221, 1214(a)(3); *Orr v. Dep't of Treasury*, 83 M.S.P.R. 117 (1999). But the Government doesn't argue that this exception, or any other, applies.

the unreviewable discretion of Government officials—puts the lie to the Government's two-sentence suggestion that the OSC or MSPB could or would give the plaintiffs relief against a nationwide vaccine mandate. *See* Gov't En Banc Br. 26 (so suggesting).

As for the Government's invocation of the All Writs Act, it proves both too much and too little. It's too much because the Government cannot explain how the CSRA implicitly strips § 1331 jurisdiction but somehow does not strip § 1651 jurisdiction. And all of the Government's policy arguments about the former—that it undermines the CSRA's "integrated" review, creates a "loophole," &c.—apply equally to the latter. But the Government's reliance on the All Writs Act also proves too little because as the Government itself concedes, mandamus relief is a "drastic and extraordinary" remedy "reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quotation omitted). So it's hard to see how it provides "meaningful review." Moreover, as then-Judge Roberts noted for the D.C. Circuit, employees with CSRA-covered claims cannot avail themselves of the All Writs Act. *See Fornaro v. James*, 416 F.3d 63, 69–70 (D.C. Cir. 2005). So the only way the All Writs Act could apply, on the Government's own logic, is to hold that the plaintiffs' claims are *outside* the CSRA, thus obviating the need for the All Writs Act in the first place. In all events, the All Writs Act does not provide "meaningful review" here.

The second *Thunder Basin* factor is whether plaintiffs' claims are "wholly collateral" to the CSRA's review provisions. 510 U.S. at 212 (quotation omitted). "[W]hether a claim is collateral to the relevant statutory-review scheme depends on whether that scheme is intended to provide the sort of relief sought by the plaintiff." *Cochran*, 20 F.4th at 207.

This factor again cuts against stripping the district court of jurisdiction. As detailed in Part II.A, the CSRA scheme is a highly reticulated web of statutes and regulations spanning multiple federal agencies (including the employee's own, the OSC, the OPM, the EEOC, and the MSPB) with overlapping procedural requirements and complicated substantive rules. *See, e.g.*, *Butler v. West*, 164 F.3d 634, 637 (D.C. Cir. 1999) (describing it as a "complicated tapestry"). We've described the CSRA as a winding road which cannot be driven by "the easily carsick." *Punch*, 945 F.3d at 324. The important point for present purposes, however, is that individual federal employees are forced to navigate it to air their individual grievances regarding individual personnel actions. The standard fare for the MSPB's docket includes employee misconduct, hostile work environments, whistleblowing, and the like. No part of it includes reviewing an executive order for compliance with the APA or ordering injunctive relief that affects thousands or millions of employees. No part of its byzantine procedures is suited for (or even appears to allow) an emergency preliminary injunction. And the Government does not cite a single case, nor have we found one, where OSC agreed in its unreviewable discretion to petition the MSPB for relief that remotely resembles what plaintiffs request here.

The Government nevertheless contends plaintiffs' claims are not wholly collateral to the CSRA because what plaintiffs *really* want is to "avoid adverse employment action," namely their terminations. Gov't En Banc Br. 17, 21–22. This is an untenable recharacterization of plaintiffs' suit, which prayed to have a federal court "[h]old unlawful and set aside the Federal Employee Mandate" and did not make specific employment-related claims. ROA.138 (complaint). Declaring unlawful an executive order that requires millions of people to undergo a medical procedure is hardly "relief that the CSRA routinely affords." *Elgin*, 567 U.S. at 22.

No. 22-40043

The third *Thunder Basin* factor is whether the claims at issue are "outside the agency's expertise." 510 U.S. at 212. As in *Cochran*, this case involves constitutional issues and "standard questions of administrative law, which the courts are at no disadvantage in answering." 20 F.4th at 207–08 (quotation omitted). By contrast, MSPB's expertise lies in "ensur[ing] that Federal employees are protected against abuses by agency management, that Executive branch agencies make employment decisions in accordance with the merit system principles, and that Federal merit systems are kept free of prohibited personnel practices." Merit Systems Protection Board, An Introduction to the Merit Systems Protection Board 5 (1999).

The Government doesn't argue that plaintiffs' claims fall under the MSPB's expertise. Rather, the Government argues that "the MSPB's resolution of *preliminary* questions unique to the employment context could obviate the need to address" plaintiffs' claims. Gov't En Banc Br. 17 (quotation omitted) (emphasis added). The Government provides no further support for this claim, however, and we therefore hold that it's forfeited. *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 732 (5th Cir. 2018).

## V.

Judge Higginson's dissent warrants a few additional words. He agrees that we have jurisdiction over plaintiffs' constitutional claims. Thus, thirteen of the seventeen members of our en banc court agree that the CSRA does not implicitly strip the jurisdiction that § 1331 explicitly confers on the district court to hear plaintiffs' constitutional claims. And eleven members agree that the CSRA does not implicitly strip jurisdiction over *any* of plaintiffs' claims, constitutional and non-constitutional alike. But he

disagrees with how we reach that conclusion. We write to address these areas of disagreement.

## A.

As an initial matter, JUDGE HIGGINSON's disagreement with the majority opinion is perplexing. On the one hand, the dissenting opinion says "the CSRA does not provide meaningful judicial review of the plaintiffs' pre-enforcement challenge and [therefore] Congress did *not* intend the CSRA to foreclose judicial review of their separation-of-powers claim" against the vaccine requirement, *post*, at 50 (Higginson, J., dissenting) (emphasis added), and "*nothing* in the CSRA shows that Congress meant to preclude federal jurisdiction to adjudicate separation-of-powers challenges to employment policies set by the President," *id.* at 76 (emphasis added). On the other hand, the dissenting opinion says, "Congress's intent to preclude judicial review over challenges to the [vaccine] requirement is fairly discernible within the statutory scheme," *id.* at 63, "Congress's intent to preclude jurisdiction over pre-enforcement challenges is fairly discernible in the statute," *id.* at 64, and "the only conclusion consistent with the text of the [CSRA] and binding Supreme Court authority is that Congress's intent to preclude pre-enforcement challenges is fairly discernible in the CSRA," *id.* at 69. It's difficult to reconcile these two positions.

The dissent tries to square that circle by arguing that plaintiffs' separation-of-powers challenges raise unique constitutional concerns and thereby preclude Congress from implicitly stripping § 1331 jurisdiction in this case. *See, e.g.*, *id.* at 75–76 & n.16. But it's unclear where the dissenting opinion would root its concerns in the Constitution or Supreme Court precedent. True, the Supreme Court has said the Constitution requires a federal forum for certain habeas claims, *see Boumediene v. Bush*, 553 U.S. 723, 795 (2008), and takings claims, *see First Eng. Evangelical Lutheran Church of*

*Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 315–19 (1987); Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 330 (7th ed. 2015) [Hart & Wechsler]. But it's well established that Congress need not provide a federal forum for constitutional claims more generally. To the contrary, the first Congress did not create general federal question jurisdiction in the Judiciary Act of 1789, so all manner of constitutional claims were denied a federal forum at the Founding without offending any constitutional principle. *See* Hart & Wechsler, *supra*, at 25–26; Daniel J. Meltzer, *The History and Structure of Article III*, 138 U. Pa. L. Rev. 1569, 1585–93 (1990).[7]

Even if the dissenting opinion could identify a constitutional problem to be avoided, it then must identify an alternative interpretation of the statutory text that avoids it. *See Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) ("The trouble with this argument is that constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction. The canon has no application absent ambiguity." (quotation omitted)); *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001) ("Despite this constitutional problem, if Congress has made its intent in the statute clear, we must give effect to that intent."

---

[7] If the dissenting opinion intends to ally itself with an Amarian conception of Article III, § 2, clause 1—namely, that Congress somehow must provide a federal forum for all cases arising under federal law, *see* Akhil R. Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. Rev. 205 (1985)—then it proves too much. That's because Article III, § 2, clause 1 says the judicial power extends to "all Cases, in Law and Equity, arising under this Constitution [*and*] *the Laws of the United States* . . . ." (emphasis added). The Amarian view of Article III would require Congress to provide a federal forum for plaintiffs' statutory APA claims, which the dissenting opinion expressly rejects. *See post*, at 70 n.12 (Higginson, J., dissenting) (arguing Congress can strip all jurisdiction over plaintiffs' claims arising under the APA).

(quotation omitted)). But the dissent raises no such plausible alternative reading. It simply says there's a constitutional problem of unknown constitutional provenance, so plaintiffs must win to avoid it. That's a quite-odd form of constitutional avoidance.

### B.

Second, the dissent argues that the CSRA implicitly strips § 1331 jurisdiction over CSRA-covered personnel actions. *See, e.g.*, *post*, at 54 (Higginson, J., dissenting). We agree. *Elgin*, *Fausto*, this majority opinion, and the dissent all agree (quite clearly) that where the CSRA applies, it implicitly strips the district court's § 1331 jurisdiction. The question of course is whether the CSRA applies.

And on that question, the dissent appears to say that the CSRA applies to both personnel actions *and pre-enforcement* personnel actions. But this proposition belies confusion over (1) what plaintiffs are challenging and (2) what sort of jurisdiction the CSRA strips. Plaintiffs are challenging the President's vaccine mandate—not any personnel action that may or may not be taken in conjunction with that mandate. And the CSRA's implicit effects on jurisdiction depend on the claims plaintiffs choose to bring. That's why the CSRA can apply when a plaintiff challenges his demotion or termination under Chapter 75 and not apply when the employee's boss installs a hidden camera in a workplace changing room. *See supra*, at 8. Thus, if the employee is subject to surveillance and then gets fired, she has a multitude of claims. She might, for example, challenge her termination—which would be subject to the CSRA/MSPB process. But if the employee seeks damages for *the invasion of privacy itself*, which is an obvious injury separate and apart from the employment action, that challenge does nothing to trigger the CSRA or to implicitly strip § 1331 jurisdiction. *See Gustafson*, 803 F.3d at 888; *Bush*, 462 U.S. at 385 n.28.

So it might be true, as the dissenting opinion sometimes suggests, that the CSRA would implicitly strip jurisdiction over an employee's pre-termination suit to enjoin her termination (*i.e.*, "pre-enforcement challenge to a covered personnel action"). We take no position on that because it's irrelevant here. All that matters here is that plaintiffs have identified an illegal vaccine mandate and, separate and apart from any personnel action the President might one day take to enforce that illegal order, the plaintiffs want judicial review of it. The CSRA does nothing to implicitly strip jurisdiction over these claims because the vaccine mandate itself is not a personnel action—even if a future employer at some future time might take some future action to impose some future personnel action on a future plaintiff who might violate the mandate in the future.

## C.

The dissenting opinion next says the vaccine mandate itself is a "working condition" of federal employment. That's so, the dissent says, because romanette xii's reference to "working conditions" is so capacious that it includes—and hence channels into the MSPB—*any* significant change to *any* "circumstances under which an employee performs his or her job." *Post*, at 57 (Higginson, J., dissenting). Under the dissenting opinion's theory, it's unclear there are any limits at all on what the President could call a change in "working conditions." But we know there are limits because the Supreme Court has said that warrantless searches and wiretaps are so far afield from the CSRA's list of personnel actions that they remain actionable in district court. *See Bush*, 462 U.S. at 385 n.28; *see also Collins*, 195 F.3d at 1080. And our sister circuits have said the same thing about peephole cameras and assaults. *See Gustafson*, 803 F.3d at 888; *Brock*, 64 F.3d at 1425; *Orsay*, 289 F.3d at 1131.

The dissenting opinion hazards no argument that an employee's irrevocable medical decision like the one at issue here is somehow the employer's prerogative in ways that wiretaps, peephole cameras, and assaults are not. Rather, the dissenting opinion contends that Congress contravened *Bush v. Lucas* (and *Gustafson*, *Brock*, *Orsay*, and *Collins* by extension) when it added romanettes x through xii to the CSRA. *See post*, at 59–61 & n.5 (Higginson, J., dissenting). Those romanettes bring under the CSRA "a decision to order psychiatric testing or examination," "the implementation or enforcement of any nondisclosure policy, form, or agreement," and "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(x)–(xii). They say nothing about wiretaps, peephole cameras, workplace assaults, or for that matter irrevocable medical decisions. We cannot infer that Congress's decision to cover nondisclosure agreements under the CSRA brings with it an implied congressional decision to cover elephantine medical decisions in romanette xii's ambiguous catchall phrase. To conclude otherwise, "we would have to conclude that Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence." *ABA v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005) (Sentelle, J.).

Nor would it matter if the President ordered employees to make their irrevocable medical decisions "at work." *Post*, at 62 (Higginson, J., dissenting). The vaccine mandate still would not be covered by the CSRA in any event. After all, the peephole camera in *Gustafson* was in the workplace. *See* 803 F.3d at 886–87. So too with the hypothesized wiretaps in *Bush*. *See* 462 U.S. at 385 n.28. So too with the assaults in *Brock*. *See* 64 F.3d at 1425. The reason these illegalities were actionable outside of the CSRA had nothing to do with the location or timing of the employer's actions. They

were actionable outside of the CSRA because the definition of "personnel action" cannot reasonably be read to include peephole cameras, assaults, or illegal wiretaps. The same is true of irrevocable medical decisions. The fact that the President ordered employees to make medical decisions outside of the workplace—and to live with those irrevocable decisions even after they leave the federal workforce—bolsters plaintiffs' argument that the mandate is not a "working condition." But it's not necessary.

## D.

The dissenting opinion next contends that its reading of the CSRA is compelled by "the logic of *Fausto*." *Post*, at 64 (Higginson, J., dissenting). Again, we respectfully disagree.

*Fausto* involved the removal of a federal employee—unquestionably a "personnel action" covered by the CSRA. *See* 5 U.S.C. §§ 2302(a)(2)(A)(iii), 7512(1) (covering "a removal"). While the CSRA covered the employer's personnel action, it did not cover Fausto himself because he served in the "excepted service." *Fausto*, 484 U.S. at 441 & n.1. Because Congress carved Fausto out of the CSRA's coverage, he sought remedies under a different federal statute called the Back Pay Act, 5 U.S.C. § 5596. The question presented was whether Congress's decision not to cover Fausto under the CSRA impliedly preempted his ability to seek more generous remedies under the Back Pay Act. The Court held yes because to hold otherwise "would have given him greater rights than were available under the CSRA to employees who enjoyed rights under that statute—primarily those in the competitive service." *Graham*, 358 F.3d at 934.

Likewise in *Graham*, the D.C. Circuit held that an employee covered by the CSRA must use that process—and only that process—to challenge his employer's personnel actions. *See ibid.* And it did not matter that the particular personnel action at issue in *Graham* (the issuance of a censure

letter) was not one of the listed personnel actions covered by the CSRA. As then-Judge Roberts wrote: "in granting review with respect to some personnel actions under the CSRA, Congress meant to preclude review of others." *Ibid.*

These cases teach that the CSRA establishes a comprehensive framework for (1) federal employees challenging (2) personnel actions. Under both *Fausto* and *Graham*, an employee cannot avoid the CSRA's implicit stripping of § 1331 jurisdiction by saying "Congress's decision to limit (1) covered employees and (2) covered personnel actions" should be read to allow (1) uncovered employees to avoid the CSRA or (2) judicial review of uncovered personnel actions.

But neither decision strips § 1331 jurisdiction over claims that *do not challenge personnel actions*. That's why, again, the Supreme Court said that federal employees can bring claims unrelated to personnel actions outside of the CSRA. *See Bush*, 462 U.S. at 385 n.28. Congress certainly could pass a statute that says, "federal employers are suable under the CSRA and only under the CSRA." But that's not what Congress said. Congress said personnel-action claims must go through the CSRA process—thus leaving undisturbed whatever § 1331 jurisdiction might otherwise attach to claims unrelated to personnel actions, like wiretaps, peephole cameras, and irrevocable medical decisions.

## E.

The dissenting opinion is also incorrect to contend "this case is justiciable because it involves challenges to CSRA-covered personnel actions." *Post*, at 67 (Higginson, J., dissenting). The dissent's theory appears to be that plaintiffs *only* have standing because the Government threatens to take CSRA-covered personnel actions against noncompliant employees. *See ibid.*

We respectfully disagree because the plaintiffs alleged an injury distinct from any personnel action. The mandated medical decision alone is an injury. When a "regulation is directed at [plaintiffs] in particular" and "requires them to make significant changes," plaintiffs have suffered an injury to challenge the order *even if* the Government has yet to elucidate the precise consequences of failing to comply. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). Plaintiffs do not have to identify exactly how the Government will enforce the mandate; it's enough that plaintiffs face the ominous order, "get vaccinated or else." *See Abbott Lab'ys*, 387 U.S. at 151 (holding that plaintiffs subject to a regulation had standing to challenge it even though the Attorney General had yet to "authorize criminal and seizure actions for violations of the statute").

Moreover, plaintiffs did not seek or receive relief against any personnel action. Plaintiffs only sought an injunction against the executive order. The executive order nowhere references any threatened or actual personnel action. *See* EXEC. ORDER 14043. And the district court's injunction nowhere restricts the Government from bringing personnel actions against plaintiffs. Rather, it prevents the Government from "implementing or enforcing Executive Order 14043 until this case is resolved on the merits." ROA.1770. The Government is thus prohibited from ordering plaintiffs to get vaccinated—but the Government is not prohibited from taking personnel actions against them.

True, when a plaintiff seeks pre-enforcement review of a government mandate, ripeness is always a concern. *See, e.g.*, *Abbott Lab'ys*, 387 U.S. at 148. But in this case, it's not difficult "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. The issue for judicial decision is the purely legal one of whether the President can lawfully enact this order. *See ibid.*

(holding "the issues presented are appropriate for judicial resolution at this time" because "all parties agree that the issue tendered is a purely legal one"). And the hardships to the plaintiffs of withholding a decision are plain: they'll be forced to undergo irrevocable medical procedures and comply with a potentially unlawful order or face unknown consequences that "may be even more costly." *See id.* at 153; *id.* at 152 (finding hardship and hence ripeness where "[t]he regulations are clear-cut, and were made effective immediately upon publication; [and the Government's lawyers made clear] that immediate compliance with their terms was expected"). The mandate thus plainly affects plaintiffs' "primary conduct" and hence is ripe for review irrespective of any personnel actions the Government has taken or might eventually take. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810 (2003).

## F.

Finally, the dissenting opinion claims that "[t]his circuit's door is now open to all pre-enforcement challenges to federal employment policies. Plaintiffs are welcome to challenge any personnel action before it takes place." *Post*, at 67–68 (Higginson, J., dissenting) (footnote omitted). "But this is one of those instances in which the dissent clearly tells us what the law is not." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 978 (5th Cir. 2019) (Oldham, J., dissenting) (quotation omitted).

Plaintiffs in this circuit, as in every circuit of which we're aware, are not free to challenge federal personnel actions under § 1331. Instead, challenges to federal personnel actions must be channeled through the CSRA process. True, § 1331 jurisdiction remains undisturbed for claims that do *not* challenge federal personnel actions. But even then, the eye of the federal employee's needle is narrow. The plaintiff still must demonstrate an injury in fact under well-established standing principles. And if the employee seeks

pre-enforcement review of a federal mandate, he must satisfy well-established ripeness rules.[8] And even if the plaintiff can thread that needle, again, he cannot "challenge any personnel action before it takes place." *Post*, at 68 (Higginson, J., dissenting). He can only challenge the Government's illegal actions that do *not* constitute a personnel action.

Ours is hardly the first court to recognize that this needle, while narrow, can be threaded. The plaintiffs in *Gustafson*, *Brock*, *Orsay*, and *Collins* all managed to do it. The sky did not fall, and the doors of the inferior federal courts were not blown open to claims that otherwise belonged in the CSRA/MSPB process. Therefore in our view, the dissenting opinion's rhetoric is misplaced.

## VI.

As noted, the panel limited its decision to jurisdiction. *See Feds for Medical Freedom*, 30 F.4th at 511. Finding that we have jurisdiction, we review the district court's decision regarding the other factors necessary for a preliminary injunction for abuse of discretion. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 447 (5th Cir. 2022). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The district court carefully considered these factors and wrote a thorough opinion explaining its decision to grant preliminary relief. After carefully considering the district court's opinion and the

---

[8] For example, the district judge in this case rejected a previous challenge to this same mandate as unripe. *See Rodden v. Fauci*, 571 F. Supp. 3d 686, 689 (S.D. Tex. 2021).

Government's criticisms of it, we are unpersuaded that the district court abused its discretion. And we need not repeat the district court's reasoning, with which we substantially agree.

The one issue that warrants additional discussion is the scope of injunctive relief. The Supreme Court has recently stayed nationwide injunctions. *See, e.g.*, *DHS v. New York*, 140 S. Ct. 599 (2020) (mem.). But the Court has yet to tell us they're verboten. Some Justices have expressed concerns that such injunctions can contravene equitable principles because "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring) ("Universal injunctions do not seem to comply with those [equitable] principles."). For example, the English system of equity did not authorize injunctions against the King. *See Trump*, 138 S. Ct. at 2427 (Thomas, J., concurring). And "as a general rule, American courts of equity did not provide relief beyond the parties to the case." *Ibid.* As with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as "that benefit was merely incidental." *Ibid.*

It appears that the district court did its best to follow these equitable principles in this case. The court carefully carved the President out of its injunction, which is an obviously imperfect analogue to the English king but an equally obvious good-faith recognition of the rule. It also recognized that, unlike the plaintiffs in both *New York* and *Hawaii*, the lead plaintiff in this case has over 6,000 members spread across every State in the Nation and nearly every federal agency in the entire Government. ROA.1770. And plaintiffs cited multiple instances in the aftermath of Executive Order 14043 where the Government wrongfully targeted unvaccinated federal employees who sought exemptions—despite assurances from the Government that it

would not do so. ROA.1454, 1464, 1600, 1625, 1645. The court therefore expressed its "fears that limiting the relief to only those before it would prove unwieldy and would only cause more confusion." ROA.1770. On this record and absent binding precedent from the Supreme Court, we cannot say that the district court abused its discretion in rejecting the Government's assurances that it could and would comply with an injunction limited to the plaintiffs' members.

The Government's position on the scope of the injunction also sits awkwardly with its position on the merits. On the merits, the Government wants "consistency across government in enforcement of this government-wide vaccine policy." ROA.810. But on the scope of the injunction, the Government wants piecemeal enforcement, where thousands of plaintiffs' members across the Nation are subject to the district court's injunction, others are given exemptions from vaccination, and only the remainder are subject to the President's mandate. That undermines rather than supports the Government's purported interest in "consistency across government in enforcement of this government-wide vaccine policy." ROA.810.

Finally, a word about concerns expressed by JUDGE HAYNES and JUDGE STEWART regarding a purported conflict between this injunction and the decisions of other courts across the country. They worry that the district court's injunction awards relief to parties who have already lost their claims elsewhere. But our esteemed colleagues reference no cases where plaintiffs have lost their claims *on the merits*. They first cite *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022) (unpublished). There, our sister circuit vacated a district court judgment denying a preliminary injunction of Executive Order 14043 but *only* because the court concluded that the CSRA stripped the district court of jurisdiction. *See id.* at *1. The panel dismissed the case under FED. R. CIV. P. 12(b)(1) without prejudice and without reaching the merits. *See id.* at *8 ("We therefore

vacate the district court's judgment and remand the case with instructions that it be dismissed without prejudice for lack of subject-matter jurisdiction."). The D.C. Circuit took the same route in *Payne v. Biden*, --- F.4th ----, 2023 WL 2576742 (D.C. Cir. 2023). *See id*. at *7 (dismissing for lack of subject matter jurisdiction without reaching the merits). In all the other cases JUDGE STEWART cites, the districts courts dismissed the claims without prejudice on the grounds that the CSRA stripped jurisdiction. *See Am. Fed'n of Gov't Emps. Loc. 2018 v. Biden*, 598 F. Supp. 3d 241, 248–49 (E.D. Pa. 2022); *Payne v. Biden*, 602 F. Supp. 3d 147, 151 (D.D.C. 2022); *Am. Fed'n of Gov't Emps. Loc. 2586 v. Biden*, No. CIV-21-1130-SLP, 2022 WL 3695297, at *6 (W.D. Okla. July 22, 2022). The overwhelming majority of district courts that have dismissed these challenges have also done so for lack of jurisdiction under FED. R. CIV. P. 12(b)(1). *See, e.g., Calderwood v. United States*, No. 2:21-CV-702-CLM, 2022 WL 4353382 (N.D. Ala. Aug. 25, 2022); *Church v. Biden*, No. 21-2815 (CKK), 2022 WL 1491100 (D.D.C. May 11, 2022); *Am. Fed'n of Gov't Emps. Loc. 501 v. Biden*, 576 F. Supp. 3d 1155 (S.D. Fla. 2021); *McCray v. Biden*, 574 F. Supp. 3d 1 (D.D.C. 2021); *Brass v. Biden*, No. 21-CV-02778-CNS-MEH, 2022 WL 11732833 (D. Colo. Oct. 20, 2022). Thirteen members of this court, including JUDGE HAYNES, agree that we have jurisdiction and must reach the merits of the preliminary injunction. Accordingly, any perceived conflict is misconstrued, and any benefit to outside parties is "merely incidental." *See Trump*, 138 S. Ct. at 2427 (Thomas, J., concurring).

We hasten to emphasize that this case only involves a *preliminary* injunction. The preliminary injunction's purpose is to maintain the status quo until the parties have the chance to adjudicate the merits. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) ("[T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . ." (quotation omitted)); *Texas v. United*

*States*, 809 F.3d 134, 187 n.205 (5th Cir. 2015), *affirmed by an equally divided Court*, 579 U.S. 547 (2016) (per curiam) (similar). When the parties proceed to the merits in the district court, the plaintiffs will have to *prove* that whatever injunction they request is broad enough to protect against their proven injuries and no broader. And the Government will have another chance to show that any permanent injunction should be narrower than the preliminary one. And both sides will have to grapple with the White House's announcement that the COVID emergency will finally end on May 11, 2023. *See* Exec. Off. of the President, Statement of Administration Policy Re: H.R. 382 & H.J. Res. 7 (Jan. 30, 2023).

AFFIRMED.

JAMES C. HO, *Circuit Judge*, joined by JONES, *Circuit Judge*, concurring:

Our court today holds that we have jurisdiction to hear this challenge to the President's vaccine mandate for federal employees. Moreover, by affirming the preliminary injunction, we also hold that coercing an employee to comply with a vaccine mandate as a condition of continued employment constitutes irreparable injury.[1] I concur.

Judge Higginson agrees that we have jurisdiction. But he concludes that we should deny relief on the merits and therefore reverse. He notes that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Post*, at 77 (Higginson, J., concurring in part and dissenting in part) (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1; *id.* at § 3)). He concludes that the President possesses the constitutional authority to order federal employees to comply with his vaccine mandate, if they wish to avoid removal from office.

I certainly agree that "[t]he entire 'executive Power' belongs to the President alone." *Seila Law*, 140 S. Ct. at 2197. *Contrast* U.S. CONST. art. I, § 1 (vesting the legislative power in a bicameral Congress); *id.* art. III, § 1 (vesting the judicial power in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"). To be sure, "it would be impossible for one man to perform all the great business of the State." *Seila Law*, 140 S. Ct. at 2197 (quotations omitted). So "the

---

[1] *Cf. NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) ("A vaccination . . . cannot be undone at the end of the workday.") (quotations omitted); *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (noting that "employees would have to undertake an irreversible decision—vaccination—in order to be compliant with this mandate"); *see also Sambrano v. United Airlines, Inc.*, 45 F.4th 877, 878–79 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc) (same).

No. 22-40043

Constitution assumes that lesser executive officers will assist the supreme Magistrate in discharging the duties of his trust." *Id.* (quotations omitted). But "[t]hese lesser executive officers must remain accountable to the President, whose authority they wield." *Id.*

All of this means that the President *should* possess the constitutional authority under Article II to remove his subordinates from office. *See, e.g., Myers v. United States*, 272 U.S. 52, 122, (1926) ("[W]hen the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal."); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (insulating subordinates from removal "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts"); *Seila Law*, 140 S. Ct. at 2203–04 (observing that "the threat of removal" allows the President to "meaningfully control[]" subordinates, and that "removal at will" is "the most direct method of presidential control"); *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) ("The President must be able to remove not just officers who disobey his commands but also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against [the President's] agenda, and those in whom he has simply lost confidence.") (cleaned up).[2]

---

[2] *But see Collins v. Mnuchin*, 938 F.3d 553, 614 (5th Cir. 2019) (en banc) (Higginson, J., dissenting in part) ("The Constitution affords sparse materials to resolve this question—only broad pronouncements that '[t]he executive Power shall be vested' in the President and that 'he shall take Care that the Laws be faithfully executed.' Art. II §§ 1, 3. These clauses say nothing about removal of executive-branch officers.").

No. 22-40043

In reality, however, the President actually controls surprisingly little of the Executive Branch. Only a tiny percentage of Executive Branch employees are subject to Presidential removal. The overwhelming majority of federal employees, by contrast, are protected against Presidential removal by civil service laws. *Compare* OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, BUDGET OF THE UNITED STATES GOVERNMENT, FISCAL YEAR 2023, at 83 (2022) (4.2 million Executive Branch employees), *with* HOUSE COMMITTEE ON OVERSIGHT AND REFORM, UNITED STATES GOVERNMENT POLICY AND SUPPORTING POSITIONS 209–15 (2020) (commonly known as the "Plum Book") (fewer than four thousand Executive Branch employees are subject to removal at will by the President).

The net result is that there are only a "small number of politically appointed leaders" who "enjoy only limited control of the mass of civil servants." Eric Posner, *And if Elected: What President Trump Could or Couldn't Do,* N.Y. TIMES, June 3, 2016. Federal civil service laws make it virtually impossible for a President to implement his vision without the active consent and cooperation of an army of unaccountable federal employees. And that presents a rather curious distortion of our constitutional structure. The Constitution requires the President, the Vice President, and every member of Congress to stand for re-election if they wish to continue holding federal office and exercising federal power. Meanwhile, countless Executive Branch employees have the ability to influence or implement federal policy in their capacity as subordinates of the President—yet they enjoy a *de facto* form of life tenure, akin to that of Article III judges. *See* U.S. CONST. art. III, § 1 ("The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour").

It's a phenomenon that legal scholars have identified (and decried) for decades. "The critical fact of civil service today is that covered employees

are rarely discharged from government for inadequately doing their jobs.  The civil service system has provided the equivalent of life tenure (at least until retirement) once a brief probation period is passed, absent what the government considers a serious act of misconduct."  Gerald E. Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees?*, 124 U. Pa. L. Rev. 942, 945 (1976).  *See also* Philip K. Howard, Not Accountable: Rethinking The Constitutionality Of Public Employee Unions 136 (2023) ("Federal government . . . is an accountability-free zone.  More federal employees die on the job than are terminated for poor performance.  Regular stories emerge of employees who cannot be terminated despite outrageous behavior.").

Not surprisingly, these "tenure-like protections for the civil service have sharply reduced the president's ability to change the direction of the permanent bureaucracy."  John Yoo, *Unitary, Executive, or Both?*, 76 U. Chi. L. Rev. 1935, 1956 (2009).

What's more, federal employees know it—and they take full-throated advantage of it.  As anyone who has ever held a senior position in the Executive Branch can attest, federal employees often regard themselves, not as subordinates duty-bound to carry out the President's vision whether they personally agree with it or not, but as a free-standing interest group entitled to make demands on their superiors.  *See*, *e.g.*, Philip K. Howard, *Civil Service Reform: Reassert the President's Constitutional Authority*, The American Interest, Jan. 28, 2017 ("The slow dissipation of presidential power is a story rich with irony—designed to avoid interest group capture, the civil service became its own special interest.").

As a result, "Presidents can have a hard time implementing their agenda if civil servants collectively drag their feet or lack the competence to carry out the President's orders."  Jason Marisam, *The President's Agency*

*Selection Powers*, 65 ADMIN. L. REV. 821, 863 (2013). "Even if a president has the perfect ally running an agency, that ally may still fail to produce the desired results if the ally runs into resistance from his civil servants." *Id.*

Indeed, one scholar has pointedly noted that the single "*biggest* obstacle" for any President "is not the separation of powers" designed by our Founders, "but the millions of federal employees who are supposed to work for him." Posner, *supra* (emphasis added). "These employees can drag their feet, leak to the press, threaten to resign and employ other tactics to undermine [a President's] initiatives if they object to them." *Id.* "They're also hard to fire, thanks to Civil Service protections." *Id. See, e.g.*, Marisam, *supra*, at 863–64 ("For example, the efforts of President Reagan's EPA Administrator, Ann Gorsuch, to slow down and halt EPA regulatory actions was marked by staff resistance to the Administration's attempt to change the agency's goals.") (cleaned up).

In an appropriate case, we should consider whether laws that limit the President's power to remove Executive Branch employees are consistent with the vesting of executive power exclusively in the President. *See, e.g.*, HOWARD, NOT ACCOUNTABLE, *supra*, at 140 ("[T]he president and federal supervisory officials must have authority to manage personnel . . . . This requires, among other remedies, invalidating specific provisions of the Civil Service Reform Act of 1978 that . . . disempower the president and his appointees from removing officers."); Yoo, *supra*, at 1957 ("[P]residents consistently followed a common position toward the civil service that sought to maintain the right to fire federal employees in order to guarantee a uniform execution of federal law."); Christopher S. Yoo, Steven G. Calabresi, and Anthony J. Colangelo, *The Unitary Executive in the Modern Era, 1945–2004*, 90 IOWA L. REV. 601, 660 (2005) ("[T]he idea that the civil service laws limit the president's power to remove is of fairly recent vintage dating back

only to 1974."); Frug, *supra*, at 949 (noting that "the President's absolute power of removal of federal employees was established in principle" in 1789).

This is not that case, however. That's because the Government doesn't challenge the validity of the CSRA or invoke the President's Article II removal power in this case. It doesn't do so in its briefing. And it reconfirmed during oral argument that it doesn't challenge the constitutionality of the CSRA here. During oral argument, I asked whether the President has the power under the Constitution to remove any Executive Branch employee, notwithstanding laws like the CSRA. Counsel for the Government responded: "Plaintiffs say periodically we haven't challenged the constitutionality of the CSRA. That's absolutely right—we have not." Oral Arg. at 5:40-6:23.

The argument is thus forfeited. We therefore have no occasion to decide whether this case implicates the President's constitutional power to remove employees who are unwilling to faithfully execute his policy vision for our country—or if, instead, the President is impermissibly leveraging (and therefore exceeding) his removal power in order to meddle in the private lives of federal employees. *See post*, at 52 (Higginson, J., concurring in part and dissenting in part) (noting that the President's vaccine mandate "requires federal employees to 'protect themselves' against COVID-19 by getting FDA-approved vaccinations"); *cf. Louisiana v. Biden*, 55 F.4th 1017, 1030 (5th Cir. 2022) ("unlike the non-discrimination, E-Verify, *Beck* rights, and sick leave orders, which govern the conduct of *employers*, the [President's federal contractor] vaccine mandate purports to govern the conduct of

*employees* – and more than their conduct, purports to govern their individual healthcare decisions").[3]

---

[3] *See also Horvath v. City of Leander*, 946 F.3d 787, 799 (5th Cir. 2020) (Ho, J., concurring in the judgment and dissenting in part) (observing that a municipal vaccine mandate "forces [an employee] to choose between sacrificing his faith or working under unequal conditions"); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618–19 (5th Cir. 2021) (OSHA vaccine mandate implicates "the liberty of individuals to make intensely personal decisions according to their own convictions"); *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021) (Ho, J., dissenting) ("Vaccine mandates . . . present a crisis of conscience for many people of faith.  It forces them to choose between the two most profound obligations they will ever assume—holding true to their religious commitments and feeding and housing their children."); *Sambrano v. United Airlines, Inc.,* 2022 WL 486610, *9 (5th Cir. Feb. 17, 2022) ("United has presented plaintiffs with two options: violate their religious convictions or lose all pay and benefits indefinitely.  That is an impossible choice for plaintiffs who want to remain faithful but must put food on the table.").

HAYNES, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

## I.     Concurrence

I concur in the en banc court's judgment that we have jurisdiction over pre-enforcement challenges to President Biden's vaccine mandate for federal employees.  I also concur in the affirmance of the preliminary injunction as to the parties in this case, but I respectfully dissent from the affirmance of the grant of a nationwide injunction.

## II.     Dissent[1]

The district court noted that it was "cognizant of the 'equitable and constitutional questions raised by the rise of nationwide injunctions.'" *Feds for Medical Freedom v. Biden*, 581 F. Supp. 3d 826, 836 (S.D. Tex. 2022) (quoting *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring)).  Nevertheless, the district court concluded that tailoring relief here was impractical.  581 F. Supp. 3d at 836.  According to the district court, the fact that the lead Plaintiff—Feds for Medical Freedom—has more than 6000 members spread across every state and in nearly every federal agency means that limiting the injunction's scope would "prove unwieldy and would only cause more confusion."  *Id.* (quotation omitted).

However, a federal court's "constitutionally prescribed role is to vindicate the individual rights *of the people appearing before it*," and accordingly "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (emphasis added); *see also Dep't of Homeland Sec.*, 140 S. Ct. at 600 (Gorsuch,

---

[1] Judges Higginson and Willett join in Section II.

J., concurring) ("[W]hen a court . . . order[s] the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies."); *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) ("In their universal reach to plaintiffs and nonplaintiffs alike, nationwide injunctions push against the boundaries of judicial power, and very often impede the proper functioning of our federal court system."). This seems especially true where, as here, several district courts (and two circuit courts) across the country have come out differently from this district court on these issues.[2]  For instance, the Government noted that it has successfully defended the executive order in the Fourth Circuit[3] and is currently defending the dismissal of similar challenges in the Third and D.C. Circuits,[4] "[b]ut those cases are rendered essentially meaningless by this nationwide injunction."[5]

---

[2] At least twelve district courts previously rejected challenges to Executive Order 14043 for various reasons.  *See Feds for Med. Freedom*, 30 F.4th at 505 n.1 (collecting cases).

[3] The Fourth Circuit, like the panel opinion in this case, determined that the CSRA deprived the district court of jurisdiction.  Accordingly, it vacated the district court's judgment denying relief to the plaintiffs on the merits and dismissed the suit for lack of jurisdiction.  *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *8 (4th Cir. Apr. 19, 2022).

[4] The Government subsequently noted that the D.C. Circuit ruled in its favor.  *See Payne v. Biden*, --- F.4th ----, 2023 WL 2576742 (D.C. Cir. 2023).

[5] The majority opinion misunderstands my point here: we should generally only address the *parties*' request for a preliminary injunction, particularly in this circumstance, where other litigants are raising the same issues in other circuits.  In other words, I am less concerned with whether we are creating circuit splits than whether we are appropriately limiting the scope of our decisions to the parties before us.  The reasoning other circuits use to resolve these issues is therefore not my point.  That said, the majority is plainly incorrect that its opinion doesn't truly conflict with other courts' decisions.  The other circuits' jurisdictional rulings are far from "merely incidental"—they are wholly fatal to the plaintiffs' claims.  Therefore, a nationwide ruling which the majority opinion seems to

No. 22-40043

Nor is tailored injunctive relief unworkable here. The district court could direct Feds for Medical Freedom to submit the names of its members to the Government and employing agencies in order to provide them relief. If it has not already done so, Feds for Medical Freedom also could provide either online proof of membership or physical cards to that effect that the unvaccinated individual member employees could utilize as proof to avoid any adverse employment actions. Additionally, as the Government notes, "[a]s for the court's view that tailored relief would be unworkable because [Feds for Medical Freedom] 'is actively adding new member[s],' it is far from clear that [Feds for Medical Freedom] has standing to litigate on behalf" of potential or future members.[6] In contrast, the plaintiffs wholly failed to meet their burden to show that tailoring was not workable. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (on appeal from grant of preliminary injunction, the party who "bears the burden of proof on the ultimate question" bears the same burden on appeal); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1982) ("[T]he district court must remember that a preliminary injunction is an extraordinary and drastic remedy, and that the movant has a heavy burden of persuading the district court that all four elements are satisfied. Thus, if the *movant* does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue and, if issued, will be

---

find overrules the other circuits is also problematic because we have no greater jurisdiction to grant relief (or make decisions about federal court jurisdiction) than the other circuits.

[6] The majority opinion's last substantive paragraph notes that this case "only involves a preliminary injunction" which has the "purpose to maintain the status quo until the *parties* have the chance to adjudicate the merits." *Ante*, at 37 (emphasis added). Exactly—we should not address the interests of non-parties where, as here, it is certainly feasible to tailor the injunctive relief to the plaintiffs.

vacated on appeal." (internal quotation marks, alteration, and citation omitted) (emphasis added)).

### III.    Conclusion

Accordingly, the district court erred in issuing a nationwide injunction when a tailored injunction is not unworkable or impossible to apply. Therefore, I dissent from the court's decision to leave the nationwide injunction in place rather than reversing the portion of the injunction that extends beyond the plaintiffs.

No. 22-40043

STEPHEN A. HIGGINSON, *Circuit Judge*, joined by SOUTHWICK, *Circuit Judge*, concurring in part and dissenting in part:

This case begins with the question of whether we have jurisdiction to review the President's vaccine requirement for Executive Branch employees. If the answer is yes, we also must decide whether the President's order exceeded his authority to require his employees to get an FDA-approved vaccination during a pandemic that has killed over a million Americans.

For the wrong reasons, our court correctly concludes that we do have jurisdiction. But contrary to a dozen federal courts—and having left a government motion to stay the district court's injunction pending for more than a year—our court still refuses to say why the President does not have the power to regulate workplace safety for his employees.

\* \* \*

The Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq.*, generally precludes subject-matter jurisdiction over pre-enforcement challenges to Executive Branch employment policies. For that reason, I cannot agree with our court's blueprint for covered employees to short circuit the CSRA by filing a federal lawsuit against workplace regulations before they are disciplined. Now, litigants can forum shop challenges to federal employment policies in our court, even though Congress directed their cases to the Federal Circuit. However, because I conclude the CSRA does not provide meaningful judicial review of the plaintiffs' pre-enforcement challenge and Congress did not intend the CSRA to foreclose judicial review of their separation-of-powers claim, I concur that we have jurisdiction over this claim.

On the merits, our court is wrong that the plaintiffs are entitled to a preliminary injunction, let alone one that sweeps nationwide. The vaccine requirement fell within the President's power to regulate his employees. Nor

have the plaintiffs shown that they are likely to suffer an irreparable injury from the requirement in the absence of injunctive relief. Without identifying any reason that the requirement exceeded Presidential authority or any irreparable injury that the plaintiffs will suffer, our court concludes that such an injunction, which overruled all other federal courts that left the mandate untouched, is justified.

Setting aside the substance of what our court says on the merits, I disagree with *how* we say it. Today, our court affirms a nationwide injunction, put in place over a year ago, without explanation or analysis of any of the preliminary injunction factors. This method of rubberstamping a district court's nullification of the President's authority over the Executive Branch is unprecedented and improper on en banc rehearing. The People's trust in our independence is undermined when we answer vital constitutional questions without showing our work—especially when the questions before us "are inescapably entangled in political controversies" and "touch the passions of the day." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 149 (1951) (Frankfurter, J., concurring).

## I.

By September 2021, more than 600,000 Americans had died from COVID-19. *Covid Data Tracker Weekly Review: Easy as 1-2-3*, Ctrs. for Disease Control & Prevention (Interpretive Summary for Aug. 27, 2021). Millions were missing work each week. *Educational Attainment for Adults Not Working at Time of Survey, by Main Reason for Not Working and Source Used to Meet Spending Needs*, *Weekly 37 Household Pulse Survey: Sept. 1 – Sept. 13*, U.S. Census Bureau (Sept. 21, 2021).

To combat those threats to "the health and safety of the [f]ederal workforce and the efficiency of the civil service," on September 9, 2021, the President issued Executive Order 14043. Exec. Order No. 14043, 86 Fed.

Reg. 50,989, 50,989 (Sept. 9, 2021). This order requires federal employees to "protect themselves" against COVID-19 by getting FDA-approved vaccinations. *Id.* Specifically, the President directed executive agencies to implement "a program to require COVID-19 vaccination for all of its [f]ederal employees, with exceptions only as required by law." *Id.* at 50,990.

Pursuant to the Executive Order, the Safer Federal Workforce Task Force issued guidance stating that covered employees would "need to be fully vaccinated by November 22, 2021." *Vaccinations*, Safer Fed. Workforce, https://perma.cc/G8T6-K8XN. The guidance said that agencies "may be required to provide a reasonable accommodation to employees" who did not get vaccinated "because of a disability" or "a sincerely held religious belief, practice, or observance." *Id.*

The guidance also explained how agencies could enforce the vaccine requirement. Agencies should first provide "an appropriate period of education or counseling" to employees who initially fail to comply with the requirement. *Id.* Afterwards, if an employee still does not get vaccinated, an agency could "issue a letter of reprimand, followed by a short suspension," which would "generally" last "14 days or less." *Id.* The agency could propose that the employee be removed if the employee does not comply with the requirement during the suspension. *Id.* The guidance further noted that "[e]mployees who violate lawful orders," like the requirement, "are subject to discipline, . . . including termination or removal." *Id.*

In December 2021, Feds for Medical Freedom, individual federal employees, and other plaintiffs challenged Executive Order 14043 in federal district court. They alleged that the Executive Order is ultra vires because it exceeded the President's constitutional and statutory authority, and they challenged the Executive Order as arbitrary and capricious under the Administrative Procedure Act (APA), 5 U.S.C. § 706. The plaintiffs moved

for a preliminary injunction, which the district court granted. *See Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 836-37 (S.D. Tex. 2022), *vacated*, 30 F.4th 503 (5th Cir. 2022), *reh'g granted*, 37 F.4th 1093. In granting the injunction, the district court split from a dozen other district courts who had already rejected similar challenges.[1] *See Feds for Med. Freedom*, 30 F.4th at 505 n.1 (collecting cases).

The government appealed and moved for a stay pending appeal. A divided panel carried the motion with the case, *see Feds for Med. Freedom v. Biden*, 25 F.4th 354 (5th Cir. 2022) (per curiam), and a divided panel then vacated the injunction on the basis that the CSRA precluded the district court's exercise of jurisdiction, *see Feds for Med. Freedom v. Biden*, 30 F.4th 503, 511 (5th Cir. 2022). Our court granted rehearing en banc. *Feds for Med. Freedom v. Biden*, 37 F.4th 1093 (5th Cir. 2022) (per curiam).

## II.

Congress's constitutional power to establish inferior federal courts includes the power to define their jurisdiction. *See* U.S. Const. art III, § 1; *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943). Pursuant to this power, Congress can preclude district courts from exercising jurisdiction by requiring certain claims "to proceed exclusively through a statutory review scheme." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012).

In determining whether a statute precludes district court jurisdiction, we consider whether Congress's intent to do so is "fairly discernible in the

---

[1] The district court's decision also conflicts with the Fourth Circuit's and D.C. Circuit's conclusion that Congress precluded jurisdiction over a similar challenge to the vaccine requirement. *See Payne v. Biden*, --- F.4th ----, 2023 WL 2576742 (D.C. Cir. 2023); *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022). Another appeal is pending before the Third Circuit. *See Smith v. Biden*, No. 21-CV-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021), *appeal docketed*, No. 21-3091 (3d Cir. Nov. 10, 2021).

statutory scheme." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). If so, we decide whether the plaintiffs' claims "are of the type Congress intended to be reviewed within this statutory structure." *Id.* at 212. Three factors are relevant to this inquiry: whether (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the claims are "wholly collateral to a statute's review provisions," and (3) the claims are "outside the agency's expertise." *Id.* at 212-13 (cleaned up).

Applying this Supreme Court test, the CSRA generally precludes district court jurisdiction over pre-enforcement challenges to Executive Branch employment policies. But, as I explain below, the plaintiffs' separation-of-powers claim is the rare type of pre-enforcement challenge that Congress did not intend to preclude in the CSRA. Therefore, I agree narrowly in outcome with the majority that we have jurisdiction over plaintiffs' pre-enforcement challenge to the Executive Order as ultra vires.[2]

But the majority takes two significant wrong turns in reaching its jurisdictional conclusion, which rejects Supreme Court precedent and imperils Congress's CSRA regime. First, the majority is incorrect that plaintiffs are not challenging a "personnel action" within the meaning of the CSRA. In addition, the majority is mistaken that Congress did not intend the CSRA to preclude jurisdiction over pre-enforcement challenges to personnel actions covered by the statute. This second error of our court is grave and lets any covered employee facing proposed discipline rush to federal court ahead of the statutory timeline contrary to Supreme Court precedent and the text of the CSRA.

---

[2] With the benefit of en banc argument, I have reconsidered my initial view that the district court likely lacked jurisdiction over the *entire* case. *Feds for Med. Freedom v. Biden*, 25 F.4th 354, 356 (5th Cir. 2022) (Higginson, J., dissenting), though I continue to believe that jurisdiction over plaintiffs' APA claim is precluded.

### A.

The CSRA imposed a "comprehensive and integrated review scheme" for "personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 454, 455 (1988). This system replaced a set of "haphazard" and "patchwork" "arrangements for administrative and judicial review of personnel action," which had resulted in a "wide variation[] in [district court] decisions issued on the same or similar matters." *Id.* at 444-45 (cleaned up). Among other reforms, the CSRA created the Merit Systems Protection Board (MSPB), "a quasi-judicial agency with the power to adjudicate disputes arising from adverse personnel actions taken against covered federal employees." *Zummer v. Sallet*, 37 F.4th 996, 1003 (5th Cir. 2022), *cert. denied*, --- S. Ct. ----, 2023 WL 2563318 (2023).

Under the CSRA's "elaborate new framework," challenges to "minor adverse action[s]," "major adverse action[s]," and "prohibited personnel practices" are channeled into separate procedural tracks. *Fausto*, 484 U.S. at 443, 445-47 (cleaned up); *see* 5 U.S.C. §§ 1212, 1214, 2301, 2302, 7502, 7503, 7512, 7513; *see also* 5 U.S.C. § 4303 (review of actions based on unacceptable performance).

Minor adverse actions, meaning suspensions lasting fourteen days or less, are not appealable to the MSPB. *See* 5 U.S.C. § 7503; *Fausto*, 484 U.S. at 446. Instead, an employee against whom such a suspension is proposed is entitled to certain procedural protections, including notice, an opportunity to respond, representation by an attorney, and a written decision. 5 U.S.C. § 7503(b)(1)-(4).

Major adverse actions, including removal and suspension for more than fourteen days, *id.* § 7512(1)-(5); *Fausto*, 484 U.S. at 446-47, trigger a similar set of safeguards. When such an action is proposed against an employee, he or she is generally entitled to "at least [thirty] days' advance

written notice," "a reasonable time . . . not less than [seven] days . . . to answer," representation by an attorney, and a written decision. 5 U.S.C. § 7513(b)(1)-(4).

Unlike minor adverse actions, major adverse actions can be reviewed in federal court. But this channel is narrowly prescribed. An employee "against whom [a major adverse] action is taken . . . is entitled to appeal to the [MSPB]," *id.* § 7513(d), and the United States Court of Appeals for the Federal Circuit has jurisdiction over appeals from the MSPB's final orders and decisions. *See id.* § 7703(a)(1), (b)(1)(A).

Finally, the CSRA includes a mechanism for employees to challenge a "personnel action" that is a "prohibited personnel practice." *Id.* § 2302(a)(1), (a)(2), (b). The statute lists eleven types of personnel actions and includes a residual clause that covers "any other significant change in duties, responsibilities, or working conditions." *Id.* § 2302(a)(2)(A)(xii). An employee may challenge a prohibited personnel practice by making an allegation to the Office of Special Counsel (OSC). *Id.* § 1214(a)(1)(A), (a)(3); *see id.* § 1212(a)(2). OSC must investigate the allegation, *id.* § 1214(a)(1)(A), and may petition the MSPB for corrective action, *id.* § 1214(b)(2)(C). The Federal Circuit can review a final order of the MSPB in response to such a petition. *Id.* §§ 1214(c), 7703(b)-(c). Therefore, where prohibited personnel practices are concerned, access to the MSPB and the Federal Circuit depends on OSC's discretion with limited exceptions. *See id.* § 1214(a)(3) (exceptions for cases where (i) other law provides a right of direct appeal to the MSPB or (ii) OSC declines to seek corrective action after terminating an investigation into retaliation as described in § 2302(b)(8) and § 2302(b)(9)(A)(i), (B), (C), and (D)).

B.

The Supreme Court has held that the CSRA "forecloses judicial review" for employees "to whom the CSRA *grants* administrative and judicial review" as well as for those employees "to whom the CSRA *denies* statutory review." *Elgin*, 567 U.S. at 11.

Specifically, in *Elgin v. Department of Treasury*, the Court, in an opinion written by Justice Thomas, decided that the CSRA precluded jurisdiction over employees' constitutional claims challenging their removal from federal employment. 567 U.S. 1, 8 (2012). And in *United States v. Fausto*, the Court, in an opinion written by Justice Scalia, decided that the exclusion of certain employees from the CSRA review scheme for major adverse actions precluded jurisdiction over those employees' challenges to those actions. 484 U.S. 439, 455 (1988).

These precedents control here.

1.

To begin, because the vaccine requirement is a "significant change in [an employee's] . . . working conditions," 5 U.S.C. § 2302(a)(2)(A)(xii), the CSRA gives plaintiffs a mechanism for "administrative and judicial review," *Elgin*, 567 U.S. at 11.

"Working conditions" are the circumstances under which an employee performs his or her job.[3] The vaccine requirement changes those

---

[3] *See Fort Stewart Schs. v. Fed. Lab. Relations Auth.*, 495 U.S. 641, 645 (1990) (explaining, with reference to different CSRA provision, that "working conditions . . . refers, in isolation, only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job"); *Hesse v. Dep't of State*, 217 F.3d 1372, 1378 (Fed. Cir. 2000) (defining the phrase in § 2302 to mean "the physical conditions under which an employee labors"); *Mahoney v. Donovan*, 721 F.3d 633, 636 (D.C. Cir. 2013) (defining the phrase in

circumstances.   Employees covered by the requirement have to get vaccinated before going to work and work only with other vaccinated or exempted employees.  Being vaccinated against a pandemic disease and being surrounded by vaccinated people are circumstances under which an employee does his job according to *any* test: vaccination is a physical condition of labor because it affects the employee's body during work, *Hesse*, 217 F.3d at 1378; vaccination manifestly impacts absenteeism and "the efficiency of the civil service," Exec. Order No. 14043, 86 Fed. Reg. at 50,990; *see Mahoney*, 721 F.3d at 636, by reducing the incidence and severity of disease; and vaccination is a "daily, concrete parameter[]" of federal employment because it concerns "the provision of necessary . . . resources"—shots that ensure employees can stay healthy and do their jobs, *Turner*, 502 F. Supp. 3d at 367.[4]  A vaccination requirement is therefore a "working condition" within the meaning of § 2302(a)(2)(A)(xii).

---

§ 2302 as concerning actions that "affect the ability of [employees] to do their jobs efficiently and effectively"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 367 (D.D.C. 2020) (defining the phrase in § 2302 as "generally refer[ring] to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources"); *see also Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 955 (Fed. Cir. 2020) ("[A] retaliatory investigation, either on its  own or as part of a broader set of circumstances, may . . . rise[] to the level of a significant change in working conditions." (cleaned up)).

[4] Many Executive Branch employees do not have the luxury to decide for themselves to put up plexiglass barriers, require attorneys to wear masks, and conduct judicial proceedings by videoconference, as we can order at our discretion. *See, e.g.*, Order, General Dkt. No. 2020-5, United States Court of Appeals for the Fifth Circuit (authorizing panels to conduct remote oral arguments). Indeed, some federal courts mandated vaccinations for court employees and lawyers appearing for in-person oral argument. *See* Order Regarding Masking, Vaccination, and COVID-19 Self-Certification, General Order No. 21-009, United States Court of Appeals for the Seventh Circuit.  State courts took similar measures.  *See* Keshia Clukey, *Four Unvaccinated Judges in New York Face Sanctions, Removal*, BLOOMBERG LAW (Mar. 23, 2022).

Statutory context shows that vaccination is a working condition. The CSRA lists twelve categories of "personnel action" in § 2302(a)(2)(A), starting with nine conventional types of "individualized employment decisions," as the majority puts it. These include "appointment," "promotion," "disciplinary or corrective action," "detail, transfer, or reassignment," "reinstatement," "restoration, "reemployment," "performance evaluation," and "decision[s] concerning pay, benefits, or awards, or concerning education or training." 5 U.S.C. § 2302(a)(2)(A)(i)-(ix). Notably, then, the list shifts. Romanette xi refers in relevant part to "the implementation of any nondisclosure *policy*." *Id.* § 2302(a)(2)(A)(xi) (emphasis added). And romanette x concerns "a decision to order psychiatric testing or examination"—a medical procedure that very well could occur outside the workplace. *Id.* § 2302(a)(2)(A)(x). So, contrary to the majority's view, § 2302(a)(2)(A) does include workplace medical policies that are "government-wide" and require "medical decisions made outside the workplace."

Indeed, Congress has amended § 2302(a)(2)(A) several times to broaden its scope to include policies like a workplace vaccine requirement. When first enacted, § 2302(a)(2)(A) consisted of romanettes i to ix (the nine conventional employment decisions listed above) and a modified version of what is now romanette xii: "any other significant change in duties or responsibilities *which is inconsistent with the employee's salary or grade level*." CSRA, Pub. L. No. 95-454, ch. 23, § 2302(a)(2)(A)(x), 92 Stat. 1111 (Oct. 13, 1978) (emphasis added). This language made a qualifying change in "duties or responsibilities" dependent on an individual employee's position. And originally, psychiatric testing, nondisclosure policies, and significant changes in working conditions were not covered personnel actions.

Then, in 1994, Congress added the "psychiatric testing or examination" romanette and edited romanette xii. *See* Act of Oct. 29, 1994,

Pub. L. No. 103-424, sec. 5, § 2302(a)(2)(A)(x), 108 Stat. 4361. Instead of "any other significant change in duties or responsibilities *which is inconsistent with the employee's salary or grade level*," the romanette was expanded to cover "any other significant change in duties, responsibilities *or working conditions*." *Id.* § 2302(a)(2)(A)(x), 108 Stat. 4361 (emphasis added). Finally, in 2012, Congress added the "nondisclosure policy" romanette. *See* Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, sec. 104, § 2302(a)(2)(A)(xi), 126 Stat. 1465.

In sum, the "working conditions" phrase (i) substituted for a restrictive clause linking changes in "duties or responsibilities" to individual employee status, (ii) was added immediately after a romanette dealing with medical activities, and (iii) became the neighbor of a romanette about nondisclosure policies. Together, these amendments show that Congress understood the "working conditions" language to extend beyond the traditional types of individual employment decisions § 2302(a)(2)(A) had previously covered, to reach a workplace health policy like the vaccine requirement.[5]

---

[5] The majority relies on *Gustafson v. Adkins*, a Seventh Circuit case holding that placement of a hidden camera in a workplace changing area was not a "personnel action" under § 2302(a)(2)(A). 803 F.3d 883, 889 (7th Cir. 2015). *Gustafson* based this decision on dicta in *Bush v. Lucas* that "wiretapping" and "warrantless searches" would not be personnel actions within the CSRA. 462 U.S. 367, 385 n.28 (1983). But *Lucas* was decided almost a decade before Congress amended the CSRA to include the "working conditions" phrase. And it is difficult to see how the hidden camera at issue in *Gustafson* did not significantly change "working conditions" for the surveilled employees.

The majority's reliance on *NFIB v. OSHA* is also misplaced. 142 S. Ct. 661 (2022). That case held that the Occupational Safety and Health Administration lacked authority under the Occupational Safety and Health Act (OSHA) to issue a vaccine requirement for certain private employers because the statute empowered the agency "to set workplace safety standards, not broad public health measures," and Congress had not spoken clearly

The majority reads § 2302(a)(2)(A)(xii) as excluding the vaccine requirement because the requirement is "government-wide, involves "medical decisions made outside the workplace," and has "consequences long after the employee leaves the federal workforce." This alternative reading is inconsistent with common sense and the text of the statute.

First, the majority thinks "working conditions" refers only to "discrete employment decisions." Under this interpretation, any employment policy that changed working conditions for more than one employee would not be a "significant change in . . . working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). But there is no one-at-a-time requirement in the text of § 2302(a)(2)(A). Like all general policies, the vaccine requirement changes working conditions for each individual employee who is covered by it.

Next, the majority reasons that "working conditions" cannot refer to "medical decisions made outside the workplace." Yet the majority fails to explain why medical decisions that impact the circumstances under which a job is performed—indeed, as we have seen globally, make work possible during a pandemic—are not working conditions, regardless of where the medical decision is made or the duration of its effects.

To the extent the majority argues that medical decisions made *outside* the workplace are not covered by § 2302(a)(2)(A)(xii), the majority draws a line, absent from the statute, based on *where* the conduct targeted by an

---

in "authorizing [OSHA] to exercise powers of vast economic and political significance." *Id.* at 665 (cleaned up). The jurisdictional issue in this case is not whether the President had authority under the CSRA to require vaccinations, but rather whether such a requirement changed working conditions for affected employees. And in *NFIB v. OSHA*, the Court accepted that COVID-19 posed occupational risks; the problem was that OSHA's requirement went beyond those risks to address "general public health." *Id.* at 666.

employment policy occurs.  If the majority is right, a policy that promotes a "Drug-Free Federal Workplace" by prohibiting employees from using illegal drugs outside work, as President Reagan enacted, would not be a significant change in working conditions.[6]  *See* Exec. Order No. 12,564, 51 Fed. Reg. 32,889, 32,889-90 (1986).  Similarly, under this novel interpretation, a ban on employees drinking liquor before work, requiring them to be sober at work, would not be a significant change in working conditions.  A policy that employees have to use birth control outside work in order to refrain from being pregnant at work would not be a significant change in working conditions.  Conversely, according to the majority's logic, if the Executive Order or guidance had only required employees to receive the vaccine (or birth control) *at work*, the requirement would fall within § 2302(a)(2)(A). This arbitrary distinction ignores that there is a change in "working conditions" when the effects of a policy are felt at work, irrespective of the initial place where the policy must be followed.

And if the majority argues that medical decisions made *at* the workplace are not covered by § 2302(a)(2)(A)(xii), that reading is contrary to the plain meaning of the text as courts have interpreted it. *See, e.g.*, *Fort Stewart Schs.*, 495 U.S. at 645; *Hesse*, 217 F.3d at 1378; *Mahoney*, 721 F.3d at 636; *Turner*, 502 F. Supp. 3d at 367.  Under the majority's interpretation, a directive that an employee receive *any* sort of medical treatment at work in order to continue working—like an order that an employee take antimalarial

---

[6] Our court found that President Reagan's order survived a facial constitutional challenge. *See NTEU v. Bush*, 891 F.2d 99, 102 (5th Cir. 1989).  Prior to this appeal, relying on the Supreme Court dicta that warrantless searches are not personnel actions, *see supra* note 5, the district court had found that the CSRA did not preclude jurisdiction over a challenge to the warrantless uranalysis testing aspect of President Reagan's program.  *See NTEU v. Reagan*, 651 F. Supp. 1199, 1200-02 (E.D. La. 1987).  As I explained, because of amendments to the statute, the district court's reasoning in reliance on this dicta is no longer persuasive.

medicine while detailed to a tropical environment—wouldn't be a change in that employee's working conditions.  The employee told to swallow the pills at her desk might be surprised to hear that news.

Finally, the majority says that § 2302(a)(2)(A)(xii) "only include[s] conditions that last for the duration of the employee's job tenure."  The majority does not explain why vaccinations, which may not last forever or even for the entire term of employment, violate this rule.  But more importantly, the statute does not exclude a change in the circumstances of work that has persistent or permanent effects on the employee from the term "working conditions."  Like the majority's other attempts to limit the scope of "working conditions," this constraint has no basis in the text of the statute.

For those reasons, § 2302 provides a vehicle for review of the vaccine requirement under the CSRA, and Congress's intent to preclude judicial review over challenges to the requirement is fairly discernible within the statutory scheme.  *See Elgin*, 567 U.S. at 11.

### 2.

Were we to assume that the vaccine requirement cannot be challenged under § 2302, the CSRA still generally precludes pre-enforcement challenges to employment policies that, if violated, would result in discipline.[7]  This is because the CSRA (i) provides for post-enforcement review of major adverse actions like removal, *see* 5 U.S.C. § 7513(d), and (ii) confers pre-enforcement due process protections to employees against whom minor and major adverse

---

[7] As I explain below, the requirement has been enforced against at least some of the plaintiffs because disciplinary actions have been taken against them, and this suit challenges those disciplinary actions.  But if this suit is conceived of as a true pre-enforcement challenge, as the majority insists—for example, if this suit only challenged the requirement insofar as the requirement might be used to terminate the plaintiffs in the future—then the CSRA still precludes pre-enforcement challenges for the reasons stated in this section.

actions are proposed *without* providing those or other employees with immediate review, *see id.* §§ 7503(b)(1)-(4), 7513(b)(1)-(4). In other words, the CSRA gives statutory review to some employees (those against whom major adverse actions have been taken) and not others (those against whom major adverse actions have not been taken). Since the CSRA denies statutory review to employees before they violate a policy and disciplinary action is taken against them, Congress's intent to preclude jurisdiction over pre-enforcement challenges is fairly discernible in the statute. *See Elgin*, 567 U.S. at 11.

This conclusion follows from the logic of *Fausto*. There, the Supreme Court considered whether the CSRA's "withholding of remedy" from certain employees "was meant to preclude judicial review for those employees, or rather merely to leave them free to pursue the remedies that had been available before enactment of the CSRA." 484 U.S. at 443-44. Fausto, who had been suspended for thirty days from his job as an administrator at a "Young Adult Conservation Corps camp," was a "nonpreference member of the excepted service." *Id.* at 441 & n.1. The CSRA does not include nonpreference excepted service members in the definition of employees covered for minor and major adverse actions, *see* 5 U.S.C. § 7511(a)(1), and so the CSRA did not give Fausto a way to obtain administrative review of his suspension and then appeal to the Federal Circuit. *See Fausto*, 484 U.S. at 447-48. The Court concluded that "the *absence* of provision for these employees to obtain judicial review" is a "manifestation of a considered congressional judgment that they should not have statutory entitlement to review for [minor and major adverse actions]." *Fausto*, 484 U.S. at 448-49 (emphasis added).

In part, the Court reasoned that if Fausto could get judicial review of his thirty-day suspension because he was excluded from the CSRA scheme, then he could also get judicial review of a ten-day suspension even though the

CSRA does not provide covered employees with administrative and judicial review of suspensions less than fourteen days. *Id.* at 449-50. And if Fausto had such an expanded right to judicial review, the "preferred position" of covered employees in the statutory scheme would be turned upside down. *Id.* In a footnote, the Court clarified that this line of reasoning assumes that employees "who *are* given review rights by [the CSRA] . . . cannot expand these rights by resort to pre-CSRA remedies." *Id.* at 450 n.3; *See Graham v. Ashcroft*, 358 F.3d 931, 934 (D.C. Cir. 2004) (Roberts, J.) (charting this logic).

Like Fausto, the plaintiffs here would have expanded rights under the CSRA if they could obtain judicial review of the vaccine requirement before major adverse actions are taken against them. There is generally no statutory mechanism for judicial review of minor adverse actions. When a covered employee faces a *proposed* minor or major adverse action, the CSRA gives him procedural protections but no path to judicial review. *See* 5 U.S.C. §§ 7503(b)(1)-(4), 7513(b)(1)-(4). Rather, an employee must wait until the agency takes a major adverse action against him before appealing to the MSPB and the Federal Circuit. *See id.* § 7513(d). Resort to judicial review for a minor adverse action or a proposed action would thus expand an employee's right to judicial review outside the bounds of the CSRA. *See Graham*, 358 F.3d at 934 (applying this logic to hold that the CSRA precludes jurisdiction over "a personnel action as to which the CSRA grants no right of review, even for employees who are otherwise granted such rights under the CSRA in other circumstances"); *Nyunt v. Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (Kavanaugh, J.) ("When Congress wants to preserve remedies outside the CSRA, it does so expressly; for example, the CSRA maintains federal employees' rights to bring suit under Title VII and other anti-discrimination laws."). The same is true where an employee seeks to challenge an employment policy, like the vaccine requirement, that permits an agency to discipline violators. *See Vaccinations*,

Safer Fed. Workforce, https://perma.cc/G8T6-K8XN. The CSRA says that an employee subject to such a policy has to wait until a major adverse action is taken against him to get judicial review—and if the discipline imposed falls below threshold of a major adverse action, or is merely proposed, then no judicial review is available under the scheme.

The majority argues that jurisdiction over the plaintiffs' claims is not precluded because while the CSRA provides the exclusive means to challenge "[p]ersonnel actions covered by the CSRA," "plaintiffs are not challenging CSRA-covered 'personnel actions.'"

But the whole point of this lawsuit is to challenge CSRA-covered personnel actions. The first paragraph of the complaint says so. "[F]ederal employees" like the plaintiffs "have been put in an intolerable bind," the complaint alleges: "either submit to forced vaccination pursuant to illegal agency requirements, or forfeit a career[.]" Consistent with this allegation, the plaintiffs say that they have been disciplined through formal reprimands and threatened with suspension and termination. They have put forward evidence that disciplinary actions, including minor adverse actions, have been taken against them for their noncompliance with the vaccine requirement.[8] Accordingly, while the plaintiffs allege that they "do not challenge any individual employment decisions," and ask the court to hold

---

[8] *See, e.g.*, *Feds for Med. Freedom v. Biden*, No. 21-CV-356, Aff. of Brian Fouche ¶ 4, Dkt. No. 35-1, Ex. 39 (asserting that employee "received . . . notice of a 14-day unpaid suspension," which is a minor adverse action under 5 U.S.C. § 7502); *id.*, Aff. of John Armbrust ¶ 6, Dkt. No. 3, Ex. 15 (asserting that employee received "written letter of reprimand stating [that] it is [a] 'disciplinary action'"); *id.*, Aff. of Nevada Ryan ¶ 6, Dkt. No. 3, Ex. 27 (similar); *id.*, Aff. of Michael Ball ¶ 6, Dkt. No. 3, Ex. 16 (asserting that employee "was disciplined in the form of a Letter of Counseling and Education"); *id.*, Aff. of M. LeeAnne Rucker-Reed ¶ 6, Dkt. No. 3, Ex. 26 (asserting that employee was prohibited from traveling "to attend necessary training" or "to work Judicial [C]onference or protection details" and "was not selected for a promotion opportunity").

the vaccine requirement unlawful, they also seek to enjoin the government "from enforcing or implementing" the vaccine requirement—which would keep the government from taking CSRA-covered personnel actions, like suspension and termination, against them.

Indeed, this case is justiciable because it involves challenges to CSRA-covered personnel actions. The plaintiffs' Article III injuries stem from personnel actions that they allege have been or will be taken against them because of their refusal to comply with the vaccine requirement. As the plaintiffs alleged in their complaint, "[t]he entire point of the [m]andate[] is to force vaccinations quickly by threatening to initiate drastic employment or contractual harms." There is no mandate and no justiciable case without, in the plaintiffs' words, a "sword of Damocles," or, as the Supreme Court put it, "expos[ure] to the imposition of strong sanctions," *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967)—here, the personnel actions. And the district court found this case ripe because plaintiffs "already have received letters from their employer agencies suggesting that suspension or termination is imminent, have received letters of reprimand, or have faced other negative consequences."[9] *Feds for Med. Freedom*, 581 F. Supp. 3d at 832.

The majority calls this suit a "pre-enforcement challenge" that the plaintiffs can bring "outside of the CSRA," and the broader implication of this holding is unmistakable. This circuit's door is now open to all pre-

---

[9] The majority contends that because the plaintiffs "claim that the President's vaccine requirement violates the U.S. Constitution and the APA," the plaintiffs do not challenge any personnel action. But the legal arguments or causes of action by which the plaintiffs try to attack the personnel actions taken or proposed against them are immaterial to what the plaintiffs hope to get out of this suit: injunctive relief to avoid personnel actions. *See Elgin*, 567 U.S. at 8 (concluding that "the CSRA precludes district court jurisdiction over petitioners' claims even though they are constitutional claims for equitable relief").

enforcement challenges to federal employment policies.[10]  Plaintiffs are welcome to challenge any personnel action before it takes place.

Under the majority's rule, Justice Thomas's *Elgin* and Justice Scalia's *Fausto* are dead letters.  Elgin, who brought a constitutional challenge to a federal statute "bar[ring] from employment by an Executive agency anyone who has knowingly and willfully failed to register" for the Selective Service, *Elgin*, 567 U.S. at 7, could have forum shopped into our court if he filed when his removal from federal employment was ripe but had not yet taken place. *Elgin*, 567 U.S. at 7.  Likewise, Fausto could have sued when the agency "advised [him] that it intended to dismiss him for a number of reasons." *Fausto*, 484 U.S. at 441.[11]  So the majority would let plaintiffs end run Supreme Court precedent.

---

[10] The majority claims that the ripeness doctrine closes this loophole because "any suit to enjoin a personnel action before it occurs will likely be unripe."  This ignores that a personnel action may be certain to occur or imminent—and therefore ripe—long before the action is taken against an employee. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

[11] The majority invokes two pre-*Fausto* cases that explicitly exercised jurisdiction over certain pre-enforcement challenges. *See NFFE v. Weinberger*, 818 F.2d 935, 940 (D.C. Cir. 1987); *NTEU v. Devine*, 733 F.2d 114, 117 n.8 (D.C. Cir. 1984).  Because these cases were decided before both *Fausto* and *Elgin* mapped the landscape of CSRA preclusion, they are inapposite.  In particular, *Devine* reasoned that just because it is true that "when a statute provides a detailed scheme of administrative protection for defined employment rights, less significant employment rights of the same sort are implicitly excluded and cannot form the basis for relief directly through the courts," it does not follow that "a detailed scheme of administrative adjudication impliedly precludes preenforcement judicial review of rules." 733 F.2d at 117 n.8.  But this proposition runs headlong into the logic of *Fausto*, which I outlined in this section.  As for *Weinberger*, there the court relied entirely on the premise that "civilian federal employees may seek to enjoin government actions that violate their constitutional rights." 818 F.2d at 940.  However, by ruling that covered employees' constitutional claims had to run through the CSRA scheme, *Elgin* unsettled that assumption.  As the D.C. Circuit recently recognized, this part of *Weinberger*

Accordingly, the only conclusion consistent with the text of the statute and binding Supreme Court authority is that Congress's intent to preclude pre-enforcement challenges is fairly discernible in the CSRA.

## C.

But our inquiry does not stop there. Jurisdiction over the plaintiffs' claims is only precluded if their "claims are of the type Congress intended to

---

"cannot survive the Supreme Court's subsequent decisions in *Thunder Basin* and *Elgin*." *Payne*, 2023 WL 2576742, at *6.

Finally, the majority cites two Supreme Court cases that adjudicated the merits of pre-enforcement challenges to laws and programs affecting federal employees without addressing CSRA preclusion. *See United States v. NTEU*, 513 U.S. 454 (1995); *NTEU v. Von Raab*, 489 U.S. 656 (1989). Both these cases involved constitutional claims and were decided before *Elgin*, which clarified the standard for determining whether the CSRA precludes constitutional claims, *see* 567 U.S. at 8-10, and applied the appropriate standard to find that Elgin's claims were precluded, *see id.* at 10-16.

For additional reasons, neither *United States v. NTEU* nor *NTEU v. Von Raab* is persuasive. It is unclear whether enforcement of the statute at issue in *United States v. NTEU* would have triggered CSRA review. *See* 513 U.S. at 460 (enforcement through civil penalty). And in *NTEU v. Von Raab*, 489 U.S. 656, the district court *did* consider whether the CSRA precluded jurisdiction, *see* 649 F. Supp. 380, 384-86 (E.D. La. 1986). The district court's jurisdictional holding rested on two principal grounds, one of which was abrogated by the CSRA amendments and the other undermined by *Elgin*. First, the district court reasoned that the challenged program, a drug-testing scheme for certain Customs Service employees, was a warrantless search. 649 F. Supp. at 384-85. Relying on dicta in *Lucas* that warrantless searches were not personnel actions under the CSRA, the district court decided that a challenge to the drug-testing scheme was not covered under the CSRA. *See id.* (discussing *Lucas*, 462 U.S. at 385 n.28). As I explained, *supra* note 5, at the time of the district court's and the Supreme Court's decisions, the CSRA had not yet been amended to add the "working conditions" phrase—abrogating the *Lucas* dicta and this part of *Von Raab*. Regardless, since the *Lucas* dicta was highly persuasive when *Von Raab* was decided, it is unsurprising that the Supreme Court did not take up jurisdiction sua sponte after neither party raised the issue. *See* Pet'rs' Br., *NTEU v. Von Raab*, No. 86-1879, 1988 WL 1025626; Resp't's Br., *NTEU v. Von Raab*, No. 86-1879, 1987 WL 880093. Second, like *Weinberger*, the district court relied on the idea that the plaintiffs were seeking to enjoin unconstitutional activity. *See Von Raab*, 649 F. Supp. at 385-86. But *Elgin* calls this theory into question.

be reviewed within" the CSRA. *Thunder Basin*, 510 U.S. at 212. Three factors are probative of Congress's intent: whether preclusion could foreclose all meaningful judicial review of the claims; whether the claims are collateral to the review scheme; and whether the claims are outside the agency's expertise. *See Thunder Basin*, 510 U.S. at 212-13; *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (cleaned up) ("[W]e presume that Congress does not intend to limit jurisdiction if a finding of preclusion could foreclose all meaningful judicial review; if the suit is wholly collateral to a statute's review provisions; and if the claims are outside the agency's expertise." (cleaned up)).

Here, preclusion would foreclose meaningful judicial review of plaintiffs' pre-enforcement challenge to the requirement. So we ask whether Congress intended the CSRA to have that effect in this case. Since plaintiffs' challenge to the requirement as ultra vires sounds in separation-of-powers principles, I conclude, in this narrow circumstance, that *this* claim is not of the kind Congress intended to be precluded by the CSRA under *Elgin* and *Fausto*.[12]

### 1.

Neither § 2302, the All Writs Act, nor the procedure for challenging major adverse actions provides for meaningful judicial review of plaintiffs' pre-enforcement challenge.

---

[12] Preclusion of plaintiffs' claim under the APA, on the other hand, does not raise the same constitutional concerns. After all, the APA does not apply to the President, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and Congress's potential withdrawal of jurisdiction over agency-by-agency implementation of the requirement does not raise the specter of the President altering the separation of powers or implicate a constitutionally necessary remedy. Moreover, for the reasons stated in the panel opinion, *Feds for Med. Freedom*, 30 F.4th at 510-12, the APA claim is not wholly collateral to the CSRA scheme and does not exceed the MSPB's expertise.

No. 22-40043

I agree with the majority that plaintiffs do not have a path to meaningful judicial review of their separation-of-powers claim under § 2302 or the All Writs Act, 28 U.S.C. § 1651. As described above, judicial review under § 2302 is not available unless the OSC petitions the MSPB for corrective action. *See* 5 U.S.C. §§ 1214(b)(2)(C), 1214(c), 7703(b)-(c). The plaintiffs would have to wait and see if the OSC filed a petition. And the OSC could insulate the requirement from judicial review by declining to escalate to the MSPB.[13]

Mandamus relief under § 1651 does not offer meaningful judicial review, either. While § 1651 "authorizes employment of extraordinary writs, it confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534 (1999) (quoting 28 U.S.C. § 1651(a)). If the CSRA strips jurisdiction from federal courts to hear pre-enforcement challenges in their "arising under" jurisdiction, 28 U.S.C. § 1331, then no jurisdiction exists for mandamus to aid.[14] And as the

---

[13] The plaintiffs could seek a writ of mandamus compelling the OSC to take the ministerial act of investigating a complaint, but not to petition the MSPB for corrective action, which is within OSC's discretion. *See Carson v. U.S. Off. of Special Counsel*, 633 F.3d 487, 491-92 (6th Cir. 2011).

[14] The prospective jurisdiction doctrine ordinarily permits an appellate court to issue writs that "are within its appellate jurisdiction although no appeal has been perfected." *FTC v. Dean Foods Co.*, 384 U.S. 597, 630 (1966). "Once there has been a proceeding of some kind instituted before an agency . . . that might lead to an appeal, it makes sense to speak of the matter as being within our appellate jurisdiction—however prospective or potential that jurisdiction might be." *In re Tennant*, 359 F.3d 523, 529 (D.C. Cir. 2004) (Roberts, J.) (cleaned up). Arguably, in the event that a pre-enforcement complaint could be made with the OSC, the possibility that the OSC would petition the MSPB and that the MSPB would issue an appealable final order would render the case in the Federal Circuit's protective jurisdiction. *Cf. In re Donohoe*, 311 F. App'x 357, 358-59 (Fed. Cir. 2008) (per curiam) (concluding that the court lacked authority under the All Writs Act to mandamus the MSPB where the petitioner 'did not seek remedy from [the MSPB] or initiate any proceeding at [the MSPB] before seeking relief from [the Federal

majority points out, there is no reason why the CSRA would strip jurisdiction under § 1331 but not § 1651.

Finally, the CSRA channel for appellate review over major adverse actions is not meaningfully available in this case. *See* 5 U.S.C. §§ 7513(d), 7703(a)(1), (b)(1)(A). The Executive Order does not require agencies to take major adverse actions against noncompliant employees, *see* Exec. Order No. 14043, 86 Fed. Reg. at 50,990, and neither does the guidance. Instead, the guidance gives agencies discretion but does not explicitly require them to discipline employees with "a letter of reprimand, followed by a short suspension," "a longer second suspension," and "proposing removal." *Vaccinations*, Safer Fed. Workforce; *see Guidance on Enforcement of Coronavirus Disease 2019 Vaccination Requirement for Federal Employees – Executive Order 14043*, Off. of Personnel Mgmt. https://chcoc.gov/sites/default/files/Enforcement-Guidance-FAQs_508.pdf (similar). This disciplinary policy would not necessarily result in a major adverse action like removal. At most, the guidance states that "consistency across Government in enforcement of this Government-wide vaccine policy is desired, and the Executive Order does not permit exceptions from the vaccination requirement except as required by law." *Vaccinations*, Safer Fed. Workforce; *compare* Exec. Order No. 12,564, 51 Fed. Reg. at 32,889-90 ("Agencies *shall* initiate action to remove from the service any employee who is found to use illegal drugs." (emphasis added)).

In theory, under the vaccination requirement and the CSRA, agencies could circumvent judicial review by only taking minor adverse actions against employees who refused vaccination. This appears to have been agency

Circuit]"). But since the CSRA likely strips the Federal Circuit of § 1651 jurisdiction, this theory is a non-starter.

practice. During the almost two months that passed from the start of enforcement to the district court's injunction, there is no evidence that any agency proposed a major adverse action against any noncompliant employee. Had the vaccine requirement been allowed to continue, agencies could have continued suspending employees for fourteen-day periods without triggering the major adverse action process. Because the requirement's disciplinary policy gives agencies discretion to evade judicial review, and because implementation of the policy had that effect, I conclude that CSRA preclusion would foreclose all meaningful review.[15]

### 2.

The plaintiffs' challenge to the vaccine requirement as exceeding the President's statutory and constitutional authority is not the sort of claim that Congress intended to remove from all meaningful judicial review.

"Congress generally does not violate Article III when it strips federal jurisdiction over a class of cases." *Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) (plurality op.). But there are limits on this jurisdiction-stripping power, at least two of which are relevant here. "Jurisdiction-stripping statutes can violate other provisions of the Constitution." *Patchak*, 138 S. Ct. at 906 n.3 (plurality op.). And they can violate Article III "if they attempt to direct the

---

[15] The district court found this case ripe in part because "some plaintiffs face an inevitable firing." *Feds for Med. Freedom*, 581 F. Supp. 3d at 832. But the government letter upon which the district court relied imposed a fourteen-day suspension and said, "any further misconduct . . . will not be tolerated and *may* result in more severe discipline." Regardless, there is daylight between when an action becomes ripe because of the threat of disciplinary action and when a major adverse action is sufficiently certain such that meaningful judicial review is not foreclosed. Of course, it will not always be the case that a disciplinary policy that permits but does not require major adverse actions be taken against employees will foreclose all meaningful review. But the language of the guidance and patterns of agency enforcement show that preclusion would foreclose review here.

result by effectively altering legal standards that Congress is powerless to prescribe." *Id.* (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016)).

These principles raise serious constitutional doubts about an interpretation of the CSRA that would foreclose all federal jurisdiction over plaintiffs' ultra vires claim. Congress, not the President, has the power to define federal court jurisdiction. *See* U.S. Const., art. I, § 8 (giving Congress the power to "constitute Tribunals inferior to the supreme Court"); *id.* art. III, § 1 (vesting the judicial power "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"). If we read the CSRA as permitting the President to say which of his federal employment policies were subject to judicial review—here, by creating a disciplinary scheme that might never permit appeal from a personnel action—the statute might transfer jurisdictional control from Article I to Article II.

In the usual course of administration under the CSRA, this lurking threat of an unconstitutional delegation never surfaces. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)). When a covered employee violates an employment policy, the Executive Branch merely decides whether a particular infraction warrants a major adverse action or not. These discretionary decisions about how to punish employees are a lawful exercise of Executive authority "to implement and enforce" the CSRA. *Id.* Similarly, the Executive can usually decide that a particular class of conduct does not merit a major adverse action as punishment without triggering a constitutional question.

But the threat of an unconstitutional delegation becomes material when the Executive uses the CSRA to decide the outcome of a separation-of-

powers challenge to a federal employment policy. Whatever power the President has to enact those policies comes from Congressional enactments and the Constitution, neither of which the President can change himself. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). So, by designing an employment policy in such a way that the CSRA precludes *all* federal jurisdiction to review a separation-of-powers challenge, the President could nullify any limits on his powers set by Article I and Article II.[16] Further, by doing so, he would decide the outcome of this litigation. I doubt that Congress, in enacting the CSRA, intended to give the President control of federal jurisdiction so that he might acquire powers that the plaintiffs contend have not been given to him by statute or the Constitution.

In addition, if the CSRA foreclosed all meaningful review over the plaintiffs' ultra vires claim, a serious constitutional question would arise about whether Congress had eliminated a mandatory remedy for separation-

---

[16] This scenario is a variation on the puzzle that the Supreme Court solved in *United States v. Klein*, 80 U.S. 128 (1872). There, the plaintiff sought to recover the sale proceeds of expropriated property on behalf of an estate under a Civil War law that allowed recovery if the owner had "never given any aid or comfort to the present rebellion." *Bank Markazi*, 578 U.S. at 227 (cleaned up). The original estate holder had been pardoned by President Lincoln, and the Supreme Court had held that a Presidential pardon satisfied the loyalty requirement of the expropriation statute. *See United States v. Padelford*, 76 U.S. 531, 543 (1870). Congress then passed a statute repudiating the Supreme Court's decision. The statute said that pardons could *not* be used to prove loyalty, that accepting a pardon under certain circumstances would prove disloyalty, and that the Court of Claims and the Supreme Court had "to dismiss for want of jurisdiction any claim based on a pardon." *Bank Markazi*, 578 U.S. at 227. In *Klein*, the Supreme Court held that this jurisdiction-stripping statute "passed the limit which separated the legislative from the judicial power," *Klein*, 80 U.S. at 147, by seeking "to nullify" "Presidential pardons . . . by withdrawing federal-court jurisdiction," *Bank Markazi*, 578 U.S. at 227 n.19. Stated in general terms, Congress had impermissibly "exercise[d] its authority . . . to regulate federal jurisdiction . . . in a way that require[d] a federal court to act unconstitutionally." *Id.* (cleaned up) (quoting Daniel J. Meltzer, *Congress, Courts, and Constitutional Remedies*, 86 Geo. L.J. 2537, 2549 (1998)).

of-powers violations. There may be some "constitutionally necessary remedies for the violation of constitutional rights" that Congress cannot preclude through jurisdiction stripping. Richard H. Fallon, Jr., *Jurisdiction-Stripping Reconsidered*, 96 Va. L. Rev. 1043, 1134 (2010). Injunctive relief for Executive Branch actions that exceed the President's authority may be one such remedy.[17] *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all [Executive Branch] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief. . . . Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.).

Had Congress foreclosed all meaningful judicial review over plaintiffs' ultra vires claim, we would have to confront these difficult constitutional questions today. But nothing in the CSRA shows that Congress meant to preclude federal jurisdiction to adjudicate separation-of-powers challenges to employment policies set by the President. An ultra vires claim like the plaintiffs' is therefore within our narrow subject-matter jurisdiction and outside the comprehensive CSRA scheme described by the Supreme Court in *Elgin* and *Fausto*.

## III.

Because we have jurisdiction over plaintiffs' challenge to the requirement as ultra vires, we next must consider whether the district court abused its discretion in granting the plaintiffs' request for a nationwide

---

[17] The same might be true of individual constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[S]erious constitutional question[s] . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." (cleaned up)).

preliminary injunction. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). To obtain a preliminary injunction, the plaintiffs must establish that they are "likely to succeed on the merits" and "likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of the equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

For the reasons I offered in my motions panel dissent, *see Feds for Med. Freedom*, 25 F.4th at 356-60, reproduced in relevant part below,[18] *infra* Section III.A, the plaintiffs have not shown that they are entitled to a preliminary injunction, and a nationwide injunction is inappropriate.

A.

Had our court ever given it the chance, the government likely would have succeeded in showing that the President has authority to promulgate this Executive Order pertaining to the federal executive workforce.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; and then quoting *id.* § 3). The President's executive power has long been understood to include "general administrative control of those executing the laws." *Id.* at 2197-98 (quoting *Myers v. United States*, 272 U.S. 52, 163-64 (1926)). Accordingly, the President "has the right to prescribe the qualifications of [Executive Branch] employees and to attach conditions to their employment." *Friedman v. Schwellenbach*, 159 F.2d 22, 24 (App. D.C. Cir. 1946); *see also Old Dominion*

---

[18] I have made some edits to the text.

*Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974) (noting "the President's responsibility for the efficient operation of the Executive Branch"); *Crandon v. United States*, 494 U.S. 152, 180 (1990) (Scalia, J., concurring in the judgment) (describing "the President's discretion-laden power" to regulate the Executive Branch under 5 U.S.C. § 7301); *NTEU v. Bush*, 891 F.2d 99 (5th Cir. 1989) (upholding President Reagan's executive order authorizing random drug testing of certain federal employees). The President, as head of the federal executive workforce, has authority to establish the same immunization requirement that many private employers imposed to ensure workplace safety and prevent workplace disruptions caused by COVID-19.

The district court rejected the above argument as "a bridge too far," given "the current state of the law as just recently expressed by the Supreme Court" in *NFIB v. OSHA*, 142 S. Ct. 661 (2022), and *Biden v. Missouri*, 142 S. Ct. 647 (2022). However, the district court misapprehended the single, animating principle that all Justices embraced in these decisions. As Justice Gorsuch explained in his *NFIB* concurrence, "The central question we face today is: Who decides?" 142 S. Ct at 667 (Gorsuch, J., concurring). In *NFIB*, the Court stayed an immunization requirement that unelected agency officials imposed on private employers that do not receive federal funding, explaining that "[a]dministrative agencies are creatures of statute" and that the Occupational Safety and Health Act does not "plainly authorize[] the Secretary's [immunization or testing] requirement." 142 S. Ct. at 665. Comparatively, in *Biden v. Missouri*, which involved an immunization requirement that unelected agency officials imposed on the staff of healthcare facilities receiving Medicare and Medicaid funding, the Court concluded that "the Secretary's rule falls within the authorities that Congress has conferred upon him." 142 S. Ct. at 652. Notably, even the dissenting Justices in that case acknowledged that "[v]accine requirements . . . fall squarely within a

State's police power." *Id.* at 658 (Thomas, J., dissenting); *see also NFIB v. OSHA*, 142 S. Ct at 667 (Gorsuch, J., concurring) ("There is no question that state and local authorities possess considerable power to regulate public health."). Thus, in these two cases, the Court gave a consensus answer to Justice Gorsuch's question: it is elected, democratically-accountable officials, including members of Congress[19] and state legislators,[20] who have authority to decide—and answer for—the infection-fighting measures that they impose, including immunization requirements, such as mandatory smallpox vaccination, that our country has utilized for centuries. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (upholding the authority of states to enforce compulsory vaccination laws); *Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301 (2022) (staying district court order preventing Navy from considering vaccination status in making operational decisions); *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587 (7th Cir. 2022) (upholding state and local vaccine

---

[19] *Cf.* 8 U.S.C. § 1182(a)(1)(A)(ii) (statutory requirement that any alien "who seeks admission as an immigrant" must "receive[] vaccination against vaccine-preventable diseases," including "mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B").

[20] For example, at least one state governor recently exercised his executive authority to permanently require COVID-19 vaccinations for certain state employees. *See* Off. of Governor Jay Inslee, State of Wash., Directive 22-13.1, COVID-19 Vaccination Standards for State Employees (Aug. 5, 2022). A bill has been introduced in the Washington House to permit reemployment for state employees who were dismissed from their jobs for failing to get vaccinated. H.B. 1029, 68th Leg., Reg. Sess. (Wash. 2023). Conversely, in Texas, Governor Abbot issued an executive order prohibiting Texas entities from requiring employees to get vaccinated and that would terminate when the Texas legislature passed legislation "consider[ing] this issue." Exec. Dep't, State of Tex., Exec. Order GA 40, Relating to Prohibiting Vaccine Mandates, Subject to Legislative Action (Oct. 11, 2021).

requirements), *cert. denied sub nom.*, *Troogstad v. Chicago*, 143 S. Ct. 734 (2023).[21]

The President is not an unelected administrator. He is instead the head of a co-equal branch of government and the most singularly accountable elected official in the country. This federal workplace safety order displaces no state police powers and coerces no private sector employers. Instead, consistent with his Article II duty to "take Care that the Laws be faithfully executed," the President performed his role as CEO of the federal workforce,[22] taking executive action in order to keep open essential government buildings;[23] to maintain the provision of vital government services, such as the Transportation Security Administration; and to prevent unvaccinated federal employees from infecting co-workers or members of the public who, whether because of age or infirmity, might be highly vulnerable to hospitalization and death.

---

[21] Indeed, executive immunization requirements predate the birth of this country, with George Washington famously requiring members of the Continental Army to be inoculated against smallpox. *See Letter from George Washington to William Shippen, Jr.* (Feb. 6, 1777), *in* 8 THE PAPERS OF GEORGE WASHINGTON, REVOLUTIONARY WAR SERIES, 6 JANUARY 1777 - 27 MARCH 1777, 264 (Frank E. Grizzard, Jr., ed.) (1998) ("Finding the small pox to be spreading much and fearing that no precaution can prevent it from running thro' the whole of our Army, I have determined that the troops shall be inoculated.").

[22] Notably, in a recent survey of nearly 500 employers, the employee benefits consultancy Mercer "found 44% with a [vaccine] requirement currently in place and 6% planning to implement one, with another 9% still considering it." Beth Umland & Mary Kay O'Neill, *Worksite Vaccine Requirements in the Wake of the OSHA ETS* (Jan. 27, 2022), https://www.mercer.us/our-thinking/healthcare/worksite-vaccine-requirements-in-the-wake-of-the-osha-ets.html.

[23] As noted earlier, in contrast to many of the essential services and executive agencies that the President oversees, Article III institutions such as this court can close our buildings to the public.

Federal employees that disagree with the content of Executive Order 14043 retain the right to claim an exemption, to leave the government's employment, to collectively bargain, to challenge the order through the CSRA, or to challenge the order in federal court, as they have done in this case. Of course, any American who disagrees with the content of the order has the right to vote the President out of office. Relatedly, Congress rescinded the President's requirement that members of the Armed Forces get vaccinations. *See* James M. Inhofe Nat'l Def. Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 525 (2022). Thus, consistent with *NFIB v. OSHA* and *Biden v. Missouri*, and applying the Supreme Court's methodology for assessing the President's emergency powers in the absence of direct Congressional intervention, *see Youngstown*, 343 U.S. at 635-38 (Jackson, J., concurring in the judgment and opinion of the Court); *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981) ("[E]xecutive action in any particular instance falls . . . at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition. This is particularly true as respects cases . . . involving responses to international crises the nature of which Congress can hardly have been expected to anticipate in any detail."), accountability for the federal executive employee immunization requirement is open, obvious, and vested in one elected, democratically accountable official. These cases do not cast doubt on, but rather determinatively confirm, the President's emergency power to issue Executive Order No. 14043. Yet our court refuses to explain why the President does not have this power.

In addition to the issues discussed above, the government is also likely to succeed in showing that the plaintiffs have not met their burden for obtaining a preliminary injunction. A plaintiff seeking such an injunction must establish, among other requirements, "that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at

20.  However, even if the plaintiffs were to lose their jobs as a result of this order, we have explained in a previous case involving "discharge under the federal civil service laws" that "[i]t is practically universal jurisprudence in labor relations in this country that there is an adequate remedy for individual wrongful discharge after the fact of discharge": "reinstatement and back pay." *Garcia v. United States*, 680 F.2d 29, 31-32 (5th Cir. 1982). The CSRA makes this remedy available to the plaintiffs. *See* 5 U.S.C. § 7118(a)(7)(C). Accordingly, the district court did not show that the plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. Our court rubberstamps the injunction without identifying any irreparable harm, either.

Finally, even if I were to conclude that the plaintiffs were entitled to injunctive relief, I agree with Judge Haynes and would not affirm the district court's grant of a nationwide injunction.[24] As our court recently explained, nationwide injunctions "can constitute 'rushed, high-stake, low-information decisions,' while more limited equitable relief can be beneficial." *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (quoting *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600, (2020) (Gorsuch, J., concurring in the grant of a stay)); *see Kentucky v. Biden*, 57 F.4th 545, 556-57 (6th Cir. 2023) (finding district court abused its discretion in extending preliminary injunction of vaccine requirement for federal contracts to non-parties); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (observing that nationwide injunctions "are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal

---

[24] In this respect, I join Judge Haynes's separate opinion.

courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch").[25]

Cognizant of the separation of powers, as well as our judicial ignorance of the immense task of running the Executive Branch of government, for which the President, informed by public health experts, is solely accountable, I would not allow an unelected lower court to impose its Article III fiat on millions of Article II employees, above all when a dozen other lower courts have declined to enjoin the President's order. More egregious, our court should not have approved this unaccountable exercise of the judicial power without explaining why an injunction was warranted in the first place.

## B.

In affirming the district court's nationwide injunction, the majority defends the scope of the injunction but does not say why the district court properly exercised its discretion in granting any injunction at all. "After

---

[25] The majority argues that a nationwide injunction is permissible because "any benefit to outside parties is 'merely incidental.'" I fail to understand how this is so. Historically, courts of equity "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring). Of course, an injunction tailored to the parties in a case might sometimes incidentally benefit a nonparty. For example, "injunctions barring public nuisances" might "benefit[] third parties . . . merely [as] a consequence of providing relief to the plaintiff," *id.*, because when a source of water or air pollution is enjoined, everyone's water or air gets cleaner. But a nationwide injunction barring the vaccine requirement is not analogous to an injunction barring a public nuisance. Outside parties to this case who don't want to get vaccinated are *directly* shielded from federal government enforcement action by the nationwide injunction; they are *direct* "beneficiaries" of the relief granted to plaintiffs, even though they are not plaintiffs. In sum, there is no way to turn upside down Justice Thomas's skepticism toward nationwide injunctions by framing this case as an exception to "historical limits on equity and judicial power." *Id.* at 2429 (Thomas, J., concurring). Rather, by affirming the Executive Order, every court excepts ours has respected the President's decision to protect federal employees and the public from the effects of a pandemic disease and respected the principle that courts do not make federal policy. *See id.* at 2427 (Thomas, J., concurring).

carefully considering the district court's opinion and the Government's criticisms of it, we are unpersuaded that the district court abused its discretion. And we need not repeat the district court's reasoning, with which we substantially agree"—that's it. In two sentences and without any explanation, after more than a year of government attempts to get our court to engage, we limit the President's authority to protect federal employees from a pandemic. Our perfunctory treatment of this important and difficult issue does not reflect a "[d]ue regard for the implications of the distribution of powers in our Constitution and for the nature of the judicial process as the ultimate authority in interpreting the Constitution." *Youngstown*, 343 U.S. at 597 (Frankfurter, J., concurring). Nor does it meet our basic "obligation to say enough that the public can be confident that cases are decided in a reasoned way." *United States v. Handlon*, 53 F.4th 348, 353 (5th Cir. 2022); *see Rita v. United States*, 551 U.S. 338, 356 (2007).

\* \* \*

This case requires us to determine the powers of the President to regulate the Executive Branch workforce—in other words, "to intervene in determining where authority lies as between the democratic forces in our scheme of government." *Youngstown*, 343 U.S. at 597 (Frankfurter, J., concurring). As Justice Frankfurter warned during another national emergency, "we should be wary and humble" in drawing those lines. *Id.* Contrary to his teachings, our court, asserting that it is right but unable to explain why, hastily sketches the President as a diminished figure in our system of government.

I respectfully dissent.

CARL E. STEWART, *Circuit Judge*, joined by RICHMAN, *Chief Judge*, and DENNIS and GRAVES, *Circuit Judges*, dissenting:

Respectfully, I dissent from the en banc majority opinion because, as the original panel opinion held, the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 *et seq.*, precludes district court review of challenges to Executive Order 14043 ("the Order"). *See Feds for Med. Freedom v. Biden ("Feds II")*, 30 F.4th 503, 511 (5th Cir. 2022). As the Supreme Court explained in *United States v. Fausto*, "the CSRA comprehensively overhauled the civil service system, creating an elaborate new framework for evaluating adverse personnel actions against [federal employees]." 484 U.S. 439, 443 (1988) (internal quotation marks and citations omitted). "It prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Id.*

As we explained in *Feds II*, "[t]he CSRA established 'the comprehensive and exclusive procedures for settling work-related controversies between federal civil-service employees and the federal government.'" 30 F.4th at 506 (quoting *Rollins v. Marsh*, 937 F.2d 134, 139 (5th Cir. 1991)). Prior to the enactment of the CSRA, administrative and judicial review under the civil service system was "haphazard," resulting from the "outdated patchwork of statutes and rules built up over almost a century." *Fausto*, 484 U.S. at 444 (quoting S. REP. NO. 95–969, at 3 (1978)). This system drew "widespread" criticism, in part because it produced inconsistent judicial decisions on similar matters due to the "concurrent jurisdiction, under various bases of jurisdiction, of district courts in all Circuits and the Court of Claims." *Id.* at 445. In response to these issues, Congress enacted the CSRA, which imposed "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.*

No. 22-40043

The CSRA provides different procedures for employees facing different types of employment actions. *Feds II*, 30 F.4th at 507 ("The CSRA distinguishes between employees facing 'proposed' adverse action and those who have already suffered an adverse action[.]"). Employees facing "proposed" action are entitled to notice, an opportunity to respond, legal representation, and written reasons supporting the employing agency's decision. 5 U.S.C. § 7513(b). A Merit Systems Protection Board ("MSPB") appeal, however, is only guaranteed to "employee[s] against whom an action is taken." *Feds II*, 30 F.4th at 508; § 7513(d). "If the employee prevails on appeal, the MSPB can order the agency to comply with its decision and award 'reinstatement, backpay, and attorney's fees.'" *Id.* at 507; *Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012) (citing 5 U.S.C. §§ 1204(a)(2), 7701(g)). "'An employee who is dissatisfied with the MSPB's decision is entitled to judicial review in the United States Court of Appeals for the Federal Circuit' under § 7703." *Id.* (quoting *Elgin*, 567 U.S. at 6). The jurisdiction of the Federal Circuit over such appeals is "exclusive." *Id.* (citing 28 U.S.C. § 1295(a)(9)). Once an employee appeals to the Federal Circuit, that court must "review the record and hold unlawful and set aside any agency action, findings, or conclusions that are (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Id.* (citing 5 U.S.C. § 7703(c)(1)–(3) (internal quotation marks omitted)). This remedial scheme is intricate and as the Supreme Court has recognized, "[g]iven the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Id.* (quoting *Elgin*, 567 U.S. at 11–12).

In *Elgin v. Department of Treasury*, the Supreme Court addressed an attempt by former federal employees to "carve out an exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal statutes." 567 U.S. at 12. The Court rejected their attempt, explaining that the CSRA's text and structure demonstrated that "[t]he availability of administrative and judicial review under the CSRA generally turns on the type of civil service employee and adverse employment action at issue," not whether a challenged action is constitutionally authorized. *Id*. at 12–13. The Court further noted that the CSRA's purpose, which is to create an integrated scheme of review, confirms that "the statutory review scheme is exclusive." *Id*. at 13. The Court ultimately held that "the CSRA provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional." *Id*. at 5.

Relying on this Supreme Court guidance, the *Feds II* panel majority reasoned that this case is "the vehicle by which [the plaintiffs] seek to avoid imminent adverse employment action" for not complying with the Order, "which is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." 30 F.4th at 511 (citing *Elgin*, 567 U.S. at 22) (internal quotation marks omitted). The panel majority further determined that the plaintiffs' claims did not exceed the MSPB's expertise. *Id*. (citing *Elgin*, 567 U.S. at 22 (recognizing that "many threshold questions . . . may accompany a constitutional claim" and "the MSPB can apply its expertise" to those questions)).

A unanimous Fourth Circuit panel agreed with our view that "Congress intended for the CSRA to cover [the plaintiffs'] claims" and "that the district court lacked jurisdiction" over a challenge to the Order. *See Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *3 (4th Cir. Apr. 19, 2022). Like the *Feds II* panel majority, *Rydie* relied on *Elgin* to hold that "Congress

intended the CSRA to foreclose judicial review in at least some circumstances." *Id*. at *4. As the *Rydie* panel observed, courts use the three *Thunder Basin* factors[1] to determine whether Congress intended the CSRA to foreclose judicial review in certain cases and concluded that the factors militated in favor of preclusion. *Rydie*, 2022 WL 1153249, at *4–7. Both the *Feds II* and *Rydie* decisions align with those of other courts that have considered challenges to the Order since April of last year. *See Am. Fed'n of Gov't Emps. Loc. 2018 v. Biden*, 598 F. Supp. 3d 241, 248 (E.D. Pa. 2022) ("This action will be dismissed in its entirety for lack of subject-matter jurisdiction."); *Payne v. Biden*, 602 F. Supp. 3d 147, 151 (D.D.C. 2022) ("The Court will grant the Government's Motion because the Civil Service Reform Act deprives the Court of subject-matter jurisdiction over this workplace dispute involving a covered federal employee.")[2]; *Am. Fed'n of Gov't Emps. Loc. 2586 v. Biden*, No. CIV-21-1130-SLP, 2022 WL 3695297, at *4 (W.D. Okla. July 22, 2022) ("[T]he Court finds the CSRA's scheme is detailed, comprehensive and exclusive and it is fairly discernible that Congress intended the Civilian Employees' claims to be encompassed within that scheme.").

Because I am not persuaded that we should create a split with the Fourth Circuit or depart from the sound reasoning of numerous other federal

---

[1] The *Thunder Basin* factors are: "(1) whether a finding of preclusion could foreclose all meaningful judicial review; (2) whether the claims were wholly collateral to a statute's review provisions; and (3) whether the claims were outside the agency's expertise." *See Cochran v. SEC*, 20 F.4th 194, 205 (5th Cir. 2021), *cert. granted SEC v. Cochran*, No. 21-1239, 2022 WL 1528373 (U.S. May 16, 2022) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)).

[2] The D.C. Circuit has since ruled in the Government's favor. *See Payne v. Biden*, --- F.4th ---, 2023 WL 2576742 (D.C. Cir. 2023).

courts that have since heard similar challenges and reached the same result, I would affirm our original holding in *Feds II* that the CSRA precludes the district court's jurisdiction in this case. *See* 30 F.4th at 511.