

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW
Washington, DC 20530

Tel: (202) 514-3159

April 21, 2023

**Via CM/ECF**

Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119

      RE:   *Donovan v. Biden*, No. 22-35474 (oral argument scheduled for May 8, 2023)

Dear Ms. Dwyer:

      Pursuant to Rule 28(j), we inform the Court that, on April 19, 2023, a unanimous panel of this Court issued a published decision in *Mayes v. Biden*, No. 22-15518 (9th Cir. Apr. 19, 2023), reversing a permanent injunction enjoining enforcement of the COVID-19 vaccine requirement for federal contractors at issue this appeal (Contractor EO).

      The panel upheld the Contractor EO, largely for the reasons the government outlined in its briefs in this case. The panel held that the order was a valid exercise of the President's Procurement Act authority because it has a close nexus and bears a reasonable relationship to the Act's stated goal of establishing an "economical and efficient system" for procurement. 40 U.S.C. § 101; *see* Op. 37-40. The panel further explained that the major questions doctrine did not cast doubt on the validity of the order because the order "is a Presidential—not an agency—action"; it involves an exercise of proprietary, not regulatory, authority; and it is not a transformative expansion of that authority, in any event. Op. 37; *see* Op. 27-37. The panel likewise reasoned that the order did not run afoul of federalism or nondelegation principles. *See* Op. 43-45. Finally, the panel rejected the plaintiffs' procedural challenge, concluding that the Office of Management and Budget (OMB) properly invoked a waiver provision in the Procurement Policy Act. *See* Op. 47-49.

1

The *Mayes* decision is largely dispositive of the federal contractor plaintiffs' claims challenging the Contractor EO here. The federal contractor plaintiffs, like the *Mayes* plaintiffs, argued that the Contractor EO exceeded the President's authority under the Procurement Act, lacked the requisite nexus to an economical and efficient procurement system, and violated major questions, nondelegation, and federalism principles. They also argued that the OMB determination violated the procedural requirements of the Procurement Policy Act. Because the *Mayes* panel rejected those arguments in a published opinion, this panel must do so too. The federal contractor plaintiffs' only remaining claims related to the Contractor EO arise under the Religious Freedom Restoration Act. Those claims fail for the reasons explained in our brief. Response Br. 32-35.

Sincerely,

*/s/ Anna O. Mohan*
Anna O. Mohan

cc:     All counsel (via CM/ECF)

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KRISTIN K. MAYES, Attorney General; STATE OF ARIZONA; AL REBLE; PHOENIX LAW ENFORCEMENT ASSOCIATION; UNITED PHOENIX FIREFIGHTERS ASSOCIATION LOCAL 493, | No. 22-15518 |
| | D.C. No. 2:21-cv-01568-MTL |
| *Plaintiffs-Appellees,* | OPINION |
| v. | |
| JOSEPH R. BIDEN, in his official capacity as President of the United States; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, in his official capacity as Senior Official Performing the Duties of the Commissioner of US Customs and Border Protection; TAE JOHNSON, in his official capacity as Senior Official Performing the Duties of Director of US Immigration and Customs Enforcement; UR MENDOZA JADDOU, in her official capacity as Director of US Citizenship | |

and Immigration Services; OFFICE
OF PERSONNEL MANAGEMENT;
KIRAN AHUJA, in her official
capacity as director of the Office of
Personnel Management and as co-
chair of the Safer Federal Workforce
Task Force; UNITED STATES
GENERAL SERVICES
ADMINISTRATION; SHALANDA
YOUNG, in her official capacity as
Acting Director of the Office of
Management and Budget and as a
member of the Safer Federal
Workforce Task Force; SAFER
FEDERAL WORKFORCE TASK
FORCE; JEFFREY ZIENTS, in his
official capacity as co-chair of the
Safer Federal Workforce Task Force
and COVID-19 Response Coordinator;
L. ERIC PATTERSON, in his official
capacity as Director of the Federal
Protective Service and member of the
SFWTF; JAMES M. MURRAY, in his
official capacity as Director of the
United States Secret Service and
member of the SFWTF; DEANNE
CRISWELL, in her official capacity as
Director of the Federal Emergency
Management Agency and member of
the SFWTF; ROCHELLE
WALENSKY, in her official capacity
as Director of the Centers for Disease
Control and Prevention and member of

the SFWTF; CENTERS FOR
DISEASE CONTROL AND
PREVENTION; FEDERAL
ACQUISITION REGULATORY
COUNCIL; MATHEW C. BLUM, in
his official capacity as Chair of the
Federal Acquisition Regulatory
Council and Acting Administrator of
the Office of Federal Procurement
Policy, Office of Management and
Budget; LESLEY A. FIELD, in her
official capacity as a member of the
Federal Acquisition Regulatory
Council and Acting Administrator for
Federal Procurement at the Office of
Federal Procurement Policy, Office of
Management and Budget; KARLA S.
JACKSON, in her official capacity as
a member of the Federal Acquisition
Regulatory Council and Assistant
Administrator for Procurement at the
National Aeronautics and Space
Administration; JEFFREY A. KOSES,
in his official capacity as a member of
the Federal Acquisition Regulatory
Council and Senior Procurement
Executive at the General Services
Administration; JOHN M.
TENAGLIA, in his official capacity as
a member of the Federal Acquisition
Regulatory Council and Principal
Director of Defense Pricing and
Contracting at the Department of

Defense; UNITED STATES OF
AMERICA; UNITED STATES
DEPARTMENT OF JUSTICE;
MERRICK B. GARLAND, Attorney
General, in his official capacity as
Attorney General of the United States,

*Defendants-Appellants,*

_____

ARIZONA CHAMBER OF
COMMERCE & INDUSTRY;
FIFTY-SIXTH ARIZONA
LEGISLATURE,

*Intervenors.*

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted March 7, 2023
Las Vegas, Nevada

Filed April 19, 2023

Before: Richard R. Clifton, Mark J. Bennett, and Roopali
H. Desai, Circuit Judges.

Opinion by Judge Bennett

# SUMMARY[*]

## Injunction

The panel reversed the district court's order granting a permanent injunction and dissolved the injunction, which had enjoined the President's "Contractor Mandate" Executive Order requiring federal contractors who worked on or in connection with federal government projects to be vaccinated against COVID-19.

President Biden issued Executive Order 13,991, establishing the Safer Federal Workforce Task Force that was charged with providing ongoing guidance concerning the operation of the Federal Government during the COVID-19 pandemic. The President invoked his authority under the Federal Property and Administrative Services Act of 1949 ("Procurement Act") to direct federal agencies to include in certain contracts a clause requiring covered contractor employees to follow COVID-19 safety protocols, including vaccination requirements, in order for employees to be eligible to work on federal government projects. Plaintiffs sued to enjoin the vaccination mandate. This lawsuit revolves around four documents that comprise the Contractor Mandate: the Executive Order, the Task Force Guidance, the Office of Management and Budget Determination, and the Federal Acquisition Regulatory Council Guidance.

The district court granted a permanent injunction against the Contractor Mandate, effective in any contract that either

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

involved a party domiciled or headquartered in Arizona
and/or was performed "principally" in Arizona.

The panel considered the first factor of the permanent
injunction inquiry: actual success on the merits. First, the
panel held the Major Questions Doctrine—which requires
that Congress speak clearly if it wishes to assign to an
agency decisions of vast economic and political
significance—did not apply. There is no relevant agency
action here, and the doctrine does not apply to actions by the
President. Second, the panel held that even if the Major
Questions Doctrine applied, it would not bar the Contractor
Mandate because the Mandate is not a transformative
expansion of the President's authority under the
Procurement Act. The Contractor Mandate is not an
exercise of regulatory authority at all, but of proprietary
authority. It is not a "transformative expansion" of any
authority, regulatory or proprietary, to require federal
contractors—amid an unprecedented global pandemic—to
take vaccination-related steps that promote efficiency and
economy by reducing absenteeism, project delays, and cost
overruns. Third, the panel held that the Contractor Mandate
fell within the President's authority under the Procurement
Act. The panel held that the President was justified in
finding that prescribing vaccination-related steps contractors
must take in order to work on government contracts would
directly promote an economical and efficient "system" for
both procuring services and performing contracts. The
President was authorized by the Act to establish a procedure
by which taxpayer funds used to pay contractors who work
on federal government contracts are only used to pay those
contractors whose relevant employees are vaccinated against
COVID-19. Fourth, the panel held that the nondelegation
doctrine and state sovereignty concerns did not invalidate the

Contractor Mandate. Finally, the panel held that the Contractor Mandate satisfied the Office of Federal Procurement Policy Act's procedural requirements. The panel held that Arizona's claims under the Administrative Procedure Act also failed.

Because Arizona failed to satisfy the first prong of the permanent injunction inquiry—actual success on the merits—the panel held that it need not analyze whether it had satisfied the remaining prongs. The panel reversed the district court's grant of a permanent injunction and dissolved the injunction.

---

**COUNSEL**

David L. Peters (argued), Anna O. Mohan, and Mark B. Stern, Appellate Staff Attorneys; Joshua Revesz, Counsel, Office of the Assistant Attorney General; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice; Washington, D.C.; Samuel F. Callahan, Associate Deputy General Counsel; Shraddha A. Upadhyaya, Associate General Counsel; Arpit K. Garg, Deputy General Counsel; Daniel F Jacobson, General Counsel; Office of Management and Budget; Washington, D.C.; for Defendants-Appellants.

Alexander W. Samuels (argued), Deputy Attorney General; James K. Rogers, Senior Litigation Counsel; Drew C. Ensign, Deputy Solicitor General; Joseph A. Kanefield, Chief Deputy & Chief of Staff; Mark Brnovich, Attorney General of Arizona; Office of the Arizona Attorney General; Phoenix, Arizona; Hannah H. Porter and Kevin E. O'Malley, Gallagher and Kennedy, Phoenix, Arizona; for Plaintiffs-Appellees Mark Brnovich and State of Arizona.

Dennis I. Wilenchifk, Wilenchik & Bartness PC, Phoenix, Arizona, for Plaintiff-Appellee Al Reble.

Michael Napier, Napier Abdo Coury & Baillie PC, Phoenix, Arizona, for Plaintiff-Appellee Phoenix Law Enforcement Association and United Phoenix Firefighters Association Local 493.

Michael G. Bailey (argued), Tully Bailey LLP, Phoenix, Arizona, for Intervenor Arizona Chamber of Commerce & Industry.

Kory Langhofer (argued) and Thomas J. Basile, Statecraft PLLC, Phoenix, Arizona, for Intervenor Fifty-Sixth Arizona Legislature.

Natalie P. Christmas, Assistant Attorney General of Legal Policy; James H. Percival, Deputy Attorney General of Legal Policy; Henry C. Whitaker, Solicitor General; Ashley Moody, Attorney General of Florida; Office of the Florida Attorney General; Tallahassee, Florida; for Amici Curiae the States of Florida, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia.

Daryl Joseffer and Stephanie A. Maloney, United States Chamber Litigation Center, Washington, D.C.; Steven P. Lehotsky, Gabriela Gonzalez-Araiza, and Adam Steene, Lehotsky Keller LLP, Washington, D.C.; Matthew H. Frederick, Lehotsky Keller LLP, Austin, Texas; for Amicus Curiae the Chamber of Commerce of the United States of America.

**OPINION**

BENNETT, Circuit Judge:

The purpose of the Federal Property and Administrative Services Act of 1949 ("Procurement Act"), 40 U.S.C. § 101 *et seq.*, "is to provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and . . . contracting," *id.* § 101(1). "The President may prescribe policies and directives that the President considers necessary to carry out" the Procurement Act, so long as they are "consistent" with the Act. *Id.* § 121(a). President Biden was justified in concluding that requiring federal contractors who worked on or in connection with federal government projects to be vaccinated against COVID-19 would promote economy and efficiency in federal contracting. Because the district court erred in enjoining the President's "Contractor Mandate" Executive Order, we dissolve the injunction entered by the district court.

In the midst of the COVID-19 pandemic—and faced with a rising death toll and lost work hours during a recession—the President invoked his authority under the Procurement Act. He used that authority to direct federal agencies to include in certain contracts a clause requiring covered contractor employees to follow COVID-19 safety protocols, including vaccination requirements, for employees to be eligible to work on federal government projects. The President's delegated executive officer found that requiring vaccination against COVID-19 would reduce absenteeism, lower cost overruns, and prevent delays on government projects. Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce

Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418, 63,418 (Nov. 16, 2021) ("OMB Determination").

Plaintiffs sued to enjoin the vaccination requirement. The district court granted a permanent injunction against the Contractor Mandate, effective in any contract that either involved a party domiciled or headquartered in Arizona and/or was performed "principally" in Arizona. The federal government appealed. We stayed the district court's injunction pending resolution of this appeal. Dkt. No. 70.

We have jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). We **REVERSE** the district court's grant of a permanent injunction and dissolve the injunction.

## I. BACKGROUND

### A. Statutory Framework

1. The Procurement Act

This dispute involves two provisions of the Procurement Act:

> **§ 101. Purpose**
>
> The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:
>
> **(1)** Procuring and supplying property and nonpersonal services, and performing related functions including contracting . . . .

40 U.S.C. § 101.

### § 121. Administrative

**(a) Policies prescribed by the President.** –
The President may prescribe policies and
directives that the President considers
necessary to carry out this subtitle.  The
policies must be consistent with this subtitle.

*Id.* § 121.

### 2.    The Procurement Policy Act

The Office of Federal Procurement Policy Act
("Procurement Policy Act"), 41 U.S.C. § 1707,[1] states that a
"procurement policy, regulation, procedure, or form . . . may
not take effect until 60 days after it is published for public
comment in the Federal Register" if it "relates to the
expenditure of appropriated funds" and either "has a
significant effect beyond the internal operating procedures
of the agency issuing the policy, regulation, procedure, or
form" or "has a significant cost or administrative impact on
contractors or offerors."  *Id.* § 1707(a)(1).

The Procurement Policy Act's requirements apply to
specific "executive agenc[ies]."  *Id.* § 1707(c)(1). But "[i]f
urgent and compelling circumstances make compliance with
the [notice and comment] requirements impracticable," the
officer authorized to issue the procurement policy may
waive them.  *Id.* § 1707(d).

---

[1] In addition to the substantive challenges to the Contractor Mandate that
Arizona asserted related to the Procurement Act, Arizona also asserted
procedural challenges under the Procurement Policy Act.

## B.    Organizational Framework

On his first day in office, President Biden issued
Executive Order 13,991, establishing the Safer Federal
Workforce Task Force ("Task Force").      Protecting the
Federal Workforce and Requiring Mask-Wearing, 86 Fed.
Reg. 7,045, 7,046 (Jan. 25, 2021).   Executive Order 13,991
charged the Task Force with "provid[ing] ongoing guidance
to heads of agencies on the operation of the Federal
Government, the safety of its employees, and the continuity
of Government functions during the COVID-19 pandemic."
*Id.*

The Office of Federal Procurement Policy is part of the
Office of Management and Budget ("OMB").      41 U.S.C.
§ 1101(a).  Congress has authorized it to "provide overall
direction of Government-wide procurement policies . . . and
promote economy, efficiency, and effectiveness in the
procurement of property and services."  *Id.* § 1101(b).

Congress also created the Federal Acquisition
Regulatory Council ("FAR Council").    41 U.S.C. § 1302(a).
The Administrator of the Office of Federal Procurement
Policy chairs the FAR Council and provides guidance on
how agencies should obtain full and open competition in
contracting.  *See id.* §§ 1121, 1122(a)(1)–(2), 1302(b).  The
FAR Council promulgates the Federal Acquisition
Regulation ("FAR"), *id.* § 1303, which contains standard
provisions that are included in certain government contracts,
*see* 48 C.F.R. §§ 1.000–53.300.

## C.  Factual Background

There have been over 760 million confirmed cases of COVID-19 worldwide,[2] and more than 100 million such cases in the United States.[3]  The disease has caused over 6.8 million deaths around the world.[4]  More than 1.1 million of those deaths have been in the United States.[5]  Since January 2020, a state of public health emergency has been in effect in the United States because of the disease.[6]

The COVID-19 pandemic has also had profound economic effects.  The pandemic triggered the greatest worldwide recession since the end of World War II.[7]  The United States Census Bureau concluded that the pandemic's initial impact on the U.S. economy was "more widespread

---

[2] World Health Organization, Coronavirus (COVID-19) Dashboard, https://covid19.who.int (last visited Apr. 11, 2023) (hereinafter "Global WHO Dashboard").

[3] World Health Organization, Coronavirus (COVID-19) Dashboard: United States of America, https://covid19.who.int/region/amro/country/us (last visited Apr. 11, 2023) (hereinafter "United States WHO Dashboard").

[4] Global WHO Dashboard, *supra* note 2.

[5] United States WHO Dashboard, *supra* note 3.

[6] The state of emergency will expire at the end of day on May 11, 2023. *See* Exec. Off. of the President, Statement of Administration Policy Re: H.R. 382 & H.J. Res. 7 (Jan. 30, 2023).

[7] Eduardo Levy Yeyati & Federico Filippini, *Social and Economic Impact of COVID-19* (Brookings Inst., Brookings Global Working Paper #158, 2021), at 1, https://www.brookings.edu/research/social-and-economic-impact-of-covid-19/.

than on mortality."**8**  It "caused the biggest blow to the U.S. economy since the Great Depression."**9**  Just a year into the pandemic, the cost of lost work hours in the United States associated with the pandemic had exceeded \$100 billion.**10**

In response, and once COVID-19 vaccinations were widely available and deemed safe and effective, the President issued an executive order requiring federal contractors' employees to get vaccinated if they work on or in connection with federal government contracts or work in the same workplace as such employees.  This lawsuit revolves around four documents that together comprise the "Contractor Mandate": (1) the Executive Order, (2) the Task Force Guidance, (3) the OMB Determination, and (4) the FAR Council Guidance.

### 1.  The Executive Order

In September 2021, President Biden issued Executive Order 14,042, Ensuring Adequate COVID Safety Protocols for Federal Contractors.  86 Fed. Reg. 50,985 (Sept. 14, 2021) ("EO").  The EO was issued pursuant to the Procurement Act to "promote[] economy and efficiency in

---

8  U.S. Census Bureau, *Pandemic Impact on Mortality and Economy Varies Across Age Groups and Geographies* (Mar. 8, 2021), https://www.census.gov/library/stories/2021/03/initial-impact-covid-19-on-united-states-economy-more-widespread-than-on-mortality.html.

9 Lucia Mutikani, *What to Know About the Report on America's COVID-Hit GDP*, World Economic Forum (July 31, 2020), https://www.weforum.org/agenda/2020/07/covid-19-coronavirus-usa-united-states-econamy-gdp-decline/.

10 Abay Asfaw, *Cost of Lost Work Hours Associated with the COVID-19 Pandemic—United States, March 2020 Through February 2021*, 65 AM. J. INDUS. MED. 20, 27 (2022).

Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument." *Id.* at 50,985.

The EO directs executive agencies subject to the Procurement Act to include, in qualifying federal contracts,[11] a clause requiring contractors to comply with guidance that would subsequently be issued by the Task Force. *Id.*[12] The Task Force was directed to issue its guidance by September 24, 2021. *Id.* The EO states that, before the deadline, the OMB Director "shall, as an exercise of the delegation of my authority under the [Procurement] Act, *see* 3 U.S.C. § 301, determine whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors." *Id.* at 50,985–86.

The EO further instructs the FAR Council to amend the FAR to include the same COVID-19 safety clause. *Id.* at 50,986. It states that "agencies are strongly encouraged, to the extent permitted by law," to seek to modify existing contracts to include the COVID-19 safety clause. *Id.* at 50,987.

## 2.    The Task Force Guidance

On September 24, 2021, in accordance with the President's deadline, the Task Force issued its initial

---

[11] We use the term "contracts" to also include the "contract-like instruments" referenced in the EO. *Accord Georgia v. President of the U.S.*, 46 F.4th 1283, 1290 n.1 (11th Cir. 2022).

[12] The EO extends to subcontractors "at any tier." 86 Fed. Reg. at 50,985. Hence, we use the term "contractors" to include both contractors and subcontractors. *Accord Georgia*, 46 F.4th at 1290 n.1.

guidance for federal contractor and subcontractor work locations. The guidance was updated on November 10, 2021, and states, in relevant part:

> Covered contractors must ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation. Covered contractor employees must be fully vaccinated no later than January 18, 2022. After that date, all covered contractor employees must be fully vaccinated by the first day of the period of performance on a newly awarded covered contract, and by the first day of the period of performance on an exercised option or extended or renewed contract when the clause has been incorporated into the covered contract.

Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* 5 (updated Nov. 10, 2021) ("Task Force Guidance").[13]

The Task Force Guidance defines "covered contractor employee" as "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." *Id.* at 3. The definition extends to employees

---

[13] Available at https://www.saferfederalworkforce.gov/downloads/Guid ance%20for%20Federal%20Contractors_Safer%20Federal%20Workfo rce%20Task%20Force_20211110.pdf.

who were "not themselves working on or in connection with
a covered contract." *Id.* A "covered contractor workplace"
excludes a covered employee's residence but encompasses
any location "controlled by a covered contractor at which
any employee of a covered contractor working on or in
connection with a covered contract is likely to be present
during the period of performance for a covered contract." *Id.*
at 4. The Task Force Guidance includes exceptions for
otherwise-covered employees who are not vaccinated
against COVID-19 because of a disability (including
medical conditions) or a "sincerely held religious belief,
practice, or observance." *Id.* at 5.

### 3. The OMB Determination

On November 10, 2021, the Acting OMB Director—
exercising power delegated under § 2(c) of the EO—
determined that the Task Force Guidance *would* promote
economy and efficiency in federal contracting. OMB
Determination, 86 Fed. Reg. at 63,418. The Acting OMB
Director reasoned that the Task Force Guidance would
"decrease the spread of COVID-19, which will in turn
decrease worker absence, save labor costs on net, and
thereby improve efficiency in Federal contracting." *Id.* at
63,421. The OMB Determination also explained how
COVID-19 infections "impose[] significant costs on
contractors and the federal government," and how
vaccination against COVID-19 "reduces net costs." *Id.* at
63,421–22 (bolding and capitalization omitted).[14]

---

[14] The Acting OMB Director had previously issued a determination
reaching the same conclusion but with less detail. *See generally* 86 Fed.
Reg. 53,691 (Sep. 28, 2021). The November 10 OMB Determination
"rescind[ed] and supersede[d]" that prior determination. 86 Fed. Reg. at
63,418.

### 4.   The FAR Council Guidance

On September 30, 2021, the FAR Council—in accord with § 3(a) of the EO—issued guidance on how to include the COVID-19 safety clause in new contracts and solicitations. *See generally* Memorandum from FAR Council to Chief Acquisition Officers, et al., *Issuance of Agency Deviations to Implement Executive Order 14042* (Sept. 30, 2021) ("FAR Council Guidance").[15] The FAR Council Guidance includes a sample clause that implements the COVID-19 vaccination requirement. *Id.* at 4–5.

## D.   Proceedings Below

The State of Arizona and then-Attorney General Mark Brnovich ("Arizona") filed a lawsuit challenging the EO on September 14, 2021—the date the EO was published. Once the scope of the Contractor Mandate became clear, Arizona amended its complaint to also challenge the Task Force Guidance, OMB Determination, and FAR Council Guidance, and filed a motion for a preliminary injunction.[16] All plaintiffs[17] filed a renewed motion for a preliminary injunction with the Second Amended Complaint.

In January 2022, the district court issued an order granting plaintiffs' request for a preliminary injunction. *See*

---

[15] Available at https://www.whitehouse.gov/wp-content/uploads/2021/0 9/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Imple ment-EO-14042.pdf.

[16] A federal employee joined the amended complaint and motion for a preliminary injunction.

[17] Two Arizona public sector unions also joined Arizona and the federal employee, *see* note 16 *supra*, as plaintiffs, asserting claims against Defendant City of Phoenix, a federal contractor, for implementing the Contractor Mandate.

*generally Brnovich v. Biden*, 562 F. Supp. 3d 123 (D. Ariz. 2022). The district court first held that Arizona had standing to challenge the Contractor Mandate because of its proprietary interests (its contracts with the federal government) and its sovereign interests (its own vaccination policies). *See id.* at 142–47.

Next, the district court concluded that the Contractor Mandate exceeded the President's statutory authority under the Procurement Act. *See id.* at 150–57. The court reasoned that allowing the Mandate to go into effect would allow the President to enact any policy, "no matter how tenuous[ly]" connected to "the broad goals of achieving economy and efficiency in federal procurement." *Id.* at 152. The court also concluded that the Contractor Mandate is a public health measure, not a procurement policy. *See id.* at 153–54. It held that the Procurement Act does not clearly authorize the passage of such a measure, because "[w]e expect Congress to speak clearly when authorizing [the executive branch] to exercise powers of 'vast economic and political significance.'" *Id.* at 153 (second alteration in original) (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam)).

The court then concluded that, as many Arizona agencies are federal contractors, Arizona would suffer irreparable harm from implementing the Contractor Mandate in the form of (1) lost contracts, funds, and employees; (2) "compliance and monitoring costs"; and (3) the purported conflict between the Mandate and Arizona's vaccination laws. *Id.* at 165. The court found that the balance of harms and public interest weighed in favor of an injunction because "issuing an injunction here would do [the government] little harm" as the President could "recommend vaccination among contractors" rather than mandating it. *Id.* at 166. The court

rejected Arizona's proposal for a nationwide injunction, reasoning that "[e]quitable remedies should redress only the injuries sustained by a particular plaintiff in a particular case." *See id.* at 166–67.[18]

In February 2022, the district court issued a permanent injunction barring the federal government from enforcing the Contractor Mandate in any contract (i) "to which a contracting party [was] domiciled in or headquartered in the State of Arizona" or (ii) "to be performed principally in the State of Arizona."[19]  The court also issued a final judgment

---

[18] The court instructed Arizona to submit a proposed form of permanent injunction. *Id.* at 167.

[19] Until the district court's permanent injunction, the Contractor Mandate was not otherwise prohibited from implementation in Arizona.  While the Mandate had already been challenged in various courts across different circuits, and several of those courts had enjoined the Mandate, none of those injunctions covered contracting parties domiciled in or headquartered in Arizona or contracts to be performed principally in Arizona.  *See Louisiana v. Biden*, 55 F.4th 1017, 1019, 1021 (5th Cir. 2022) (preliminary injunction covering Indiana, Louisiana, and Mississippi); *Georgia v. President of the United States*, 46 F.4th 1283, 1289, 1291 (11th Cir. 2022) (preliminary injunction covering Alabama, Georgia, Idaho, Kansas, South Carolina, Utah, and West Virginia); *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (limiting the already-granted preliminary injunction to the named parties); *Missouri v. Biden*, 576 F. Supp. 3d 622, 635 (E.D. Mo. 2021) (preliminary injunction covering Alaska, Arkansas, Iowa, Missouri, Montana, Nebraska, New Hampshire, North Dakota, South Dakota, and Wyoming); *State v. Nelson*, 576 F. Supp. 3d 1017, 1040 (M.D. Fla. 2021) (preliminary injunction covering Florida); *but see* Order, *State v. Nelson*, 8:21-cv-02524-SDM-TGW, ECF No. 48 (Nov. 9, 2022) (granting stay pending appeal until March 31, 2023); Joint Status Report, ECF No. 49 (Mar. 29, 2023) (jointly proposing a continuation of the stay until May 25, 2023).

pursuant to Federal Rule of Civil Procedure 54(b).[20]  The
federal government appealed.[21]

After oral argument, we stayed the district court's
permanent injunction.  Dkt. No. 70.  We issued the stay
"pursuant to Fed. R. Civ. P. 62(g) and . . . until we issue[d]
an opinion on the merits of this appeal." *Id.*

## II.  STANDARD OF REVIEW

We review the district court's decision to grant a
permanent injunction for an abuse of discretion. *Gonzalez
v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 802 (9th Cir.
2020).  We review determinations underlying the injunction
under three standards: "factual findings for clear error, legal
conclusions de novo, and the scope of the injunction for
abuse of discretion." *United States v. Washington*, 853 F.3d
946, 962 (9th Cir. 2017).

---

[20] The district court dismissed the plaintiffs' claims challenging a
different Executive Order, which required COVID-19 vaccinations for
federal employees.  The district court also dismissed (without prejudice)
the federal employee plaintiff's claims because they were nonjusticiable,
and dismissed with prejudice the unions' claims.

[21] After briefing was completed in this case, the State of Arizona elected
a new Attorney General, Kristin Mayes.  AG Mayes informed the court
that Arizona would no longer pursue certain arguments it had previously
made.  However, Arizona would continue to defend the district court's
core holding that the Contractor Mandate exceeded the defendants'
authority under the Procurement Act and that the equitable factors for
injunctive relief were met.  Shortly thereafter, the Arizona Legislature,
the Speaker of the Arizona House of Representatives, the President of
the Arizona Senate, and the Arizona Chamber of Commerce & Industry
filed an emergency motion to intervene, seeking to continue to assert the
"abandoned" positions.  We granted permissive intervention to the
Arizona Legislature and the Arizona Chamber of Commerce & Industry,
and the Intervenors participated in oral argument.

A plaintiff seeking a permanent injunction must establish: "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). When the United States is a party, the balance of the equities and public interest factors merge. *Cf. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (noting the merging of the two factors in a preliminary injunction analysis).

## III.  DISCUSSION

On appeal, no party challenges the district court's finding that Arizona has Article III standing because of its proprietary interests. The district court did not err—let alone clearly err—in its factual finding that Arizona is "likely to suffer direct injury as a result of the Contractor Mandate." *Brnovich*, 562 F. Supp. 3d at 143. To compete for and work on federal government contracts, Arizona would have to comply with the Contractor Mandate. We therefore move on to whether Arizona has satisfied the first factor of the permanent injunction inquiry: actual success on the merits.[22]

---

[22] Because Arizona suffers a direct injury sufficient to confer standing, we do not need to determine whether Arizona has also suffered injury to its "sovereign" interests.

## A.    The Major Questions Doctrine does not apply.[23]

### 1.    The doctrine does not apply to actions by the President.

The Major Questions Doctrine has evolved over the years, but in its current form, it requires "Congress to speak clearly if it wishes to assign to *an agency* decisions of vast 'economic and political significance.'" *Util. Air. Regul. Grp. v. EPA* ("*UARG*"), 573 U.S. 302, 324 (2014) (emphasis added) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

But there is no relevant agency action here. Through the Procurement Act, Congress delegated to *the President* the authority to "prescribe policies and directives that the President considers necessary" to "provide the Federal Government with an economical and efficient system" for "[p]rocuring . . . property and nonpersonal services, and performing related functions including contracting."    40 U.S.C. §§ 101, 121.    The Major Questions Doctrine is motivated by skepticism of agency interpretations that "would bring about an enormous and transformative expansion in . . . regulatory authority without clear congressional authorization."    *UARG*, 573 U.S. at 324. Those concerns are not implicated here as the President "does not suffer from the same lack of political accountability that agencies may, particularly when *the*

---

[23] Arizona has purported to no longer pursue its Major Questions Doctrine argument. The Intervenors continue to advance it. Regardless, we independently determine whether the Major Questions Doctrine bars the Contractor Mandate. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("[T]he court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

*President* acts on a question of economic and political significance." *Georgia*, 46 F.4th at 1313 (Anderson, J., concurring in part and dissenting in part) (emphasis added); *see also Louisiana*, 55 F.4th at 1038 (Graves, J., dissenting) (same).

Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1–3. "[T]he Framers made the President the most democratic and politically accountable official in Government." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020). This accountability is ensured through regular elections and "the solitary nature of the Executive Branch, which provides 'a single object for the jealousy and watchfulness of the people.'" *Id.* (quoting The Federalist No. 70, at 479 (A. Hamilton) (J. Cooke ed., 1961)). And, of course, the President does not get a "blank check," here or otherwise. First, the President's actions must be authorized by and consistent with the Procurement Act. Second, the Constitution always provides checks on all branches of government.[24] If we were to determine that the Major

---

[24] One of those checks requires the judicial branch to respect the constitutional powers of the political branches. *See New York v. United States*, 505 U.S. 144, 182 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another . . . ."); *Myers v. United States*, 272 U.S. 52, 116 (1926) ("[T]he reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended . . . .").

And allowing the President the necessary discretion to faithfully execute our laws is a core principle of our government. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed. The buck stops with the President . . . .").

Questions Doctrine prevents the President from exercising lawfully delegated power, we would be rewriting the Constitution's Faithfully Executed Clause in a way never contemplated by the Framers. We decline to do so.

We recognize that three other circuits have concluded, without expressly deciding, that the Major Questions Doctrine applies to presidential action. But the Sixth Circuit never squarely addressed its reasoning for treating presidential action the same as agency action. *See Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022) (relying on circuit precedent involving the Occupational Safety & Health Administration to equate Congressional requirements for agency action with those for presidential action). Similarly, the lead opinion from Eleventh Circuit—while not labeling its analysis as pursuant to the Major Questions Doctrine—discussed the "statutory parameters" of contracting for agencies, but never discussed how or why such constraints apply to the President. *See Georgia*, 46 F.4th at 1295–97. And in its opinion upholding a preliminary injunction enjoining the Contractor Mandate, the Fifth Circuit similarly held that "delegations to the President and delegations to an agency should be treated the same under the major questions doctrine" because the Constitution "makes a single President responsible for the actions of the Executive Branch." *Louisiana*, 55 F.4th at 1031 n.40 (quoting *Seila Law*, 140 S. Ct. at 2203).

But that supposed equivalence does not account for how the two are different, as recognized by the Supreme Court in its treatment of agencies as different from the President. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 513–14 (holding that the structure of an independent agency violated the Constitution *because* the President, who is "accountable to the people for executing the laws," lacked the ability to hold the

independent agency accountable). Far from assuming the President is limited in the performance of his duties, the Supreme Court instead requires an "express statement" to find that Congress meant to subject the President's actions to additional scrutiny. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (declining to consider the President an "agency" under the APA because Congress did not explicitly subject his actions to review under the statute).

It is perhaps for these reasons that, before our sister circuits enjoined the Contractor Mandate, the Major Questions Doctrine had "never been applied to the exercise of power by the President." *Georgia*, 46 F.4th at 1314 (Anderson, J., concurring in part and dissenting in part). We find that the Doctrine does not apply to Presidential actions and therefore does not bar the Contractor Mandate.

> 2.   The Contractor Mandate is not a transformative expansion of regulatory authority.

But even if the Major Questions Doctrine applied to Presidential actions, it would still not preclude the Contractor Mandate. Arizona initially argued that the Doctrine applies here because the Contractor Mandate satisfies what Arizona described as the Doctrine's three "independent triggers": it (1) involves "a matter of great 'political significance,'" (2) "seeks to regulate 'a significant portion of the American economy," and (3) "'intrud[es] into an area that is the particular domain of state law,'" *i.e.*, compulsory vaccination mandates. Arizona relied on Justice Gorsuch's concurrence in *West Virginia* in advancing this position. *W. Virginia v. EPA*, 142 S. Ct. 2587, 2620–21 (2022) (Gorsuch, J., concurring).

However, the majority in *West Virginia* described the effect of the EPA action in that case as "restructur[ing] the

American energy market" because it "*represent[ed]* a 'transformative expansion in [its] regulatory authority.'" *Id.* at 2610 (quoting *UARG*, 573 U.S. at 324) (third alteration in original) (emphasis added). We do not read that sentence to mean that restructuring a sector or seeking to regulate a significant portion of the American economy is sufficient by itself to trigger the Major Questions Doctrine. But even if that were sufficient, no part of the Contractor Mandate represents an "enormous and transformative expansion in . . . regulatory authority." *UARG*, 573 U.S. at 324.

First, the Contractor Mandate is not an exercise of regulatory authority at all, but of proprietary authority. The district court concluded that the Mandate is a regulatory public health measure, not a proprietary procurement policy. *See Brnovich*, 562 F. Supp. 3d at 153–54. But nothing in the Mandate constitutes a regulation. And its broad scope alone does not make it regulatory.[25]

It is true that "[a]n exercise of proprietary authority can amount to a regulation if it seeks to regulate conduct *unrelated* to the government's proprietary interests." *Georgia*, 46 F.4th at 1314 n.3 (Anderson, J., concurring in

---

[25] The Fifth Circuit relied on the broad scope of the Contractor Mandate to conclude that it is regulatory. *Louisiana*, 55 F.4th at 1032–33 (stating that "[t]here is little internal about a mandate which encompasses even employees whose sole connection to a federal contract is a cubicle in the same building as an employee working 'in connection with' a federal contract" (internal quotation marks and footnote omitted)). But we believe that is not the correct inquiry for whether conduct is regulatory. Because the federal government contracts with approximately one-fifth of the American workforce, almost any procurement policy will have "external" effects. *See* U.S. Dep't of Labor, *History of Executive Order 11246*, https://www.dol.gov/agencies/ofccp/about/executive-order-1124 6-history (last visited Apr. 11, 2023).

part and dissenting in part) (emphasis added). But the conduct that the Contractor Mandate seeks to regulate *is* related to the government's proprietary interest here: efficient and economic procurement of services. The Contractor Mandate requires vaccination of all contractor employees who will work on or in connection with a covered contract. It also imposes that requirement on employees in the same workplace as a covered contractor employee, presumably because of the way a contagious disease such as COVID-19 spreads. *Id.* (Anderson, J., concurring in part and dissenting in part); *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) ("Because people may be infected but asymptomatic, they may unwittingly infect others [with COVID-19]."). To some, the requirement may appear overinclusive;[26] to others, it may seem underinclusive. But even if the Contractor Mandate were overinclusive or underinclusive (or both), that would not mean it is *unrelated* to efficient and economic procurement of services.

The government, as it does every day, drew certain lines. Perfection in line-drawing is not required. *Cf. Dandridge v. Williams*, 397 U.S. 471, 484–85 (1970) (discussing how "the concept of 'overreaching'" has "no place" in analysis of a "regulation in the social and economic field"). And imperfect over- or under-inclusiveness does not mean that the authority being exercised is *regulatory* rather than

---

[26] The Contractor Mandate could cover employees who never interact directly with an employee working on a federal contract. That possible over-inclusiveness does not somehow render the Mandate legally infirm.

proprietary. Nor does it give courts the authority to redraw
those lines.

Second, the Contractor Mandate is not a "transformative
expansion" of any authority—regulatory *or* proprietary.
Arizona, the district court, and other circuits raise alarms
about how the federal government has never sought, under
the authority of the Procurement Act, to regulate the health
decisions of American workers or to "reduc[e] absenteeism."
*Brnovich*, 562 F. Supp. 3d at 152–53 ("Nor has the President,
in the seventy years since the Procurement Act was enacted,
ever used his authority under the Act to effectuate sweeping
public health policy."); *Kentucky*, 23 F.4th at 607 ("[W]e
lack . . . a clear statement from Congress that it intended the
President to use a property-and-services procurement act, for
a purpose never-before recognized, to effect major changes
in the administration of public health."). But this argument
equates inactivity with forbidden activity. *See PennEast
Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2261
(2021) ("[T]he non-use[] of a power does not disprove its
existence." (citation omitted)).        The history of the
Procurement Act, Executive Orders passed under its
authority,  and  subsequent  judicial  interpretations
demonstrate that the Contractor Mandate is not a
transformative expansion of the President's statutory
authority.[27]

The Procurement Act was enacted in 1949. As discussed
above, the purpose of the Act is to promote an economical
and efficient system of federal government procurement.

---

[27] Other circuits have recounted this history as well. *See Louisiana*, 55
F.4th at 1023–27; *Kentucky*, 23 F.4th at 605–06; *Georgia*, 46 F.4th at
1299–1301.

*See Gundy v. United States*, 139 S. Ct. 2116, 2127 (2019)
(plurality op.) (noting that a statute's statement of purpose
"is an appropriate guide to the meaning of the [statute's]
operative provisions" (alteration in original) (internal
quotation marks and citation omitted)).

"[T]he most prominent use of the President's authority
under the [Act]" in the first few decades of its existence was
"a series of anti-discrimination requirements for
Government contractors." *Am. Fed'n of Lab. & Cong. of
Indus. Orgs. v. Kahn*, 618 F.2d 784, 790–91 (D.C. Cir. 1979)
(en banc). Several Presidents issued Executive Orders
forbidding contractors from discriminating on the basis of
race, creed, color, or national origin. *Id.* at 790–91, 791 n.33
(citing orders). In *Kahn*, the en banc D.C. Circuit recognized
that some of these Executive Orders "were issued under the
President's war powers and special wartime legislation," but
that "for the period from 1953 to 1964[,] *only* the
[Procurement Act] could have provided statutory support for
the Executive action." *Id.* at 790–91 (emphasis added).

In 1964, the Third Circuit became the first appellate
court to consider these executive actions. *See Farmer v.
Philadelphia Elec. Co.*, 329 F.2d 3 (3d Cir. 1964). The
*Farmer* court ruled that the President had the authority to
issue the orders under the Procurement Act. *Id.* at 8 ("In
view of the [Procurement Act], we have no doubt that the
applicable executive orders and regulations have the force of
law.").**[28]** Three years later, the Fifth Circuit also declined to

---

[28] *Farmer* also relied on the Defense Production Act of 1950 for statutory
authorization. *See* 329 F.2d at 7–8. However, the *Farmer* court made
clear that such reliance was in addition to the Procurement Act's
authority. *See id.* (quoting provisions of the Procurement Act and

hold that an antidiscrimination Executive Order was "so unrelated" to the Procurement Act's purpose that it "should be treated as issued without statutory authority." *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967).

In 1971, the Third Circuit upheld an Executive Order requiring contractors to commit to affirmative action hiring programs. *Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159, 170 (3d Cir. 1971). The court found the Executive Order supported by the President's authority under the Procurement Act because preventing the federal government's suppliers from "increasing its costs and delaying its programs by excluding from the labor pool available minority workmen" would improve the economy and efficiency of federal contracts. *Id.*

In 1979, the en banc D.C. Circuit upheld an Executive Order by President Carter that required federal contractors to adhere to price and wage guidelines. *Kahn*, 618 F.2d at 785. The *Kahn* court recognized that the Executive Order had the additional motive of slowing inflation in the economy, *see id.* at 792–93, but respected the President's calculation that there was a "nexus between the wage and price standards and likely savings to the Government," *id.* at 793.

In 1986 and 1996, Congress recodified the Procurement Act without any substantive change.[29] In 2001, President

---

referring to those provisions for statutory authority when finding the Executive Orders at issue "have the force of law," *id.* at 8).

[29] Pub. L. No. 99-500, 100 Stat. 1783, 1783-345 (1986); Pub. L. No. 99-591, 100 Stat. 3341, 3341-345 (1986); Pub. L. No. 104-208, 110 Stat. 3009, 3009-337 (1996).

Bush issued an Executive Order that required government contractors and their subcontractors to post notices at their facilities informing their employees of certain labor rights. Exec. Order No. 13,201, 66 Fed. Reg. 11,221, 11,221–22 (Feb. 17, 2001). This was the first Executive Order to explicitly cite the Procurement Act as its source of authority. *Id.* at 11,221; *but see Louisiana*, 55 F.4th at 1037 (Graves, J., dissenting) ("Executive Orders are not required to lay out the specific statute that the President's authority falls under.").

A year later, Congress recodified the Procurement Act[30] with minor changes but clarified that those edits made "no substantive change in existing law." Act of August 21, 2002 § 5(b). This is the Act's present form as to the provisions relevant here.

In 2003, the D.C. Circuit upheld the validity of President Bush's 2001 Executive Order. *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 362 (D.C. Cir. 2003). President Bush had justified the Executive Order by asserting a nexus to economy and efficiency because "[w]hen workers are better informed of their rights, . . . their productivity is enhanced" and because "[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts." *Id.* at 366 (quoting 66 Fed. Reg. at 11,221). The D.C. Circuit recognized that the "link may seem attenuated" but found that there was "enough of a nexus" to uphold the Order. *Id.* at 366–67.

---

[30] Pub. L. No. 107-217, 116 Stat. 1062, 1063, 1068 (2002) ("Act of August 21, 2002").

In 2009, the District Court of Maryland upheld an
Executive Order issued by President Bush requiring federal
contractors to use the E-Verify system to confirm
employees' compliance with immigration law ("E-Verify
Order"). *Chamber of Commerce v. Napolitano*, 648 F. Supp.
2d 726, 738 (D. Md. 2009). The district court deferred to the
President's judgment that contractors with "rigorous
employment eligibility confirmation policies" would be
"more efficient and dependable procurement sources," *id.*
(quoting Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June
11, 2008)), and noted that "[t]he President and his
Administration are in a better position than this Court to
make such determinations," *id.*

Finally, in 2015, President Obama issued an Executive
Order requiring federal contractors to "ensur[e] that
employees on [federal] contracts can earn up to 7 days or
more of paid sick leave annually, including paid leave
allowing for family care." Exec. Order No. 13,706, 80 Fed.
Reg. 54,697, 54,697 (Sept. 7, 2015). The President justified
the order under the Procurement Act on the following basis:

> Providing access to paid sick leave will
> improve the health and performance of
> employees of Federal contractors and bring
> benefits packages at Federal contractors in
> line with model employers, ensuring that they
> remain competitive employers . . . . These
> savings and quality improvements will lead
> to improved economy and efficiency in
> Government procurement.

*Id.* This order was not challenged in federal court. *See
Georgia*, 46 F.4th at 1301.

As this history demonstrates, Presidents have used the Procurement Act to require federal contractors to commit to affirmative action programs when racial discrimination was threatening contractors' efficiency; to adhere to wage and price guidelines to help combat inflation in the economy; to ensure compliance with immigration laws; and to attain sick leave parity with non-contracting employers because federal contractors were lagging behind and losing talent. It is not a "transformative expansion" of that same authority to require federal contractors—amid an unprecedented global pandemic—to take vaccination-related steps (already required by many private employers) that promote economy and efficiency by reducing absenteeism, project delays, and cost overruns.

Congress's re-enactment of the Procurement Act is also instructive. "Congress is presumed to be aware of a[] . . . judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without [substantive] change." *Chugach Mgmt. Servs. v. Jetnil*, 863 F.3d 1168, 1174 (9th Cir. 2017) (citation omitted); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015) ("If a word or phrase has been given a uniform interpretation by inferior courts, a later version of that act perpetuating the wording is presumed to carry forward that interpretation." (cleaned up) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012))). We must presume that, when recodifying the Act in 2002, Congress knew that the Third, Fifth, and D.C. Circuits had interpreted the President's Procurement Act authority and the statutory terms "economy" and "efficiency" broadly, and that President Bush had—just a year prior in 2001—relied on those terms to issue an Executive Order requiring

government contractors to post notices informing their
employees of certain labor rights.**31**

Congress's affirmation of the broad understandings of
those terms through re-enactment adds further weight to our
holding that the Procurement Act supports an exercise of
authority like the Contractor Mandate. Presidents have,
when the need arose, used the Procurement Act in ways they
found necessary to promote economy and efficiency in
federal contracting and procurement. The Contractor
Mandate, which fits well within the Procurement Act's
historical uses, was not a transformative expansion of the
President's authority under that Act.**32**

---

31 Since the Procurement Act was last recodified in 2002, we will not
presume Congressional approval of President Bush's Executive Order
upheld in *Chao*, the E-Verify Order, or President Obama's Executive
Order targeting paid sick leave. But when "the President's view of his
own authority under a statute . . . has been acted upon over a substantial
period of time without eliciting congressional reversal, it is 'entitled to
great respect'" and the President's "construction of a statute . . . should
be followed unless there are compelling indications that it is wrong."
*Kahn*, 618 F.2d at 790 (emphasis added) (citations omitted); *see also
Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in
the judgment) ("[T]he government's early, longstanding, and consistent
interpretation of a statute, regulation, or other legal instrument could
count as powerful evidence of its original public meaning." (emphasis
omitted)).

32 At oral argument, counsel for one Intervenor stated that it "is difficult
to reconcile" multiple historical uses of the Procurement Act—such as
the antidiscrimination orders or the E-Verify Order—with their view of
the Major Questions Doctrine. Oral Arg., at 45:20–46:15. We think that
might well be true: *if* Arizona's initial and Intervenors' current view of
the Doctrine were correct, then many prior actions by Presidents would
be suspect. But that provides us with an additional reason why that view

The Fifth Circuit recognized the history of the Procurement Act, but concluded that the Contractor Mandate was "strikingly unlike" any past action taken under the Act, not least because "a vaccination cannot be undone at the end of the workday." *Louisiana*, 55 F.4th at 1030 (cleaned up) (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022) (per curiam)). But the *impacts* of anti-discrimination or affirmative action programs, wage and price policies, and immigration law compliance mechanisms also do not *end* with the workday—and even if they did, we do not see how that in itself would circumscribe the President's authority.

The Fifth Circuit also found important that previous Executive Orders "govern[ed] the conduct of *employers*, [whereas] the vaccine mandate purports to govern the conduct of *employees*." *Id.* But this supposed distinction "frames the issue at the wrong level of generality." *Kentucky*, 23 F.4th at 610. As Judge Graves highlighted in dissent in *Louisiana* when discussing the E-Verify Order, the employer/employee distinction does not stand up to scrutiny:

> Both Executive Orders require something of employers, namely that the employer use the E-Verify system to verify the immigration eligibility of its workers, and that the employer uses a system to verify the vaccine eligibility of its workers. Both necessarily touch the employees, namely that employees

---

of the Doctrine is *not* correct. We agree with the courts that upheld those prior Executive Orders as within the President's authority under the Procurement Act for the same (or similar) reasons we now find that the Contractor Mandate is within President Biden's authority.

> working for federal contractors must be
> verified under the E-Verify system or be
> subject to termination, and that employees
> working for federal contractors must be
> verified as being COVID-19 vaccine
> compliant or be subject to termination.

55 F.4th at 1036–37 (Graves, J., dissenting).

In sum, we find that the Major Questions Doctrine is not
relevant here because the Contractor Mandate is a
Presidential—not an agency—action.   But even if the
Doctrine applied, it would not bar the Contractor Mandate
because the Mandate is not a transformative expansion of the
President's authority under the Procurement Act.

## B.  The Contractor Mandate falls within the President's authority under the Procurement Act.

Plaintiffs also argue that, even if the Major Questions
Doctrine does not bar the Contractor Mandate, the Mandate
nonetheless exceeds the scope of the President's authority
under the Procurement Act.   We disagree.

The Procurement Act empowers the President to
"prescribe policies and directives that the President
considers necessary to carry out" the statute's objective of
"provid[ing] the Federal Government with an economical
and efficient system" for "[p]rocuring . . . nonpersonal
services, and performing related functions including
contracting."  40 U.S.C. §§ 101, 121(a).  Our Circuit has not
yet addressed the scope of the President's authority under the
Procurement Act.  But for the EO to have the force of law,
"it is necessary to establish a nexus between the [EO] and
some delegation of the requisite legislative authority by

Congress." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979).

Different circuits have interpreted that requirement differently. The D.C. Circuit requires a "sufficiently close nexus" between an order issued pursuant to the Procurement Act and the statutory goals of economy and efficiency. *See Chao*, 325 F.3d at 366 (quoting *Kahn*, 618 F.2d at 792). The Fourth Circuit requires a finding that the executive branch policies are "reasonably related to the Procurement Act's purpose." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981). Even though the D.C. Circuit's language sounds more stringent, its standard is a "lenient" one, *Chao*, 325 F.3d at 367, and "'[e]conomy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions," *Kahn*, 618 F.2d at 789.

The President tasked the OMB Director to "determine whether [the Task Force's] Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors." 86 Fed. Reg. at 50,986. The Acting OMB Director determined that the Task Force Guidance will "decrease the spread of COVID-19, which will in turn decrease worker absence, save labor costs on net, and thereby improve efficiency in Federal contracting." 86 Fed. Reg. at 63,421. The OMB Determination further explained how COVID-19 infections "impose[] significant costs on contractors and the federal government," and how vaccination against COVID-19 "reduces net costs." *Id.* at 63,421–22 (bolding and capitalization omitted). Although Arizona describes the Contractor Mandate as an effort to make federal contractors "*supposedly* more efficient," the district court did not make factual findings that contradicted

the findings underlying the OMB Determination or conclude
that those findings were arbitrary and capricious.  *See
generally Brnovich*, 562 F. Supp. 3d at 152–57.  There is no
legal basis to disregard the OMB's findings, all of which
support the reasoning behind the Contractor Mandate.

Under either the D.C. or Fourth Circuit's tests, the
Contractor Mandate falls within the President's Procurement
Act authority.[33]  The findings in the OMB Determination
show a "sufficiently close nexus" with, *Kahn*, 618 F.2d at
792, and a "reasonabl[e] relat[ionship]" to, *Liberty Mut.*, 639
F.2d at 170, the Contractor Mandate and the Procurement
Act's goals of economy and efficiency.  It is axiomatic that
federal contracts will be performed more economically and
efficiently with fewer absences.  Would our analysis be
different if the COVID-19 pandemic were far less serious?
Perhaps, but unfortunately the President did *not* face that
hypothetical.  The President faced a pandemic the likes of
which the world has not seen in more than a century.

Our conclusion is bolstered by precedent interpreting the
Procurement Act.    The broad language of the Act
purposefully gives the President both "necessary flexibility
and 'broad-ranging authority'" in setting procurement
policies.  *Chao*, 325 F.3d at 366 (citation omitted).  And the
Act leaves room for the President's discretion by directing
the President to "prescribe policies and directives that the
President *considers* necessary" to carrying out the purposes
of the Act.  40 U.S.C. § 121(a) (emphasis added).  This
statute does not present the worry of Congress hiding

---

[33] Because any formulation of the nexus test we might adopt would yield
the same result, we do not need to provide a definitive standard here.

(41 of 51)
Case 2:21-cv-05484-DJH Document 123 Filed 04/12/23 Page 42 of 52
Case 2:22-cv-01342-ID: 12680697 DktEntry: 7-2 Page 420 of 520

40          MAYES V. BIDEN

"elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

In this way, the Procurement Act is similar to the statutory text at issue in *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam).  In *Missouri*, the Supreme Court held that language authorizing the Secretary of Health and Human Services to impose conditions he "*finds necessary* in the interest of . . . health and safety" was adequate authorization to impose a vaccination requirement on the employees of facilities that receive Medicare and Medicaid funds.  *Id.* at 652 (quoting 42 U.S.C. § 1395x(e)(9)) (emphasis added).

The Sixth Circuit concluded that the Procurement Act only confers authority "to implement systems making *the government's* entry into contracts less duplicative and inefficient, but it does not authorize [the President] to impose a medical mandate directly upon contractor employees themselves."  *Kentucky*, 23 F.4th at 605.  Therefore, according to the *Kentucky* court, the government lacked authority to regulate contractors directly to improve *their* economy and efficiency, rather than the government's.  *Id.*  Likewise, the Eleventh Circuit held the Procurement Act's "statutory scheme" is limited to "a framework through which agencies can articulate specific, output-related standards" for their procurement decisions.  *Georgia*, 46 F.4th at 1295.  There, the court determined the Contractor Mandate is "different in nature than the sort of project-specific restrictions" set forth in the Procurement Act.  *Id.* at 1296.

We respectfully disagree.  The Act's text—empowering the President to "prescribe . . . directives that the President considers necessary," 40 U.S.C. § 121(a), to realize "an economical and efficient system" for "[p]rocuring . . .

services, and performing . . . contracting," *id.* § 101(1)—
allows for prescribing requirements that address contractors'
operations. The word "system" encompasses *how* the
contractors' services are to be rendered. Merriam-Webster
defines "system" as "an organized or established
procedure."**[34]** We hold that the President was justified in
finding that prescribing vaccination-related steps contractors
must take in order to work on government contracts would
directly promote an economical and efficient "system" for
both procuring services and performing contracts. And we
believe the President was authorized by the Act to establish
a procedure by which taxpayer funds used to pay contractors
who work on federal government projects are only used to
pay those contractors whose relevant employees are
vaccinated against COVID-19.

The Sixth Circuit in *Kentucky* also did not adequately
address Presidents' historical practices under the
Procurement Act, many of which undeniably affected
contractors' own operations rather than merely the
government's entry into contracts. *See* 23 F.4th at 605–10.
President Bush justified his 2001 Executive Order requiring
contractors to post notices informing their employees of
certain labor rights on the explicit basis that "[w]hen workers
are better informed of their rights, . . . *their productivity is
enhanced*." 66 Fed. Reg. at 11,221 (emphasis added). This
was the last Executive Order issued under the Procurement
Act before Congress's latest recodification of the Act, in
which Congress stated it was making "no substantive change
in existing law." Act of August 21, 2002 § 5(b).

---

[34] *System*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dicti
onary/system (last visited Apr. 11, 2023).

The *Kentucky* court classifies the Executive Orders in *Kahn*, *Chao*, and *Napolitano* as having a "'close nexus' to the ordinary hiring, firing, and management of labor." *Kentucky*, 23 F.4th at 607 (quoting *Kahn*, 618 F.2d at 792). But the Contractor Mandate is also closely related to the ordinary management of labor—as evidenced by the analogous private sector practices that the Acting OMB Director cited in the OMB Determination. 86 Fed. Reg. at 63,421–22; *accord Louisiana*, 55 F.4th at 1036–37 (Graves, J., dissenting) (explaining how the E-Verify Order in *Napolitano* and the Contractor Mandate place similar requirements on employees).

The district court, Arizona, and the Fifth Circuit worry that upholding the Contractor Mandate will mean there is no limiting principle to the President's authority under the Procurement Act. The district court hypothesized that sustaining the Contractor Mandate would permit the President to enact any executive order, "no matter how tenuous" the connection to economy and efficiency, such as "requiring all federal contractor employees to refrain from consuming soda or eating fast food." *Brnovich*, 562 F. Supp. 3d at 152. The Fifth Circuit went further, positing that upholding the Contractor Mandate would enable the Executive Branch to require that "all federal contractors certify that their employees take daily vitamins, live in smoke-free homes, exercise three times a week, or even, at the extremity, take birth control in order to reduce absenteeism relating to childbirth and care." *Louisiana*, 55 F.4th at 1031–32; *accord Georgia*, 46 F.4th at 1296 (warning that the Procurement Act "is not an 'open book' to which contracting agencies may 'add pages and change the plot line'" (quoting *West Virginia*, 142 S. Ct. at 2609)).

We reject these invitations to adjudicate slippery-slope hypotheticals. "In our system of government, courts base decisions not on dramatic Hollywood fantasies, . . . but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an assessable record." *United States v. Kincade*, 379 F.3d 813, 838 (9th Cir. 2004) (en banc) (internal citation omitted). Moreover, the Procurement Act has a clear textual limiting principle in that the President can *only* prescribe policies and directives that he "considers necessary" to ensure "an economical and efficient system" for procurement and contracting. 40 U.S.C. §§ 101, 121(a). While a future President might try to analogize soda consumption to a worldwide pandemic in issuing an Executive Order under the Procurement Act, we will leave the consideration of that hypothetical Executive Order to a future court.

\*\*\*

We hold that the Contractor Mandate falls within the President's authority under the Procurement Act.

## C. Other doctrines do not bar the Contractor Mandate.

### 1. Nondelegation Doctrine

The district court also invoked the constitutional avoidance canon to invalidate the Contractor Mandate, reasoning that the Mandate "raises serious constitutional questions" under the nondelegation doctrine. *Brnovich*, 562 F. Supp. 3d. at 155–56. We disagree. The nondelegation doctrine arises out of the principle that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy*, 139 S. Ct. at 2123 (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)). But the

44                          MAYES V. BIDEN

Supreme Court has recognized that "Congress simply cannot do its job absent an ability to delegate power under broad general directives," *Mistretta v. United States*, 488 U.S. 361, 372 (1989), and has concluded that a statutory delegation is constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform," *id.* (second alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The Supreme Court has only twice found statutory delegations excessive under the nondelegation doctrine.[35] No statutory delegation has been invalidated due to nondelegation concerns in nearly ninety years. The Supreme Court has found an intelligible principle when the agency was authorized to regulate in the "public interest," *see National Broadcasting Co. v. United States*, 319 U.S. 190, 215–17 (1943), and—more recently—when the agency issued air quality standards "requisite to protect the public health," *Whitman*, 531 U.S. at 473. The Procurement Act has a clear intelligible principle that easily clears the low threshold established by *National Broadcasting Company*: it authorizes the President to "prescribe policies and directives that the President considers necessary" to secure "an economical and efficient system" for procurement and contracting. 40 U.S.C. §§ 101, 121(a). This principle "can

---

[35] *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530–42 (1935) (invalidating a statute that empowered the President to approve industry-specific "codes of fair competition" and thus regulate the entire economy); *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 414–20 (1935) (invalidating a statute that authorized the President to prohibit interstate and foreign transportation of oil produced in excess of state quotas but provided no guidance for how to exercise discretion).

be applied generally to the President's actions to determine whether those actions are within the legislative delegation." *Kahn*, 618 F.2d at 793 n.51.

### 2. Federalism and State Sovereignty

Neither federalism nor state sovereignty concerns bar the Contractor Mandate. The district court viewed the Mandate as a "regulation of health and safety matters" and thus in conflict with Arizona's "traditional police power." *See Brnovich*, 562 F. Supp. 3d at 156–57 (citations omitted). But the Contractor Mandate is aimed at federal contracting, even if also motivated by health and safety concerns. And the federal government undisputedly has the power to regulate the performance of federal contracts. *See Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 440–41 (9th Cir. 1991) (exempting federal contractors from state licensing requirements); *United States v. Virginia*, 139 F.3d 984, 990 (4th Cir. 1998) ("[F]ederal contractors cannot be required to satisfy state 'qualifications in addition to those that the [Federal] Government has pronounced sufficient.'" (second alteration in original) (quoting *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956))). Even if the Mandate did regulate health and safety, the federal government does not "invade[]" areas of state sovereignty "simply because it exercises its authority . . . in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 291 (1981).

The nondelegation doctrine and state sovereignty concerns do not somehow invalidate the Contractor Mandate.

### D. The Contractor Mandate satisfies the Procurement Policy Act's procedural

**requirements.**

Arizona contends that the Task Force's Guidance, the
FAR Council Guidance, and the OMB Determination fail the
Procurement Policy Act's procedural requirements. The
Procurement Policy Act typically requires that comments on
a proposed policy be open for at least 30 days and that the
policy not take effect until 60 days after its publication for
comment. 41 U.S.C. § 1707(a), (b). The district court
correctly rejected Arizona's procedural challenges.

1.    Task Force Guidance and FAQs

The Task Force documents survive any procedural
challenge for two reasons. First, the Task Force is not one
of the specifically enumerated "executive agenc[ies]" that
the Procurement Policy Act's requirements apply to. *Id.*
§ 1707(c)(1). It is merely a body created by Executive Order
13,991. *See* 86 Fed. Reg. at 7,045–46. It can only advise
the President, *id.* at 7,046, and thus lacks the "*substantial
independent authority*" required of an "agency," *Meyer v.
Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993). *See also id.* at
1292–97 (concluding that the President's Task Force on
Regulatory Relief was not an "agency" under the Freedom
of Information Act because it lacked "substantial
independent authority").

Second, the Task Force Guidance and FAQs have no
standalone legal force. The EO stated that any Task Force
Guidance would only be binding *after* the OMB Director's
economy-and-efficiency determination. 86 Fed. Reg. at
50,985–86. Therefore, as the district court found, the Task
Force Guidance and FAQs "do not independently constitute
a binding 'policy, regulation, procedure, or form.'"
*Brnovich*, 562 F. Supp. 3d at 160.

## 2.   The FAR Council Guidance

The district court correctly held that the FAR Council Guidance "is not binding of its own force" and "does not compel agencies to take any specific action." *Id.* That Guidance points contracting officers to "the direction[s] . . . issued by their respective agencies."   FAR Council Guidance, at 2.  Thus, the FAR Council Guidance is not a "'procurement policy, regulation, procedure, or form" such that it would need to conform to the Procurement Policy Act's notice-and-comment procedures under 41 U.S.C. § 1707. *Brnovich*, 562 F. Supp. 3d at 160.

## 3.   The OMB Determination

The federal government argues, as it did below, that the Acting OMB Director did not have to comply with the notice-and-comment provisions because the Director was acting pursuant to power delegated to her by the President. The federal government also notes that, like the district court, this court "need not determine the applicability of the [Procurement Policy Act] because the . . . Director voluntarily complied with § 1707."

The district court found that even if the Acting OMB Director were subject to the notice-and-comment requirements of the Procurement Policy Act, she "properly invoked the § 1707(d) waiver provision," *id.* at 158, because "'urgent and compelling circumstances' made compliance with ordinary § 1707 procedures impracticable with respect to the revised OMB determination," *id.* at 159.  We agree.

The Acting OMB Director made clear that the "broader economy-and-efficiency   purpose"   of   the   OMB Determination "would be severely undermined by the minimum delay required under" § 1707's notice-and

comment provisions. 86 Fed. Reg. at 63,424. Arizona
claims that § 1707(d)'s waiver provision only applies to
"temporary" procurement regulations, whereas the OMB
Determination here has "no certain endpoint." Arizona
incorrectly equates an unknown duration with an *unlimited*
duration. In a dynamic situation such as a pandemic, the
absolute end date of temporary measures cannot be
definitively determined in advance. In that way, the OMB
Determination is temporary much like a public health
emergency or a grant of emergency use authorization is
temporary.

Arizona also argues that there are *no* "urgent and
compelling circumstances" here because the Contractor
Mandate is "putatively based solely on promoting economy
and efficiency in federal contracting" and the government
relies on "supposed efficiency gains." In contrast, Arizona
highlights that the Centers for Medicare & Medicaid
Services in *Missouri* had found that immediate publication
would "significantly reduce . . . infections, hospitalizations,
and deaths." 142 S. Ct. at 654. Health-related concerns like
those in *Missouri* may be immediately calculable. But the
economic and logistical consequences of infections,
isolation periods, and quarantine requirements on federal
contracts and budget overruns necessarily operate as domino
effects. Therefore, it is not disqualifying that health
concerns in one context were based on actual data while
economic projections in this context are just that:
projections.

***

For similar reasons discussed above (no final agency
action in the case of the FAR Council Guidance and no

agency in the case of the Task Force), Arizona's claims under the Administrative Procedure Act ("APA") also fail.[36]

\*\*\*

Because Arizona fails to satisfy the first prong of the permanent injunction inquiry—actual success on the merits—we need not analyze whether it has satisfied the remaining prongs. *Cf. Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (stating that courts "need not consider the remaining" preliminary injunctive factors if a plaintiff fails the "threshold inquiry" of likelihood of success on the merits (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)).

## IV.  CONCLUSION

The President, when faced with an unprecedented pandemic that has claimed millions of lives and caused billions of dollars of productivity losses, issued a Mandate requiring that certain employees of contractors working on federal projects be vaccinated against the disease that resulted in the pandemic. The President appropriately relied on a statute that gave him the necessary flexibility and broad-ranging authority to ensure economy and efficiency in federal procurement and contracting. The President issued the Contractor Mandate following the required procedural measures, and the Mandate became effective upon a reasoned determination of its benefits by the OMB.

---

[36] In its briefing, Arizona originally requested that we remand the APA claims to the district court for further injunction-related litigation. However, Arizona has now abandoned that request, and Intervenors have not sought such a remand. Thus, we treat that remand request as waived.

MAYES V. BIDEN

We **REVERSE** the district court's grant of a permanent injunction and dissolve the injunction.